UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 07-CR-57 (CNC)

INTERNATIONAL OUTSOURCING SERVICES, LLC,

Defendant.

**MOTION TO DISMISS INDICTMENT**

The United States, by its attorneys Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Stephen A. Ingraham and Richard G. Frohling, Assistant United States Attorneys, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, hereby moves this Court for leave to dismiss the indictment against International Outsourcing Services, LLC ("IOS"), in the above-captioned case without prejudice by order of the Court upon the following grounds.

1. IOS has agreed to cooperate completely in the ongoing investigation and prosecution of individuals concerning the fraud scheme charged in the above-captioned case as well as in the investigation and prosecution of persons associated with IOS for possible obstruction of justice both before and after the indictment in this case.

2. IOS has agreed to cooperate after installing a new management team and after removing the indicted individuals from their roles with the company.

3. As part of IOS's cooperation agreement with the United States, IOS has agreed to take a number of actions, including:

   a. IOS has agreed to make its employees and representatives available for interview and testimony as necessary;

b. IOS voluntarily has waived its attorney-client privilege and any work-product protections regarding all of its coupon-related and case-related documents and files. IOS has agreed to make these files available to the United States for unrestricted inspection and use in the criminal cases;

c. IOS has designated a management-level employee to respond to requests by the United States for information and assistance until the indicted cases are fully adjudicated;

d. IOS has appointed and will maintain an independent, on-site monitor to oversee company operations and finances;

e. IOS has agreed to make available a custodian of IOS records to facilitate admissibility of any IOS records at the trial of any indicted individual; and

f. IOS has agreed to place in escrow any distributions available to shareholders, including any equity distributions, pending resolution of the criminal cases.

4. IOS also has agreed that the United States may re-file the existing and/or additional charges if IOS materially breaches its cooperation agreement.

5. IOS also has agreed to waive the statute of limitations for five (5) years beginning from the March 6, 2007 indictment date for any conduct that is the subject of the present indictment, as well as any conduct that could form the basis of related offenses. IOS also has waived any speedy trial rights in the event of the re-filing of charges.

6. IOS further has agreed that if charges are re-filed against IOS, the company will not raise any foundation-related objections to the admission of any evidence obtained from the company's cooperation.

Respectfully submitted at Milwaukee, Wisconsin, this 17th day of May 2007.

STEVEN M. BISKUPIC
United States Attorney

By:

s/STEPHEN A. INGRAHAM
Assistant United States Attorney
Wisconsin Bar Number 1009890
Attorney for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: stephen.ingraham@usdoj.gov

By:

s/RICHARD G. FROHLING
Assistant United States Attorney
Bar Number 1021952
Attorney for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: richard.frohling@usdoj.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 07-CR-57 (CNC)

INTERNATIONAL OUTSOURCING SERVICES, LLC,

Defendant.

---

**ORDER TO DISMISS THE INDICTMENT**

---

Based upon the motion of the United States, the indictment against defendant International Outsourcing Services, LLC, is hereby dismissed without prejudice.

Dated at Milwaukee, Wisconsin, this ___ day of May, 2007.

BY THE COURT:

______________________________
CHARLES N. CLEVERT
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 07-CR-57

INTERNATIONAL OUTSOURCING SERVICES, LLC,

Defendant.

---

**CERTIFICATE OF SERVICE**

---

I hereby certify that on May 17th, 2007 I electronically filed the government's "Motion To Dismiss Indictment" with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

| | |
|---|---|
| James G. Richmond | richmondj@gtlaw.com |
| Kevin D. Finger | fingerk@gtlaw.com |
| Michael J. Fitzgerald | mfitz@gfalaw.com |
| James H. Voyles | vzphmlaw.com |
| Thomas P. McNulty | tpmcnulty@jonesday.com |
| Mark L. Rotert | mrotert@stetlerandduffy.com |
| Charles B. Sklarsky | csklarsky@jenner.com |
| Monica R. Pinciak | mpinciak@jenner.com |
| Robert W. Tarun | bob.tarun@lw.com |
| Joseph J. Duffy | jduffy@stetlerandduffy.com |
| Cory B. Rubenstein | cruben@stetlerandduffy.com |
| Vincent J. Connelly | vconnelly@mayerbrown.com |
| Collis White | collis_white@hotmail.com |
| Royal B. Martin | Martin@mbslaw.com |
| James A. Plaisted | james.plaisted@whbesqs.com |
| Robin Shellow | rshellow@execpc.com |

James M. Shellow jamesgilda@aol.com

STEVEN M. BISKUPIC
United States Attorney

By:

s/STEPHEN A. INGRAHAM
Assistant United States Attorney
Wisconsin Bar Number 1009890
Attorney for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: stephen.ingraham@usdoj.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FILED '07 DEC -5 P12 :41 JON W. SANFILIPPO CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS C. BALSIGER,
BRUCE A. FURR,
STEVEN A. FURR,
LANCE A. FURR,
WILLIAM L. BABLER,
OVIDIO H. ENRIQUEZ,
DAVID J. HOWARD,
JAMES C. CURREY,
HOWARD R. MCKAY,
DAXESH V. PATEL, and
BHARATKUMAR K. PATEL,

Defendants.

Case No. 07-CR-57 (CNC)

[18 U.S.C. §§ 371, 1343, 1349 & 2]

**SUPERSEDING INDICTMENT**

**<u>COUNTS ONE THROUGH TWENTY-FIVE</u>**
**(Wire Fraud)**

**THE GRAND JURY CHARGES:**

1. Beginning by 1997, and continuing through December 2006, in the State and Eastern District of Wisconsin, and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**STEVEN A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD,**
**JAMES C. CURREY,**

**HOWARD R. MCKAY,**
**DAXESH V. PATEL, and**
**BHARATKUMAR K. PATEL,**

the defendants herein, devised and participated in a scheme to defraud manufacturers that issued coupons for consumer products, large retailers, and others by knowingly submitting fraudulent coupons to manufacturers for reimbursement.

2. As a result of their scheme, the defendants wrongfully obtained more than $15 million from manufacturers located in the Eastern District of Wisconsin and over $250 million from manufacturers nationwide.

**The IOS Defendants**

3. Unless otherwise noted, at all times material to this indictment:

a. International Outsourcing Services, LLC, which formerly was known as International Data, LLC, operated as a coupon clearinghouse. In this indictment, "IOS" refers to International Outsourcing Services, its predecessors, and its subsidiaries. IOS's main offices were in Bloomington, Indiana, and El Paso, Texas. IOS also had facilities in other states and several foreign countries.

b. IOS was owned by two corporations, Indiana Data, Inc. and NAFTA, Ltd. In turn, Indiana Data was owned by Bruce A. Furr, Steven A. Furr, Lance A. Furr, and others. NAFTA was owned by a publicly-traded company and Thomas C. Balsiger (a/k/a "Chris" Balsiger).

c. Chris Balsiger served as IOS's Chief Operating Officer, President, and, later, Chief Executive Officer. Balsiger worked in El Paso, Texas.

d. Bruce A. Furr served as the Chairman of IOS's board and worked in Bloomington, Indiana. Bruce Furr also had been IOS's Chief Executive Officer.

e. Until August 18, 2006, when he purported to resign, Lance A. Furr was an IOS Executive Vice President and board member, who worked in Bloomington, Indiana. Until 2004, Lance Furr had served as IOS's Chief Financial Officer.

f. Steven A. Furr was an IOS Executive Vice President, board member, and, later, President of IOS's North American Operations. Steven Furr worked in El Paso, Texas.

g. Since 2004, William L. Babler has served as IOS's Chief Financial Officer, who worked in Bloomington, Indiana.

h. Howard R. McKay was an IOS consultant and sales manager based in Memphis, Tennessee. McKay also served on IOS's advisory board.

i. Ovidio H. Enriquez was an IOS plant manager, who worked out of El Paso, Texas, and Juarez, Mexico. Enriquez also has served as a Vice President and General Manager for IOS.

j. David J. Howard was an IOS plant manager, who worked out of the Del Rio, Texas/Acuna, Mexico region. Howard also has served as a Vice President and General Manager for IOS.

k. James C. Currey was the President of Currey, Adkins, a firm which handled information technology for IOS. Currey was based in El Paso, served as IOS's Chief Operating Officer for Data Services, and served on IOS's advisory board.

**The Riya Defendants**

4. At all times material to this indictment:

a. Daxesh V. Patel (a/k/a "Dax" Patel) was the President of Riya Coupon Services, LLC ("Riya"), a coupon broker based in New Jersey. Riya recruited independent stores in several states, including a store in Racine, Wisconsin, to send their coupons to IOS.

b. Bharatkumar K. Patel (a/k/a "B.K." Patel) was the Vice President of Riya and was based in New Jersey.

**Background – Coupon Industry**

5. Retail coupons are legal documents that offer consumers discounts on the purchase of products. Coupons are issued by manufacturers to increase sales and obtain

marketing data. Retail stores which accept coupons in the course of a legitimate sale are entitled to be reimbursed by the manufacturer.

6. Due to the volume of coupons circulated in the United States, retailers and manufacturers rely upon clearinghouses to sort the coupons and process reimbursements from manufacturers to retailers.

**Background – IOS's Role**

7. IOS is the nation's largest coupon clearinghouse for retailers. IOS contracts with retailers, retailer associations, and others to process coupons. IOS then invoices manufacturers in the name of the retailer. As part of its role, IOS was obligated to take reasonable steps to refrain from submitting fraudulent coupons to manufacturers for reimbursement.

8. IOS offered its client stores various options for reimbursement. Under "non-funded" programs, retailers were reimbursed after IOS had processed the retailers' coupons, invoiced them to manufacturers, and received payment. Under "funded" programs, IOS made advance payments (typically using an estimated value based on the weight of the shipment) to stores and brokers before IOS fully processed and invoiced manufacturers for those coupons. One specific type of funded program offered by IOS for independent stores was known as "Rapid Pay."

9. To make advance payments to its funded-account clients, IOS borrowed money from banks. IOS used the receivables or payments due it from manufacturers for the coupons submitted at large retailers as collateral for the bank loans.

10. To receive reimbursement payments from manufacturers, IOS often opened bank accounts in the names of its retail clients. IOS controlled those bank accounts, and the retailers

in whose name the accounts were listed were not aware of how much money was deposited into or paid out of these accounts.

11. To receive reimbursement from manufacturers, IOS submitted invoices to manufacturers and their agents. Those invoices related to coupons submitted from a single retail client, and the invoices requested that payments be made to the accounts held by IOS in the name of its retail clients.

12. Based on its role, IOS was paid a contractual services fee by its retail clients. IOS also charged manufacturers shipping and other fees. As a result of the type of fees charged by IOS, the company gained financially by submitting as many coupons as possible for reimbursement – regardless of whether the coupons actually had been used to purchase the products listed on the coupons.

13. When manufacturers rejected coupons due to suspicions of fraud or other reasons, IOS "charged back" the face value of these coupons, plus additional fees, to its retail clients.

**<u>Background – Manufacturer Fraud Controls</u>**

14. To ensure that they only pay for coupons that actually have been redeemed in connection with purchases of their products, manufacturers and their agents have instituted fraud controls. These include assessing:

a. Whether a shipment of coupons was suspiciously large for the size of the store at which they supposedly had been redeemed;

b. Whether the store actually carried the product for which it was submitting coupons;

c. Whether the coupons had been circulated in the region where the store is located;

d. Whether the store had purchased sufficient inventory to justify the number of coupons; and

e. Whether the store's coupons appeared to have been "gang" or "mass" cut rather than torn, cut, or otherwise legitimately redeemed by individual coupon users.

15. Because many of the manufacturers' fraud detection methods focused on the volume of coupons submitted by the store, manufacturers and their agents historically have rejected a much higher percentage of coupons from smaller, independent stores than from larger retailers.

**The Scheme to Defraud**

16. The essence of the defendants' scheme was to defeat the manufacturers' fraud controls and to obtain money from the manufacturers for coupons that the defendants knew to be fraudulent. The fraudulent coupons included:

a. Coupons that never had been legitimately redeemed in connection with the purchase of a product;

b. Coupons that IOS falsely invoiced to manufacturers as having been redeemed at large retailers when, in fact, those coupons had been submitted to IOS by smaller stores that were far more likely to have their coupons rejected due to fraud concerns;

c. Coupons that IOS falsely invoiced to manufacturers as having been redeemed at large retailers when, in fact, IOS had told others that it could not identify the redeeming stores (a category known at IOS as "foreign coupons"); and

d. Coupons that IOS already had "charged back" to retailers as having been denied by manufacturers. At times, IOS also directed retailers to deduct the amount of these "chargebacks" from future payments to manufacturers.

17. Within IOS, the defendants referred to the scheme to defraud using terms such as "alternative invoicing," "alternative manufacturing invoicing," "8's and 9's," "deuces," "error trays," "indirect revenue," "trickling," "arbitrage," and "load balancing." This aspect of the scheme generally worked as follows:

a. IOS obtained as many fraudulent coupons as possible.

b. IOS and individual defendants included fraudulent coupons in shipments of coupons redeemed at IOS's larger retail clients, including HEB, Food Lion, Pathmark, Winn-Dixie, Hannaford Brothers, Kash n' Karry, CVS, Fresh Brands / Piggly Wiggly, and others.

c. IOS and individual defendants submitted, caused others to submit, and reasonably could foresee that other scheme participants would submit materially false invoices to manufacturers and their agents, making it appear as if the fraudulent coupons had been redeemed at IOS's larger clients. At times, IOS used a specific series of invoice numbers – beginning with 8's or 9's – for this purpose.

d. Chris Balsiger set periodic goals for the volume of fraudulent coupons to be included with shipments from large retailers and directed others, including Ovidio Enriquez and David Howard, to ensure that these tasks were completed.

18. As part of the scheme, at times, IOS directed employees in Mexico to use a cement mixer to mix fraudulent coupons before shipping them.

19. As part of the scheme, IOS sought to increase business from coupon brokers, who claimed to be able to recruit small stores and sub-brokers to submit coupons to IOS. These brokers included "M.D." and Abdel Rahim Jebara, both of whom worked with Chris Balsiger or other IOS employees to provide fraudulent coupons to IOS.

20. Other brokers who knowingly agreed to take part in IOS's diversion scheme were Dax Patel and B.K. Patel of Riya. As Chris Balsiger, Bruce Furr, Lance Furr, Howard McKay, and others knew and had reason to know, many of the coupons submitted by Riya and the Patels never had been used to purchase products. Because these coupons had never been used, Riya and the Patels paid stores less than face value for coupons.

21. As a further part of the scheme, IOS and individual defendants used diverted coupons to wrongfully inflate IOS's borrowing base with banks. Under IOS's loan agreements,

IOS could use as collateral the receivables due on coupons from larger stores, but could not use coupons from many smaller, independent stores. By invoicing small store coupons as if they had been negotiated at a large retail chain, IOS inflated its borrowing base, increased its line of credit, and used the proceeds to pay not only for legitimate coupons, but also to pay for fraudulent coupons provided by Riya and others, and to fund distributions to IOS executives.

22. During the period covered by the scheme, the defendants knew and had reason to know that the manufacturer victims described in Counts One through Twenty-Five of this indictment were located in the Eastern District of Wisconsin, and it was reasonably foreseeable to the defendants that as part of the scheme, wire communications would be sent to and from the manufacturers located in this district. In addition, the IOS defendants sent and caused their attorneys to send coupon-related correspondence directly to manufacturers at their Wisconsin addresses.

**Concealment of the Scheme**

23. As part of the scheme, the IOS defendants took steps to conceal the true nature of their activities from manufacturers, including:

a. When manufacturers noticed problems caused by the scheme, such as out-of-area or product-not-carried coupons, individual defendants falsely attributed the problems to retailers, plant errors, and other causes; and

b. When IOS settled with manufacturers for such problems, Lance Furr at times signed checks that disguised the fact that IOS was making the settlement payment.

24. As part of the scheme, Chris Balsiger, Bruce Furr, Steven Furr, Lance Furr, and others took steps to conceal their scheme from the innocent retailers whose accounts at IOS were used to launder the diverted coupons. These steps included providing false and misleading

information to retailers regarding the volume of coupons billed in the retailer's name as well as false information regarding IOS's coupon-processing and invoicing practices. The IOS defendants did this because they knew that the large retailers never would have authorized IOS to jeopardize their business reputations in that manner and because they knew that providing this information could lead to the discovery of their scheme.

25. As part of and to conceal the scheme, Lance Furr, Bruce Furr, Chris Balsiger, and others lied and caused others to lie to IOS's outside auditors about the nature and purpose of the diversion scheme.

26. As part of the scheme, IOS and Chris Balsiger withheld information from two IOS board members who were not employed by IOS.

27. As a further part of the scheme, after the FBI executed search warrants at IOS facilities and arrested an IOS sales manager in February 2003, individual defendants, including Dax Patel and B.K. Patel, took steps to conceal the scheme from law enforcement.

**<u>Attempts to Conceal Financial Problems</u>**

28. After the FBI executed the February 2003 search warrants, IOS drastically reduced the volume of coupons being diverted. Because of this, IOS began to suffer financially. Because IOS was diverting far fewer coupons, manufacturers and their agents were able to more readily detect fraud and deny payment for suspect coupons. This, in turn, led to increased "chargebacks" on IOS's books. As a result of these problems, and to cover up the scheme, the IOS defendants took and caused the following actions:

a. Chris Balsiger, Bruce Furr, Lance Furr, William Babler, and others caused IOS employees to make false entries in the company's accounting records

and to "leave the books open" at the end of reporting periods to disguise financial problems;

b. Chris Balsiger, Lance Furr, William Babler, and others caused IOS's accounting staff to prepare false financial statements which IOS provided to banks;

c. IOS, Howard McKay, and other individual defendants made false statements to the company's auditors, including statements regarding "ghost shipments" of coupons that were designed to make it appear as if certain "charge back" debts had been reduced; and

d. IOS, Chris Balsiger, and James Currey developed a computer program to fraudulently shift chargebacks from non-paying stores to legitimate retailers that had no relation to "charge backs" at issue.

29. To further conceal the scheme, IOS, Chris Balsiger, and others directed a private investigator to attempt to forcibly obtain physical evidence held by a witness in Mexico.

**Materiality**

30. The above acts of the defendants involved materially false representations, concealment of material facts, and attempts to obtain money under materially false pretenses.

**COUNTS ONE THROUGH FIVE**
**(Sargento Foods)**

**THE GRAND JURY FURTHER CHARGES:**

31. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

32. The writings, sounds, and signals consisted of the following invoices, which were faxed to Sargento Foods in Plymouth, Wisconsin, from its manufacturer's agent in Illinois. The invoices included requests for payments – to an account held by IOS in the name of CVS, one of its large retail clients – for coupons issued by Sargento Foods.

33. Each of the below invoices included payment requests relating to coupons that, according to IOS, had been redeemed at CVS. In reality, CVS did not carry the products at issue and, as IOS well knew, those coupons had not been used to purchase Sargento products at CVS:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 1 | 3/18/02 | 02-04278-00 | $85,894.70 |
| 2 | 4/22/02 | 02-06375-00 | $167,731.53 |
| 3 | 5/06/02 | 02-07281-00 | $113,237.41 |
| 4 | 5/13/02 | 02-07668-00 | $117,056.50 |
| 5 | 7/08/02 | 02-11179-00 | $46,829.75 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS SIX THROUGH TEN**
**(Good Humor / Breyers)**

**THE GRAND JURY FURTHER CHARGES:**

34. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

35. The writings, sounds, and signals consisted of the following invoices, which were faxed to Good Humor / Breyers Ice Cream, in Green Bay, Wisconsin, from its manufacturer's agent in Illinois. Each invoice included requests for payment – to an account held by IOS in the name of HEB, one of its large retail clients – for coupons issued by Good Humor / Breyers for its Klondike, Popsicle, or Breyers ice cream products under one or more of the following offer codes: 40298, 62252, 62228, 40263, 55949, 40233, 62252, and 55896.

36. Each of the invoices included payment requests relating to coupons that, according to IOS, had been redeemed at HEB stores in Texas. In reality, those coupons only had been distributed in the northeastern United States and, as IOS well knew, had not been used to purchase Good Humor / Breyers products at HEB stores.

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 6 | 4/01/02 | 02-05285-00 | $352,873.88 |
| 7 | 5/20/02 | 02-08282-00 | $525,503.88 |
| 8 | 8/19/02 | 02-13837-00 | $605,120.07 |
| 9 | 10/21/02 | 02-17495-00 | $247,386.54 |
| 10 | 10/28/02 | 02-17892-00 | $234,631.64 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS ELEVEN THROUGH FIFTEEN**
**(Kimberly-Clark)**

**THE GRAND JURY FURTHER CHARGES:**

37. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

38. The writings, sounds, and signals consisted of the following invoices, which were faxed to Kimberly-Clark Corporation, in Neenah, Wisconsin, from its manufacturer's agent in Illinois. Each invoice included requests for payment – to an account held by IOS in the name of HEB – for coupons issued by Kimberly-Clark for its Kotex products under one or more of the following offer codes: 42509, 42510, 42511, 42607, 42618, 42620, 42621, and 42622.

39. Each of the below invoices included payment requests relating to coupons that, according to IOS, had been redeemed at HEB stores in Texas. In reality, the coupons only had been distributed in northeastern United States and, as IOS well knew, had not been used to purchase Kimberly-Clark products at HEB stores:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 11 | 6/24/02 | 02-10458-00 | $3,020,744.36 |
| 12 | 7/01/02 | 02-10878-00 | $3,391,755.28 |
| 13 | 7/08/02 | 02-11382-00 | $2,964,381.51 |
| 14 | 8/19/02 | 02-13826-00 | $3,363,712.80 |
| 15 | 10/21/02 | 02-17486-00 | $2,913,282.42 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS SIXTEEN THROUGH TWENTY**
**(LeSaffre Yeast)**

**THE GRAND JURY FURTHER CHARGES:**

40. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

41. The writings, sounds, and signals consisted of the electronic transfer of funds from an account held by LeSaffre Yeast at U.S. Bank in Milwaukee, Wisconsin, to an account held by its manufacturer's agent at Wachovia Bank, in Charlotte, North Carolina, for ultimate payment to IOS.

42. The transfers listed below included payments for coupons issued by LeSaffre for its Red Star or Perfect Rise Yeast products under offer codes 21138 or 35155. Each transfer included payment for coupons issued by LeSaffre that, according to IOS, had been redeemed at Food Lion, Hannaford Brothers, Jacksonville Winn-Dixie, or Kash n' Karry stores located in the southern United States. However, LeSaffre only had distributed the coupons in the northeastern United States, and, as IOS well knew, the coupons had not been used to purchase LeSaffre products at these stores located far away from the northeast:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 16 | 1/03/03 | 179290000100030102 | $16,342.24 |
| 17 | 1/13/03 | 179290000100030109 | $25,284.30 |
| 18 | 1/17/03 | 179290000100030116 | $17,206.61 |
| 19 | 2/03/03 | 179290000100030130 | $15,763.95 |
| 20 | 2/07/03 | 179290000100030206 | $26,756.66 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

## COUNTS TWENTY-ONE THROUGH TWENTY-FIVE
**(S.C. Johnson & Sons)**

**THE GRAND JURY FURTHER CHARGES:**

43. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

44. The writings, sounds, and signals consisted of the electronic transfer of funds from an account held by S.C. Johnson & Sons at Johnson Bank in Racine, Wisconsin, to the account of its manufacturer's agent at Wachovia Bank in Charlotte, North Carolina, for ultimate payment to IOS.

45. The transfers listed below included payments for coupons issued by S.C. Johnson for its Shout Oxy Power and/or Scrubbing Bubbles products under offer codes 26291 or 26292. Each transfer included payment for coupons issued by S.C. Johnson that, according to IOS, had been redeemed at Food Lion or HEB stores located in the southeastern United States and Texas. In reality, S.C. Johnson only had distributed the coupons in the northeastern United States, and, as IOS well knew, the coupons had not been used to purchase S.C. Johnson products at Food Lion or HEB stores:

| Count | Date | Identifying No. | Amount |
|---|---|---|---|
| 21 | 11/29/02 | 021129001172 | $1,072,695.49 |
| 22 | 12/06/02 | 021206001172 | $2,188,752.53 |
| 23 | 1/17/03 | 030117001172 | $1,683,441.89 |
| 24 | 2/07/03 | 030207001172 | $1,016,194.07 |
| 25 | 2/14/03 | 030214001172 | $953,959.76 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNT TWENTY-SIX**
**(Conspiracy to Commit Wire Fraud)**

**THE GRAND JURY FURTHER CHARGES:**

46. Beginning by 1997, and continuing through December 2006, in the Eastern District of Wisconsin, and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**STEVEN A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD,**
**JAMES C. CURREY,**
**HOWARD R. MCKAY,**
**DAXESH V. PATEL, and**
**BHARATKUMAR K. PATEL**

knowingly conspired with each other and with other persons and entities known and unknown to the grand jury to defraud manufacturers that issued coupons for consumer products, large retailers, and others by means of interstate wire communications, in violation of Title 18, United States Code, Section 1343.

47. The primary purpose of the conspiracy was to use interstate wire communications to defeat the manufacturers' coupon fraud controls described in Paragraph 14 of this indictment and to wrongfully obtain money for the types of fraudulent coupons described in Paragraph 16 of this indictment.

48. The manner and means of the conspiracy include the actions of the defendants described in Paragraphs 16 through 30 of this indictment.

49. As part of and during the conspiracy, the defendants knew, intended, and could reasonably foresee that one or more of the conspirators would make and cause others to make

materially false representations to and conceal material facts from manufacturers in the Eastern District of Wisconsin and elsewhere, including Sargento Foods, Good Humor / Breyers Ice Cream, LeSaffre Yeast, Kimberly-Clark, and S.C. Johnson & Sons, with respect to the legitimacy and redemption history of coupons being submitted to those manufacturers for payment.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWENTY-SEVEN**
**(Conspiracy to Obstruct Justice)**

**THE GRAND JURY FURTHER CHARGES:**

50. Beginning by March 2003, and continuing through October 2007, in the Eastern District of Wisconsin and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD, and**
**JAMES C. CURREY**

knowingly conspired with each other and with persons and entities known and unknown to the grand jury to commit an offense against the United States, namely to corruptly influence, obstruct, and impede the due administration of justice, in violation of Title 18, United States Code, Section 1503(a).

**Purpose of the Conspiracy**

51. The purpose of the conspiracy was to influence, obstruct, and impede an ongoing grand jury investigation in the Eastern District of Wisconsin relating to the coupon-invoicing, accounting, and other business practices of IOS, its employees, and others.

52. To achieve the purpose of the conspiracy:

a. Thomas C. Balsiger (a/k/a "Chris" Balsiger), Bruce Furr, Lance Furr, Ovidio Enriquez, David Howard, James Currey, William Babler, and other conspirators knowingly caused others to provide materially false information to federal law enforcement officers and officials ("law enforcement") conducting the grand jury investigation into IOS's coupon-invoicing and accounting practices.

b. After learning that third parties had received grand jury subpoenas for information relating to IOS's coupon-invoicing and accounting practices, Chris Balsiger, Bruce Furr, Lance Furr, William Babler, and others provided materially false information to the subpoena recipients, knowing, intending, and having reason to believe that the same information would be presented to the grand jury.

c. Chris Balsiger, James Currey, Ovidio Enriquez, Lance Furr, and others attempted to coach witnesses and to persuade individuals to provide false information if interviewed by law enforcement conducting the grand jury investigation.

d. Chris Balsiger, Bruce Furr, Lance Furr, and others attempted to prevent IOS employees and others with knowledge of IOS's invoicing and accounting practices from communicating with federal authorities by conditioning severance benefits for departing employees on agreements not to speak to law enforcement and by suing and threatening to financially harm employees who cooperated with the grand jury investigation; and

e. Lance Furr, Chris Balsiger, and others attempted to conceal and destroy records to prevent their discovery by law enforcement conducting the grand jury investigation.

**Acts in Furtherance**

53. In furtherance of the conspiracy, the defendants and their coconspirators committed, and caused to be committed, overt acts in the Eastern District of Wisconsin and elsewhere, including the following:

a. After February 26, 2003, when search warrants were executed at IOS's offices in Memphis, Tennessee, and El Paso, Texas, Lance Furr directed IOS employees to take computer files and other information home each night to avoid being seized if additional search warrants were issued as part of the grand jury investigation.

b. After February 26, 2003, Chris Balsiger ordered that certain documents be destroyed and attempted to have others destroy documents relevant to the grand jury investigation.

c. In approximately October 2004, concerned that Food Lion had received a federal grand jury subpoena, Chris Balsiger, Bruce Furr, Lance Furr, and others provided and directed others to provide false and misleading information to Food Lion about the volume of coupons billed to manufacturers under Food Lion's name. At the time, the conspirators intended and had reason to know that the same information then would be provided to the grand jury.

d. On or about February 15, 2005, after becoming concerned that IOS's controller, C.P., might disclose the company's invoicing and accounting practices to others, Chris Balsiger, Bruce Furr, Lance Furr, and others caused IOS to reach a separation agreement with C.P. that called for C.P. to be paid an additional year of salary in exchange for agreeing not to speak with anyone – including law enforcement – about IOS without IOS's written consent.

e. On or about March 18, 2005, after K.C., an IOS executive with extensive knowledge of IOS's invoicing and accounting practices advised Bruce Furr that K.C. wanted to resign due to concerns about the company's invoicing practices, Bruce Furr, Lance Furr, and others caused a draft separation agreement to be sent to K.C. that would have prohibited K.C. from speaking to any "governmental agency" about IOS without IOS's written consent.

f. Between on or about June 3, 2005, and on or about June 17, 2005, after K.C. entered into a separation agreement with IOS, and after Bruce Furr, Lance Furr, Chris Balsiger, and others became concerned that K.C. was talking to law enforcement conducting the grand jury investigation, Bruce Furr and others accused K.C. of breaching the separation agreement, threatened to sue K.C., and threatened to overwhelm K.C. with litigation costs.

g. Between June 22, 2005, and June 28, 2005, Chris Balsiger, James Currey, and others knowingly caused materially false information regarding IOS's relationship with Riya to be submitted to federal law enforcement conducting the grand jury investigation.

h. In approximately mid-August 2005, after IOS received formal notification that it was a target of the grand jury's investigation, Lance Furr directed IOS employees to remove documents from his office and to hide them in an employee's personal residence.

i. In approximately August 2005, Lance Furr attempted to convince K.P., an employee in IOS's accounting department, to provide false information if

contacted by federal law enforcement conducting the grand jury investigation.

j. On or about August 18, 2005, Chris Balsiger, in the presence of other IOS defendants, presented false information regarding IOS's coupon-invoicing practices to one of IOS's attorneys, knowing and intending that the same false information would be presented, unwittingly, to law enforcement conducting the grand jury investigation.

k. On or about September 21, 2005, James Currey and others presented false information regarding IOS's coupon-invoicing practices and IOS's relationship to Riya Coupon Services to IOS's attorneys and others. This false information included a "store tag" defense, which falsely indicated that all coupons involved in IOS's claimed "load balancing" and "alternate invoicing" practices contained accurate "store tags" that identified the redeeming store. The false information presented by James Currey was intended to be disclosed and later was disclosed to law enforcement in an attempt to avoid indictment by the grand jury.

l. Between on or about January 5, 2006, and August 2006, Chris Balsiger and others prepared and revised a memorandum in which they described, documented, and revised the "store tag" defense. The memorandum, which described IOS's historical invoicing practices, falsely indicated that although coupons from independent stores were included on invoices that listed only a large, funded retailer, all of the coupons had accurate "store tags." The content of this document, which ultimately was entitled "IOS Should Not be Indicted for Mail/Wire Fraud," was intended to be disclosed and later was disclosed to law enforcement in an attempt to avoid indictment by the grand jury.

m. On or about February 17, 2006, Chris Balsiger, Bruce Furr, Lance Furr, and others caused IOS to file a civil lawsuit in Indiana against K.C. to retaliate against K.C. and to force K.C. to divulge what information, if any, she had provided to law enforcement conducting the grand jury investigation.

n. In March 2006, Chris Balsiger, James Currey, Ovidio Enriquez, David Howard, and others attempted to create false invoices that could be used to support the "store tag" defense.

o. On or about March 27, 2006, James Currey directed others to create a computer program that would allow IOS to generate "real time" invoices that would appear consistent with the false "store tag" defense.

p. On or about March 29, 2006, Ovidio Enriquez, David Howard, and others provided a tour of the IOS plant at Acuna, Mexico, to IOS's counsel and others. During the tour, Enriquez, Howard, and other IOS employees generated a fraudulent invoice to substantiate the store tag defense. This invoice was later presented to law enforcement conducting the grand jury investigation as "proof" of the "store tag" defense.

q. Between on or about March 24, 2006, and April 3, 2006, after IOS learned that the grand jury was investigating IOS's accounting practices, Chris Balsiger, Bruce Furr, William Babler, and others prepared an explanation of IOS's accounting practices that falsely blamed C.P. and K.C., two former employees IOS suspected of cooperating with law enforcement, for all of IOS's suspect practices.

r. On or about March 30, 2006, William Babler advised K.P., an employee of IOS, that IOS had developed a plan to falsely blame C.P. and K.C. for IOS's accounting activities in order to make the "Milwaukee investigation" go away.

s. On or about April 25, 2006, during interviews with federal investigators, IOS employees N.C. and C.Z. provided materially false information regarding IOS's coupon-processing practices and other matters. Before their interviews, N.C. and C.Z. had been brought to IOS's offices in El Paso, Texas, where they were persuaded to provide false information by Chris Balsiger, Ovidio Enriquez, and James Currey.

t. On or about August 23, 2006, after having been advised that his statements would be provided to law enforcement pursuant to a grand jury subpoena, Chris Balsiger provided materially false information to IOS's auditors regarding matters he knew to be under investigation by the grand jury.

u. On or about January 10, 2007, Chris Balsiger and others caused IOS's attorneys, who had been misled as to IOS's historical practices, to present the false "store tag" defense to law enforcement conducting the grand jury investigation. As part of this presentation, federal law enforcement was provided a copy of the fraudulent invoice generated by Ovidio Enriquez, David Howard, and others on March 29, 2006.

v. In March and April 2007, in an effort to quash a grand jury subpoena issued to a law firm for records related to IOS's coupon-invoicing practices, IOS, Chris Balsiger, and others caused the false "store tag" defense to be presented to a federal judge.

All in violation of Title 18, United States Code, Sections 371 & 2.

**FORFEITURE NOTICE**

1. Upon conviction of one or more of the offenses alleged in Counts One through Twenty-Six of the Indictment, the defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including but not limited to the following:

a. A sum of money equal to $ 250,000,000 in United States currency, representing the amount of proceeds obtained as a result of the defendants' wire fraud scheme, for which the defendants are jointly and severally liable.

2. If the above-described forfeitable property, as a result of any act or omission of the defendant(s): (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above, including but not limited to the following:

Real Property – Indiana

a. 1804 S. Weimer Road, Bloomington, IN 47403-2870;
b. 4496 W. Tanglewood Drive, Bloomington, IN 47404-9563;
c. 1600 E. 2nd Street, Bloomington, IN 47401;
d. 1700 W. Bloomfield Road, Bloomington, IN 47403-2004; and
e. 7199 S. Lodge Rd., Bloomington, IN 47403.

Real Property – Texas

a. 4905 Olmos Lane, El Paso, TX 79922;
b. 6016 Escondido Drive, El Paso, TX 79912;
c. 780 Villa Mirada Lane, El Paso, TX 79922;

d. 28 Kingery Drive, El Paso, TX 79902;
e. 123 Alta Vista Drive, Del Rio, TX 78840;
f. 212 Silver Sage, Del Rio, TX 78840;
g. 84 & 86 Apple Island Drive (lots 84 & 86 replatted into Lot 84-A), Horseshoe Bay, TX 78657;
h. 500-02 Sam Houston Parkway East, Houston, TX 77060;
i. 100-200 South Alto Mesa Drive, El Paso, TX 79912; and
j. 300 Farm Road 259, Canutillo, TX 79835.

Real Property – New Jersey
a. 10 Arrowhead Lane, Somerset, NJ 08873
b. 15 Forest Dr., Boonton, NJ 07005;
c. 166 W. Kelly Street, Metuchen, NJ 08840;
d. 43 Hampton Road, Clifton, NJ 07012;
e. 26 Comfort Place, Clifton, NJ 07011;
f. 1348 McCarter Hwy., Newark, NJ 07102;
g. 3793 Rte. 1 South, Monmouth Junction, NJ 08852;
h. 901 Spring St., Elizabeth, NJ 07201;
i. 1272 S. River Road, Cranbury, NJ 08512; and
j. 2870 Route 35 South, Hazlet, NJ 07730.

Real Property – Other States
a. 107 Roy Lane, Wentzville, MO 63385;
b. 8600 Merriam Road, Romulus, MI 48174;
c. 20 Hatfield Lane, Goshen, NY 10924;
d. 1 Industry Lane, Pittsburgh, PA 15275;
e. 24 Wexford on the Green, Hilton Head Island, SC 29928-6125;
f. 22 Marquette Lane, Kankakee, IL 60901;
g. 120 Course View Drive, Ruidoso, NM 88345; and
h. 8 Ernie Blake Road, Taos Ski Valley, NM 87525.

Vehicles
a. 1999 Bentley Arnage (VIN# SCBLB51E5XCX02650);
b. 2003 Mercedes Benz S500 (VIN# WDBNG84J83A367535);
c. 2003 Mercedes Benz Roadster (VIN# WDBSK75F23F034658);
d. 2003 Mercedes Benz Roadster (VIN# WDBSK75F63F025008);
e. 2003 Mercedes Benz C Series (VIN# WDBRN64J83A513203);
f. 2003 Mercedes Benz 600 Series (VIN# WDBNG76J73A370918);
g. 2002 Mercedes Benz S43 (VIN# WDBNG70J32A243719);
h. 2002 BMW 745 Li (VIN# WBAGN63492DR02916);
i. 2003 BMW X5 (VIN# 5UXFB33513LH48919);
j. 2004 Infiniti QX56 (VIN# 5N3AA08C64N804587);
k. 2005 Lexus RX330 (VIN# 2T2HA31U15C079559);
l. 2004 Lexus SC430 (VIN# JTHFN48Y040049488);

m. 2005 Toyota Landcruiser (VIN# JTEHT05J952074939);
n. 2006 Landrover (VIN# ALMF13406A215524);
o. 2004 Cadillac SLR Roadster (VIN# 1G6YV34A345601892); and
p. 1999 Harris-Kayot 22.2 Ft. Boat (Hull# HAMD3108B999).

Cash & Financial Assets

a. Approximately $3,364,326.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 8601);
b. Approximately $613,681.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 2120);
c. Approximately $685,728.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 2138);
d. Approximately $976,775.36 held in Wachovia Bank Checking Account of Bruce A. Furr (Account ending with 6802);
e. Approximately $977,902.40 held in The Shemano Group Brokerage Account of Thomas C. Balsiger (Account ending with 7310);
f. Approximately $337,877.90 held in Goldman Sachs & Co. Brokerage Account of Thomas C. Balsiger (Account ending with 797-3);
g. Approximately $1,463,107.58 held in Merrill Lynch Brokerage Accounts of Thomas C. Balsiger (Accounts ending with 1427, 1428, 1429);
h. Approximately $1,395,528.68 held in UBS Brokerage Accounts of Thomas C. Balsiger (Accounts ending with 6588, 0007, 0008, 0014, 0655, 0968, &9726);
i. Approximately $350,533.37 held in Bank of the West Checking Account of Thomas C. Balsiger (Account ending with 0620);
j. Approximately $531,425.39 held in Hilliard Lyons Brokerage Account of Lance A. Furr (Account ending with 1872); and
k. A cashier's check in the amount of $32,000, representing the proceeds of the sale of 3554 Windgarden, Memphis, TN 38125.

A TRUE BILL:

[redacted]

FOREPERSON

Dated: December 5, 2007

STEVEN M. BISKUPIC
United States Attorney