# SCOPE OF SERVICE

1. **Scope of Work**: The contractor will sort, handle, invoice, and redeem via Electronic Data Interchange (EDI) or secure redemption of such merchandising coupons forwarded by the Army and Air Force Exchange Service (AAFES).

2. **Payment and Redemption**: Contractor will secure redemption of all coupons received from AAFES by forwarding such coupons to issuing manufacturer on AAFES' behalf. AAFES authorizes the contractor to invoice and submit coupons to issuing manufacturers for redemption on its behalf, and to request manufacturers to reimburse the contractor.

3. **Coupon Submission and Reimbursement**:

a. Coupons will be accounted for by value and quantity. Packages prepared for shipment to the contractor will not exceed a total contents value of $25,000 per package. Documentation reflecting the applicable fiscal period covered, submitting office, quantity of coupons, and total value of coupons will accompany each shipment. The contractor will be responsible for paying shipping charges from the contractor facility to the individual manufacturers. Chargebacks for these types of charges is prohibited.

b. United States coupon shipments will be forwarded via motor freight prepaid. Overseas exchanges (including Alaska and Hawaii) will ship to the contractor via insured parcel post. Responsibility for loss of coupons will pass to the contractor at the time of receipt. Documents reflecting coupon value and quantity will be attached to the motor-freight bill of lading or other shipment documentation, and mailed directly to the contractor. If coupons cannot be forwarded as set forth above, AAFES will forward the coupons via the most economical method. All insurance and shipment documentation requirements outlined above will apply. Payment in full for the total face value of all coupons claimed on the invoice plus reimbursement for AAFES freight/shipping charges, plus the handling allowance for each coupon, minus the applicable service fee for each coupon, will be made within 30 days from the date received. Payment will be made by elecronic Fund Transfer (EFT) to Wachovia Bank of Georgia, Atlanta, GA as follows:

ABA# 061000010
FTC: Army and Air Force Exchange Service
ACCT #15-011-847

Contractor will also provide detailed payment data by Internet supporting each wire transfer to HQ AAFES-FA-T/RO (venturan@aafes.com).

SCOPE OF SERVICE

c. The coupon shipment is subject to 100% audit. Adjustments for invalid coupons or addition errors will be deducted from or added to the payment for the next shipment. Contractor will provide the following information for all deductions/adjustments.

Applicable forwarding exchange
Document number
Fiscal Period Ending
Dollar value of adjustment broken by count and face value

4. **Unredeemable Coupons**:

a. If the contractor is unable to obtain payment from the issuing manufacturer, AAFES authorizes the contractor to deduct the value of such coupons due from subsequent payments. Contractor will not charge for unredeemed coupons returned to AAFES and must support any returns with a statement of explanation. Non-redeemable coupons will be returned to AAFES, sorted and packaged, for forwarding by AAFES to the issuing manufacturer. Contractor will provide the following information for all deductions:

Applicable forwarding exchange
Document number
Fiscal Period Ending
Dollar value of adjustment broken by count and face value

In the absence of the physical coupon, the contractor will submit to AAFES, a statement from the issuing manufacturer regarding the non-redemption of such coupon.

b. As deemed necessary, and at the request of AAFES, the contractor will request that the respective coupon manufacturer provide rejected coupons (e.g. expired coupons, IN-AD, physical appearance, etc.) for review. If actual coupons are not available, a printed report will be provided, listing appropriate data supporting the reason the coupons were rejected.

5. **EDI Reporting and Reconciliation**: On a weekly basis, the contractor will provide HQ AAFES with shipment and chargeback information by individual exchange and region (as identified by AAFES). All information must be provided to AAFES via diskette in Microsoft Access format, paper reports, and or Electronic Data Interchange (EDI). Electronic transmission of data will require the contractor to provide the technology for establishing a database that will act upon the information referenced above to accomplish the following functions:

a. Chargeback accumulation regardless of amount.

b. Ability to generate invoice to manufacturer when chargebacks reach the tolerance level set for that specific manufacturer.

c. Ability to set accumulation tolerance by manufacturer.

d. Ability to sort all information in the database in whatever desired format (e.g. by region and exchange name/number, by month, by year, etc.).

e. Ability to calculate statistical information based on data housed in the database.

f. Ability to generate report information in any desired format or produce standard reports.

The method of data transmission as defined above, will be discussed and agreed upon between contractor and AAFES Finance and Accounting, after contract is awarded. AAFES will provide 60 days written notice for any changes to the mode of data transmission/acceptance.

All chargebacks to AAFES will be clearly annotated with an explanation and will be identified by exchange.
////////////////////////////////////////////////////////LAST ITEM///////////////////////////////////////////////////////

EXHIBIT D

**FEE SCHEDULE AND EVALUATION CRITERIA**

1. Contractor agrees to provide the services specified for a flat dollar fee of $ 8.45 (enter dollar amount here) for each 1,000 redeemed coupons. It is understood that this fee is based on an annual coupon redemption volume of approximately 7,863,000 coupons which AAFES represents as being our best estimate of our current coupon volume. It is understood that this estimate is based upon AAFES history under the current contract. AAFES does not guarantee this estimate and failure of AAFES to meet this volume (or if AAFES exceeds it) will not entitle the contractor to a fee adjustment or other claim.

2. The responsive, responsible offeror submitting the lowest dollar fee will be awarded the contract.

////////////////////////////////////////////////////LAST ITEM////////////////////////////////////////////////////

EXHIBIT E

## INSURANCE REQUIREMENTS

Contractor will maintain, during any contract period, insurance coverage listed below, with insurance company(ies) acceptable to AAFES. All liability insurance coverage will name the United States and AAFES as additional and several insureds for claims, demands, suits, judgments, costs, charges, and expenses arising out of or in connection with any loss, damage, or injury resulting from the negligence or other fault of contractor, or contractor agent, representatives, or employees.

a. The following coverage in amounts complying with state or military installation requirements, whichever is greater, where this contract is performed.

(1) Worker's Compensation and Employer's Liability Insurance.

(2) Automobile Bodily Injury and Property Damage Liability for vehicles operated in performance of this contract by the contractor or contractor's agents or employees on the military installation, whether or not owned by contractor.

b. The following coverage will be maintained, and the contractor will furnish Certificate of Insurance, ACORD Form 25-5, evidencing that insurance is in effect and will not less than 60 days prior to expiration as such coverage, furnish the contracting officer with Certificate of Insurance, evidencing continuation of coverage:

Commercial General Liability in minimum limits of $100,000 for personal injury for each occurrence or $200,000 aggregate and $25,000 for each occurrence for property damage or $50,000 aggregate or $300,000 for combined single limit. This insurance policy will be written on an "occurrence" basis. A policy written on "claims made" basis is not acceptable.

//////////////////////////////////////////////////////////////////LAST ITEM////////////////////////////////////////////////////////////////////////////

**Exhibit F**

**NOTICE IN LIEU OF WAGE DETERMINATION**

This contract is subject to the Service Contract Act of 1965. Contractor is responsible for and must comply with all requirements of the Act and must pay wages and fringe benefits not less than those specified in the Act and Wage Determination issued by the Department of Labor. Contractor agrees that any wage determination not yet received from the Department of Labor is applicable to this contract and will be incorporated and made a part of the contract.

//////////////////////////////////////////////////////LAST ITEM//////////////////////////////////////////////////////

# LOCATIONS

Below is a list of AAFES locations that will forward coupons for processing. Locations are subject to change, due to base closures.

Walter Reed, MD
Bolling AFB, DC
Andrews AFB, MD
Aberdeen PG, MD
Ft Meade, MD
Ft Belvoir, VA
Langley AFB, VA
Ft Lee, VA
Ft Myer, VA
Ft Bragg, NC
Seymour Johnson, NC
Ft Jackson, SC
Charleston, SC
Ft Gordon, GA
Robins AFB, GA
Ft Stewart, GA
Hunter AAF, GA
Ft Benning, GA
Moody AFB, GA
Ft McPherson, GA
Maxwell AFB, AL
Ft Rucker, AL
Ft McClellan, AL
Redstone Arsonal, AL
McDill AFB, FL
Homestead AFB, FL
Patrick AFB, FL
Tyndall AFB, FL
Eglin AFB, FL
US Military Academy, NY
Ft Drum, NY
Westover AFB, MA
Hanscom, MA
Ft Dix-McGuire, NJ
Dover AFB, DE
Carlisle Barracks, PA
Charles E. Kelly, PA
Wright Patterson AFB, OH
Ft Knox, KY
Ft Campbell, KY
Ft Benjamin Harrison, IN
Selfridge AFB, MI
Scott AFB, IL
Ft McCoy, WI
Twin Cities, MN
Malstrom, MT
Minot AFB, ND
Grand Forks AFB, ND
Ellsworth AFB, SD
F.E. Warren AFB, WY
Offutt AFB, NB
Ft Leavenworth, KS
McConnell AFB, KS
Ft. Riley, KS
Ft Leonard Wood, MO
Whiteman AFB, MO
Little Rock AFB, AR
Keesler AFB, MS
Columbus AFB, MS
Barksdale AFB, LA
Ft Polk, LA
Ft Sam Houston, TX
Randolph AFB, TX
Lackland AFB, TX
Laughlin AFB, TX
Brooks AFB, TX
Ft Hood, TX
Goodfellow AFB, TX
JNAS Ft Worth, TX
Dyess AFB, TX
Sheppard AFB, TX
Ft Bliss, TX
Ft Sill, OK
Tinker AFB, OK
Altus AFB, OK
Cannon AFB, NM
Whitesands, NM
Holloman, NM
Kirtland AFB, NM
Yuma Proving Grounds, AZ
Davis Monthan AFB, AZ
Luke AFB, AZ
Ft Huachuca, AZ
Fitzsimmons, CO
USAF Academy, CO
Peterson AFB, CO
Ft Carson, CO
Mountain Home AFB, ID
Hill AFB, UT
Nellis AFB, NV
Vandenberg AFB, CA
Edwards AFB, CA
March AFB, CA
Los Angeles AFS, CA
Ft Irwin, CA
San Francisco, CA
Travis AFB, CA
Beale AFB, CA
McClellan AFB, CA
Presidio Of Monterey, CA
Ft Lewis/McChord AFB, WA
Fairchild AFB, WA
Ft Buchanan, PR
Lajes Field, Azores
Hickam AFB, HI
Schofield Barracks, HI
Ft Shafter, HI
Elmendorf AFB, AK
Ft. Wainwright, AK
Hanau Germany
Giessen Germany
Wiesbaden Germany
Kaiserslautern Germany
Heidelberg Germany
Ramstein Germany
Mannhiem Germany
Katterback Germany
Ansbach Germany
Grafenwoehr Germany
Spangdahlem Germany
Bamberg Germany
Bad Kreuznach Germany
Baumholder Germany
AAFES-EUCOM Germany
Schweinfurt Germany
Wuerzburg Germany
Hungary/Bosnia
Vicenza Italy
Aviano Italy
Livorno Italy
Lakenheath UK
Alconbury UK
Izmir Turkey
Incirlik Turkey
Riyadh, Saudi Arabia
Korea Exchange
Okinawa Exchange
Japan Exchange
Guam Exchange

Army and Air Force Exchange Service

**AMENDMENT OF SOLICITATION/CONTRACT (AGREEMENT)**

1. Amendment of: [ ] SOLICITATION [ X ] CONTRACT (AGREEMENT)

PAGE 1 OF 2

| Solicitation/Contract Number | Amendment Number |
|---|---|
| **HQ 00-PZS-096** | **FOUR (4)** |

2. IF A SOLICITATION AMENDMENT
Refer to Section I AInstructions to Offerors≅ on page 2
Of this form and the following as indicated:

[ ] a. The time and date specified for receipt of proposal is:
[ ] Not extended
[ ] Extended until (local time at place of receipt of proposals)
Hour Date

[ ] b. The above Solicitation is modified as set forth in Block 4 below.

3. IF A CONTRACT AMENDMENT
Refer to Section II AInstructions to Contractors≅ on page 2
of this form and the following as indicated:

[ X ] a. The expiration date of the above CONTRACT is changed:

| FROM | TO |
|---|---|
| 13 Feb 04 | 30 Jun 04 |

[ X ] b. The above CONTRACT is:
[ X] Not further Modified.
[ ] Modified as set forth in Block 4 below.

**4. DESCRIPTION OF AMENDMENT.**

**Contract is extended through 30 Jun 04.**

**//////////////////////////////////////////////////////////////////LAST ITEM////////////////////////////////////////////////////////////////////////////////**

N ALL OTHER RESPECTS, THE TERMS AND CONDITIONS OF THE SOLICITATION/CONTRACT, AS AMENDED, REMAIN IN FULL FORCE AND EFFECT.

SIGNATURES

5. NAME AND ADDRESS OF OFFEROR/CONTRACTOR (Street, City, County, State, and Zip Code)

International Outsourcng Services
501 S. Madison
Bloomington, IN 47403

6. ISSUED BY

ARMY AND AIR FORCE EXCHANGE SERVICE
ATTN: FA-Z
P.O. Box 650739
Dallas, Texas 75265-0739

| Signature of Person Authorized to Sign | Date | Signature of Contracting Officer | Date |
|---|---|---|---|
| NO SIGNATURE REQUIRED | | Janie Walker | 8 Apr 04 |

| Typed or Printed Name and Title | Typed or Printed Name of Contracting Officer |
|---|---|
| UNILATERAL AMENDMENT | JANIE WALKER |

PZ-LAN VERSION (26 MAR 96)

**AMENDMENT OF SOLICITATION/CONTRACT (AGREEMENT)**

## SECTION I

Instructions to Offerors --- Amendment of Solicitation. The following instructions apply unless specified otherwise in an AAFES letter accompanying this amendment.

a. Offerors must acknowledge receipt of this amendment prior to the hour and date specified for receipt of proposals in the original solicitation, or the hour and date specified in this amendment if such has been amended. Offeror must acknowledge by one of the following means:

(1) By signing and returning all except one copy of this amendment;

(2) By acknowledging receipt of this amendment on each copy of the proposal submitted;

(3) By separate letter or telegram which includes a reference to the solicitation and amendment number.

b. Proposals must be based upon and refer to the solicitation as amended. Unless an acknowledgment of this amendment is received by the Contracting Officer before the hour and date specified for receipt of proposals, Offeror=s proposal may be considered nonresponsive.

c. If you desire to revise a proposal previously submitted, such revision must be received prior to the hour and date specified for receipt of proposals inclosed in a sealed envelope addressed to the issuing office, with the name and address of offeror and the solicitation number on the face of the envelope. Telegraphic proposals will not be considered unless authorized by the solicitation; however, proposals may be modified by telegraphic notice provided such notice is received prior to the time set for receipt of proposals. Telegraphic modifications should not reveal the amount of the original or of the revised proposal.

## SECTION II

Instructions to Contractor --- Amendment of Contract.

Unless otherwise instructed, all except one copy of this Amendment are to be executed by a person authorized to bind the firm contractually and returned to the Contracting Officer. The effective date will be the date the amendment is signed in block 6 by the Contracting Officer or the date(s) indicated in block 4, whichever is later.

ARMY AND AIR FORCE EXCHANGE SERVICE

# AMENDMENT OF SOLICITATION/CONTRACT (AGREEMENT)

PAGE 1 OF 1

1. AMENDMENT OF: ☐ SOLICITATION ☑ CONTRACT (AGREEMENT)

| SOLICITATION/CONTRACT NUMBER | AMENDMENT NUMBER | CONTRACT CONTROL NO. (If Applicable) |
|---|---|---|
| HQ 00-PZS-096 | THREE (3) | |

**2. IF A SOLICITATION AMENDMENT**

Refer to Section I "Instructions to Offerors" on reverse of this form and the following as indicated:

☐ a. The time and date specified for receipt of proposals is:

☐ Not extended

☐ Extended until (local time at place of receipt of proposals)

Hour M, Date

☐ b. The above solicitation is modified as set forth in Block 4 below.

**3. IF A CONTRACT AMENDMENT**

Refer to section II "Instructions to Contractors" on reverse of this form and the following as indicated:

☐ a. The expiration date of the above CONTRACT is changed:

FROM TO

☑ b. The above CONTRACT is:

☐ Not further modified.

☑ Modified as set forth in Block 4 below.

**4. DESCRIPTION OF AMENDMENT.**

Name change of contractor.

From:
International Data LLC
501 S. Madison
Bloomington, IN 47403

To:
International Outsourcing Services
501 S. Madison
Bloomington, IN 47403

////////////////////////////////////////////////////////////LAST ITEM////////////////////////////////////////////////////////////

IN ALL OTHER RESPECTS, THE TERMS AND CONDITIONS OF THE SOLICITATION/CONTRACT, AS AMENDED, REMAIN IN FULL FORCE AND EFFECT.

**SIGNATURES**

**5. NAME AND ADDRESS OF OFFEROR/CONTRACTOR** (Street, City, County, State, and Zip Code)

International Outsourcing Services
501 S. Madison
Bloomington, IN 47403

SIGNATURE OF PERSON AUTHORIZED TO SIGN: [signature] DATE: 5/1/03

TYPED OR PRINTED NAME AND TITLE: Kari Pace Costello

**6. ISSUED BY**

ARMY AIR FORCE EXCHANGE SERVICE
ATTN: LORRAINE TEMPLE, SD-Z
3911 S. WALTON WALKER BLVD.
DALLAS, TX 75236-1598

SIGNATURE OF CONTRACTING OFFICER: Lorraine Temple DATE: 12 May 03

TYPED OR PRINTED NAME OF CONTRACTING OFFICER: LORRAINE TEMPLE

AAFES FORM 4400-18 (REV MAY 88) (All Prev Editions Usable)

ARMY AND AIR FORCE EXCHANGE SERVICE

# AMENDMENT OF SOLICITATION/CONTRACT (AGREEMENT)

PAGE 1 OF 1

1. AMENDMENT OF: ☐ SOLICITATION ☑ CONTRACT (AGREEMENT)

| SOLICITATION/CONTRACT NUMBER | AMENDMENT NUMBER | CONTRACT CONTROL NO. (If Applicable) |
|---|---|---|
| HQ 00-PZS-096 | TWO (2) | |

2. IF A SOLICITATION AMENDMENT

Refer to Section I "Instructions to Offerors" on reverse of this form and the following as indicated:

☐ a. The time and date specified for receipt of proposals is:
- ☐ Not extended
- ☐ Extended until (local time at place of receipt of proposals)

Hour M, Date

☐ b. The above solicitation is modified as set forth in Block 4 below.

3. IF A CONTRACT AMENDMENT

Refer to section II "Instructions to Contractors" on reverse of this form and the following as indicated:

☑ a. The expiration date of the above CONTRACT is changed:

| FROM | TO |
|---|---|
| 14 Feb 2003 | 13 Feb 2004 |

☑ b. The above CONTRACT is:
- ☑ Not further modified.
- ☐ Modified as set forth in Block 4 below.

4. DESCRIPTION OF AMENDMENT.

IN ALL OTHER RESPECTS, THE TERMS AND CONDITIONS OF THE SOLICITATION/CONTRACT, AS AMENDED, REMAIN IN FULL FORCE AND EFFECT.

SIGNATURES

5. NAME AND ADDRESS OF OFFEROR/CONTRACTOR (Street, City, County, State, and Zip Code)

INTERNATIONAL DATA LLC
501 S. MADISON
BLOOMINGTON, IN 47403

6. ISSUED BY

ARMY AIR FORCE EXCHANGE SERVICE
ATTN: LORRAINE TEMPLE, SD-P/P
3911 S. WALTON WALKER BLVD.
DALLAS, TX 75236-1598

| SIGNATURE OF PERSON AUTHORIZED TO SIGN | DATE | SIGNATURE OF CONTRACTING OFFICER | DATE |
|---|---|---|---|
| K Costello | 2/18/03 | Lorraine Temple | 21 Feb 03 |

TYPED OR PRINTED NAME AND TITLE: Kari P Costello

TYPED OR PRINTED NAME OF CONTRACTING OFFICER: LORRAINE TEMPLE

AAFES FORM 4400-18 (REV MAY 88) (All Prev Editions Usable)

ARMY AND AIR FORCE EXCHANGE SERVICE

# AMENDMENT OF SOLICITATION/CONTRACT (AGREEMENT)

PAGE 1 OF 1

1. AMENDMENT OF: ☐ SOLICITATION ☑ CONTRACT (AGREEMENT)

| SOLICITATION/CONTRACT NUMBER | AMENDMENT NUMBER | CONTRACT CONTROL NO. (If Applicable) |
|---|---|---|
| HQ 00-PZS-096 | ONE (1) | |

**2. IF A SOLICITATION AMENDMENT**

Refer to Section I "Instructions to Offerors" on reverse of this form and the following as indicated:

☐ a. The time and date specified for receipt of proposals is:

☐ Not extended

☐ Extended until (local time at place of receipt of proposals)

Hour ______ M, Date ______

☐ b. The above solicitation is modified as set forth in Block 4 below.

**3. IF A CONTRACT AMENDMENT**

Refer to section II "Instructions to Contractors" on reverse of this form and the following as indicated:

☑ a. The expiration date of the above CONTRACT is changed:

| FROM | TO |
|---|---|
| 16 Dec 2002 | 14 Feb 2003 |

☑ b. The above CONTRACT is:

☑ Not further modified.

☐ Modified as set forth in Block 4 below.

**4. DESCRIPTION OF AMENDMENT.**

IN ALL OTHER RESPECTS, THE TERMS AND CONDITIONS OF THE SOLICITATION/CONTRACT, AS AMENDED, REMAIN IN FULL FORCE AND EFFECT.

**SIGNATURES**

| 5. NAME AND ADDRESS OF OFFEROR/CONTRACTOR (Street, City, County, State, and Zip Code) | | 6. ISSUED BY | |
|---|---|---|---|
| INTERNATIONAL DATA LLC<br>501 S. MADISON<br>BLOOMINGTON, IN 47403 | | ARMY AIR FORCE EXCHANGE SERVICE<br>ATTN: LORRAINE TEMPLE, SD-P/P<br>3911 S. WALTON WALKER BLVD.<br>DALLAS, TX 75236-1598 | |
| SIGNATURE OF PERSON AUTHORIZED TO SIGN: Howard McKay | DATE: 10-9-02 | SIGNATURE OF CONTRACTING OFFICER: Lorraine Temple | DATE: 16 Oct 02 |
| TYPED OR PRINTED NAME AND TITLE: Howard McKay | | TYPED OR PRINTED NAME OF CONTRACTING OFFICER: LORRAINE TEMPLE | |

AAFES FORM 4400-18 (REV MAY 88) (All Prev Editions Usable)

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

'08 MAY 22 P3:51

JON W. SANFILIPPO
CLERK

MONTANA FOOD DISTRIBUTORS ASSOCIATION, on behalf of themselves and all others similarly situated,

Plaintiff,

v.

INTERNATIONAL OUTSOURCING SERVICES, LLC; INMAR, INC.; CAROLINA MANUFACTURER'S SERVICES; and CAROLINA SERVICES.

Defendants.

Civil Action No. 08-C-0457

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

1. This case arises in the coupon processing industry, a highly concentrated industry beset with fraud, corruption, and agreements among competitors to allocate customers and not to compete. The industry is dominated by three coupon processors: International Outsourcing Services ("IOS"), Inmar, Inc. ("Inmar"), and NCH Marketing Services, Inc. ("NCH"). Two of these competitors – Defendants IOS and Inmar (and Inmar's Defendant subsidiaries) – engaged in an enterprise whereby they conspired to (a) breach fiduciary agreements and/or obligations with retailer, state association, and wholesale customers, (b) allocate customers, (c) increase the amount and type of coupon processing fees imposed on customers, and (d) defraud customers to minimize the amount customers received from manufacturers for coupons redeemed at retail stores. This Complaint is brought for breach of fiduciary duty, participation in breach of

fiduciary duty, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), violations of the Sherman Act, as well as common law fraud, conspiracy to defraud, and unjust enrichment.

**The Parties**

2. Plaintiff Montana Food Distributors Association ("MFDA") is a Montana non-profit organization with its principal place of business in Helena, Montana. The MFDA provides services and programs for its retail members, including a coupon redemption program in which roughly 162 retailers participate. Under its coupon program, the MFDA secures the processing services of a coupon processor, and retail participants in the program submit coupons to the processor. Each retailer then shares with the MFDA a small portion of the amount the coupon processor receives from manufacturers for coupons redeemed at retail outlets. From around 1993 to 2007, the MFDA used IOS to provide processing services for the MFDA's coupon program.

3. Defendant International Outsourcing Services, LLC is an Indiana limited liability company with principal offices in El Paso, Texas and Bloomington, Indiana. IOS, formerly known as International Data, LLC, acts as a processor/agent for retailers in the coupon redemption process. Throughout this Complaint, the term "IOS" refers collectively to International Outsourcing Services, LLC and International Data, LLC.

4. Defendant Inmar, Inc. is a North Carolina corporation with its principal offices in Winston Salem, North Carolina. Through its subsidiaries Carolina Manufacturer's Services ("CMS") and Carolina Services ("CS"), Inmar acts as a processor/agent for both manufacturers and retailers in the coupon redemption process. Throughout this Complaint, the term "Inmar" refers collectively to Inmar, Inc., Carolina Manufacturer's Services, and Carolina Services.

**Jurisdiction, Venue, and Interstate Commerce**

5. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in this action arise under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a)); and further pursuant to 28 U.S.C. § 1331 (federal question), because certain claims in this action arise under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; and pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because this action is brought as a class action, diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. With respect to Plaintiff's common law claims, this Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a); and 15 U.S.C. §§ 15, 22, and 26, in that Defendants inhabit, transact business, reside, are found, or have an agent in this district, and a significant portion of the affected interstate trade and commerce described below has been carried out in this district.

7. Defendants' fraudulent and anticompetitive activities were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable effect on interstate commerce.

**Industry Background**

*Coupon Redemption Process*

8. Consumer goods manufacturers ("manufacturers") issue coupons to consumers through a variety of distribution mechanisms, such as free standing inserts in newspapers, weekly circulars at retailers, the internet, the mail, at retail checkouts, on product packages, and

at retail shelves. Coupons typically have a set value for consumers, such as $1.00 off the purchase price of a product.

9. Typically, manufacturers issue coupons to consumers, and consumers redeem the coupons at retailers in connection with the purchase of a product. Retailers give consumers discounts off the purchase price of a product equal to the value of the coupons redeemed and then seek reimbursement from manufacturers for the discounts given to consumers, plus a small processing fee. To seek reimbursement from manufacturers, retailers retain or otherwise secure the services of retail coupon processors, also known in the industry as clearinghouses or agents (collectively referred to hereafter as "Retail Agents").

10. Just as their name suggests, Retail Agents serve as agents of retailers for which they provide processing services and have a fiduciary obligation to their retail clients. IOS is the largest Retail Agent in the United States.

11. Retailers compile coupons redeemed at their stores and send them to Retail Agents. Retail Agents sort and count the coupons, and send the coupons and invoices for the coupon values to manufacturer coupon processors (referred to hereafter as "Manufacturer Agents"). Manufacturer Agents are retained by, and serve as agents for, manufacturers in the coupon redemption process. Inmar and NCH are the two primary Manufacturer Agents in the United States.

12. Manufacturer Agents audit the coupons submitted by Retail Agents, and inform manufacturers of the value of the coupons that should be remitted to Retail Agents or individual retailers. Manufacturers then pay the Retail Agent or retailer.

13. While the coupon redemption process described above is typical, some variations exist. For instance, Procter & Gamble does not use a Manufacturer Agent, but interacts directly

with Retail Agents in processing coupons.

14. In addition, a number of retailers – particularly small retailers – retain the services of Retail Agents through state association or wholesaler coupon programs. Under these programs, state associations and wholesalers collect coupons from retailers and/or retain or otherwise engage Retail Agents to provide processing services. Individual retailers then share with the state associations and wholesalers a small portion of the amount a Retail Agent secures from manufacturers (less fees charged or amounts kept by the Retail Agent) for coupons redeemed at retail outlets. Any scheme by Retail Agents that minimizes the amount retailers receive for coupons submitted for redemption or otherwise results in higher prices for Retail Agent processing services, adversely affects each organization that retains or otherwise engages the Retail Agents to provide processing services, including individual retailers, state associations (including the MFDA), and wholesalers.

*The Role of "Chargebacks"*

15. As part of its audit function, a Manufacturer Agent may contend that certain coupons submitted by a Retail Agent have not been properly redeemed for a variety of different reasons, such as (a) the coupons may have expired, (b) the appearance of the coupons suggests they were not handled by consumers, (c) the product for which the coupon was purportedly redeemed for was not carried by the retailer, or (d) the volume of coupons submitted by a single retailer appears excessive, etc. In instances in which a Manufacturer Agent contends that some coupons were not properly redeemed, the agent will instruct the manufacturer to deny payment or "chargeback" to the Retail Agent (or retailer) the value of the coupons that it contends were not properly redeemed. For instance, if IOS (a Retail Agent) submits on behalf of an individual retailer $100 in coupons to Inmar (a Manufacturer Agent) and Inmar informs a manufacturer that

$80 of the coupons were properly redeemed and $20 of the coupons were not properly redeemed, the manufacturer will pay $80 of the submitted coupon value and chargeback $20.

16. Manufacturers may also chargeback the value of certain fees Retail Agents attempt to impose on manufacturers. For instance, in connection with sending coupons from its processing facility to a Manufacturer Agent's processing facility, IOS has sought to impose on manufacturers shipping fees that many manufacturers deem excessive. Manufacturers may chargeback at least a portion of IOS's shipping fees. IOS then seeks reimbursement for these fees from its own retail customers.

17. Manufacturer Agents compete for manufacturer processor contracts on the basis of their ability to lower the amount manufacturers pay in connection with coupon redemption. Rather than simply lowering prices for their own processing services, Manufacturer Agents have sought to achieve this goal, at least in part, by maximizing chargebacks to retailers.

18. Retailers often disagree with the value of manufacturer chargebacks. A retailer may believe, for instance, that a manufacturer is improperly withholding the value of properly redeemed coupons for which the retailer has given discounts to consumers. The retailer may then dispute the value of a chargeback.

19. Retailers have two mechanisms to dispute manufacturer chargebacks. First, a retailer that purchases directly from a manufacturer may simply deduct the value of the chargeback from the amount the retailer owes the manufacturer in connection with the purchase of product. (These are referred to as "deducting retailers.") Some retailers – particularly small retailers – purchase product from wholesalers and not directly from manufacturers, and thus do not have the ability to deduct disputed chargeback values from manufacturers. (These are referred to as "non-deducting retailers.")

20. Second, retailers rely on their Retail Agent to dispute chargebacks. Retail Agents serve as the only practical mechanism available to non-deducting retailers to dispute chargebacks.

21. Manufacturer Agents recognize that non-deducting retailers lack one of the two principal mechanisms to protect against chargebacks: the ability to deduct. Manufacturer Agents have thus sought to maximize chargebacks for non-deducting retailers. As a result, chargeback rates for small, non-deducting retailers tend to be higher than chargeback rates for deducting retailers.

22. Opportunities also exist for Manufacturer Agents to achieve their goal of lowering manufacturer coupon redemption costs by imposing chargebacks on deducting retailers for which these retailers will not deduct. Methodologies by which retailers deduct from manufacturers vary by retailer. For instance, some retailers may deduct for shipping fee chargebacks, but other retailers may not. If a Manufacturer Agent could access each retailer's highly proprietary deduction methodology, it could easily discern chargebacks for which a retailer deducts and chargebacks for which a retailer does not deduct.

23. Retailers typically do not specify reasons for coupon-related deductions, beyond denoting that deductions are "coupon related." This lack of specificity helps protect against Manufacturer Agents' efforts to impose chargebacks on deducting retailers. It is exceedingly difficult for Manufacturer Agents to reliably track each reason for a retailer's coupon-related deductions given the amount and complexity of the data that must be analyzed to discern this information. Accordingly, a Manufacturer Agent normally limits the number of chargebacks imposed on a deducting retailer because of these retailers' ability to deduct.

24. But if a Retail Agent were to provide a Manufacturer Agent with the proprietary

deduction methodologies of its retailer clients – as Inmar paid IOS handsomely to do – the Manufacturer Agent would know precisely the chargebacks for which each retailer does not deduct. The Manufacturer Agent could then use this data to maximize chargebacks for which a retailer will not deduct.

*IOS's Retail Processing Programs*

25. Since at least 1997, IOS has offered retailers two types of retail processing programs. First, IOS has offered retailers "funded programs," in which IOS pays retailers a negotiated, discounted amount for the value of the coupons that the retailers send to IOS. The amount that IOS pays retailers for their coupons is based in large part on the manufacturers' chargeback rates for those retailers. (IOS will also subtract its own coupon processing fees from what it pays for the value of the coupons.) Thus, IOS will pay small, non-deducting retailers with high chargeback rates less than it will pay larger, deducting retailers. After paying retailers, IOS sends invoices for the coupon value and the coupons themselves to Manufacturer Agents (or manufacturers), which then send payments to IOS.

26. Second, IOS has offered retailers "unfunded" or "non-funded programs," in which IOS receives coupons from retailers, sorts and counts the coupons, sends Manufacturer Agents invoices for the coupon value and the coupons themselves, and instructs manufacturers to remit payment directly to the retailer. In non-funded programs, IOS does not pay retailers a negotiated amount for their coupons and does not receive from manufacturers payments for the coupon value. Rather, IOS simply charges (or otherwise imposes on retailers) fees for its processing services.

**<u>The Markets for Coupon Processing Services</u>**

27. Coupon processors compete in two separate and distinct markets, both of which have high barriers to entry, including but not limited to high start-up costs, economies of scale, and exclusive contracts.

*The Market for Manufacturer Processing Services*

28. Manufacturer Agents compete in the United States market for manufacturer processing services. Manufacturer Agents contract with manufacturers and compete principally on the basis of: (a) the price to a manufacturer for performing processing services; and (b) the ability to lower a manufacturer's coupon-related costs through, for instance, realizing the maximum value of chargebacks. Inmar and NCH each have roughly 50 percent share of this market. IOS used to compete in this market, but in connection with various agreements with Inmar (discussed below), exited the market in or around 2001.

*The Market for Retail Processing Services*

29. Retail Agents compete in the United States market for retail processing services. Retail Agents contract (or otherwise agree) to perform processing services for retailers and compete principally on the basis of: (a) the amount and number of fees charged to (or otherwise imposed on) retailers; and (b) the ability to realize the maximum value of coupons a retailer invoices or otherwise submits to a manufacturer by, for instance, disputing chargebacks on behalf of the retailer.

30. IOS has historically dominated the market for retail processing services. Through at least 2004, IOS had contracts for retail processing services with at least 75 percent of the retailers in the United States. Upon information and belief, IOS's share of this market has declined marginally following the public disclosure of a government fraud investigation of IOS

that resulted in IOS's indictment on March 6, 2007. Upon information and belief, IOS continues to have contracts with at least 60 percent of the retailers in the United States. Further, since at least 2001, IOS has had exclusive processing contracts with all – or nearly all – non-deducting retailers.

31. NCH and Inmar compete against IOS in the market for retail processing services. NCH has traditionally performed retail processing services for large, deducting retailers (such as mass merchandisers) and has traditionally not competed for the business of small, non-deducting retailers. Inmar used to provide retail processing services to non-deducting retailers, but -- in connection with agreements entered with IOS in or around 2001 – Inmar substantially limited or eliminated its competitive offering to non-deducting retailers.

32. IOS possesses market power in the United States market for retail processing services. IOS and Inmar collectively possess market power in the United States market for retail processing services.

*Excess Capacity Within the Coupon Processing Industry*

33. The number of coupons redeemed in the United States has steadily been declining since at least the late 1990s, creating excess capacity in the markets for coupon processing services, including excess installed processing plant capacity. Notwithstanding this excess capacity, Retail Agents have increased the amount and type of fees they impose on retailers. This increase in the amount and type of fees is a direct result of the anticompetitive and fraudulent scheme involving IOS and Inmar, discussed below.

**IOS's and Inmar's Anticompetitive and Fraudulent Scheme**

34. In 2001, IOS and Inmar each faced a stark reality: they competed in manufacturer and retail processing markets in which the number of coupons redeemed was on the decline. Faced with the prospect of competing vigorously for a declining number of coupons processed, the organizations – rather than competing on the merits – hatched a complex and secret scheme that enabled them to join forces, defraud retailers, raise and impose on retailers additional retail coupon processing fees, and avoid the type of vigorous competition that typically occurs in industries with declining volume and excess capacity.

35. The scheme was carried out – at least in part – through a "Proprietary Data Transfer Agreement" entered on or around April 11, 2001 between IOS's retail coupon processing subsidiary International Data, L.L.C. ("ID") and Inmar's manufacturer coupon processing subsidiary, CMS. This agreement had three unlawful purposes and effects.

*IOS's Sale of Retail Deduction Methodologies to Inmar*

36. The first unlawful purpose and effect of the Proprietary Data Transfer Agreement was IOS's secret sale of its retail clients' deduction methodologies to Inmar. Under the agreement, Inmar paid IOS up to ten million dollars annually to purchase the "confidential" and "proprietary" deduction data of the retailers for which IOS served as a Retail Agent, including the retailers' highly confidential deduction methodologies:

> International Data shall provide CMS continual, on-line internet and hard copy access (and access to other such supporting documentation as is reasonably necessary) to International Data's confidential proprietary retailer-specific chargeback and deduction data concerning International Data's Retail Customers, including methodology and calculations, as well as related master files and customer contract files[.]

Proprietary Data Transfer Agreement, p. 2.

37. This Proprietary Data Transfer Agreement was intended and structured to provide Inmar with precisely the type of deduction detail retailers purposely withhold from Manufacturing Agents as a means to prevent the imposition of chargebacks. Under the agreement, for instance, IOS had to provide each retailer's reason for a deduction and whether a retailer had a formal policy in which it would not deduct for certain chargebacks, such as shipping fee chargebacks. *Id.* at Schedule 2(ii)(1). The agreement further mandates that IOS provide retailer specific data to Inmar for the express "purpose of resolving charge backs and deductions on behalf of manufacturers[.]" *Id.*

38. In effect, Inmar was secretly paying IOS to abdicate its fiduciary responsibilities to its retail clients so that chargebacks and deductions could be resolved "on behalf of the manufacturers." Inmar could use the data supplied by IOS to pinpoint precisely the chargebacks to impose on deducting retailers for which the retailers would not deduct. Inmar could then increase these chargebacks on retailers and compete more effectively against NCH in the market for manufacturer processing services while protecting its own profit margins from low prices.

*IOS and Inmar's Agreement to Allocate Customers and Fix Prices*

39. The second unlawful purpose and effect of the Proprietary Data Transfer Agreement was to restrict competition between Inmar and IOS in the retail processing services market. In return for accessing IOS's retail clients' proprietary deduction methodologies, Inmar agreed that it would not provide coupon services to any of IOS's retail clients or otherwise "call upon" any of these retailers for the purpose of providing such services:

> [D]uring the term of this Agreement, and for a period of one (1) year after the termination of this Agreement for any reason, none of the Inmar Entities or their Affiliates shall, directly or indirectly, on behalf of themselves or any other Person, provide Coupon Services to any ID Retail Customer, or solicit or call upon any ID Retail Customer for the purpose of providing Coupon Services to any such ID Retail Customer.

*Id.*, p. 6.

40. This agreement to allocate customers has substantially restricted and/or eliminated competition in the highly-concentrated retail services market, enabling Retail Agents – including IOS and Inmar – to increase the amount and type of fees imposed on retailers during a time in which the number of coupons processed has declined and excess capacity for processing services has existed. Considering that, at the time of the IOS and Inmar customer allocation agreement, IOS provided processing services to at least 75 percent of retailers, securing a commitment on behalf of its principal competitor not to compete for IOS's retail accounts was of extraordinary value to IOS and has eliminated any incentive for the competitors to compete aggressively in the market for retail processing services.

41. This incentive not to compete has persisted, even as coupon processing volume has continued to decline. For instance, in a January 23, 2008, 30(b)(6) deposition – when asked how IOS marketed its services to retailers – IOS's corporate representative testified: "We really don't do anything specific to call on customers that are not existing customers." *See* W. Freeman Tr. at 69:1-4. Given that the amount and type of coupon processing fees have increased as a result of the lack of competition in the retail processing market, IOS has benefited simply by charging its clients more for its processing services to compensate for the decline in the number of coupons processed rather than "do[ing] anything specific to call on customers that are not existing customers."

42. Upon information and belief, Inmar has also benefited by increasing the amount and type of fees it has imposed on its retail clients. For instance, under the Proprietary Data Transfer Agreement, IOS agreed to share the types and amount of fees it charged (or otherwise imposed) on retailers, such as "chargeback/adjustment handling fees and other fees." *See* Proprietary Data Transfer Agreement at Schedule 2(ii)(1). After receiving this data, Inmar could then impose on its own retailers the types of fees imposed by IOS. Upon information and belief, this price sharing agreement has enabled IOS and Inmar to fix and/or coordinate prices in the retail processing services market.

*IOS and Inmar's Fraud on Retailers Participating in IOS's Funded Programs*

43. The third unlawful purpose and effect of the Proprietary Data Transfer Agreement was to enable IOS – with Inmar's complicity – to continue to defraud retailers participating in IOS's funded programs. Beginning by at least 1997, IOS implemented a scheme to defraud small, non-deducting retailers, which had chargeback rates that were greater than those of deducting retailers. The scheme was simple: under its funded programs, IOS would pay the small retailers for the value of their coupons an amount that reflected high chargeback rates for these retailers. IOS would then submit to Manufacturer Agents the coupons received from small retailers with the volume of coupons redeemed at larger retailers with lower chargeback rates. Manufacturers would pay IOS directly for the non-deducting retailers' coupons that were submitted with the deducting retailers' coupon volume, and IOS would keep for itself the chargeback rate difference between the non-deducting and deducting retailers. IOS was indicted for this scheme on March 6, 2007.

44. Under this scheme, IOS benefited from high chargeback rates for smaller retailers: the higher the chargeback rates, the greater the spread between non-deducting and

deducting retailers' chargebacks. IOS thus abdicated its responsibility to attempt to decrease chargeback rates for its smaller retailers. In 2000, for instance, IOS allowed chargeback rates to increase eight percent for retailers in IOS's "Rapid Pay" program, a funded program designed for IOS's small, non-deducting retailers.

45. A striking disparity in chargeback rates for IOS's deducting and non-deducting retailers emerged as IOS perpetrated its fraudulent scheme. Between 2000 and 2001, for instance, chargeback rates for small retailers participating in IOS's Rapid Pay program averaged between 60 to 68 percent of the value of coupons these retailers submitted to IOS. By contrast, chargeback rates for IOS's larger, deducting retailers were as low as one percent.

46. IOS's fraudulent scheme adversely affected deducting retailers in addition to non-deducting retailers. For instance, IOS did not inform deducting retailers that it submitted non-deducting retailers' coupons to manufacturers as part of the deducting retailers' coupons. To the contrary, IOS expressly denied having done so. As the volume of coupons increased that IOS submitted to manufacturers on behalf of deducting retailers, manufacturers began to question the legitimacy of these coupons, which resulted in increased chargeback rates for these deducting retailers. These increased chargeback rates reduced the amount deducting retailers received for coupons redeemed at their stores.

47. Also as part of its fraudulent scheme, IOS submitted to manufacturers fraudulently obtained coupons (e.g., coupons that had never been properly redeemed in connection with the purchase of a product) with the volume of coupons redeemed at larger stores, which ultimately increased the chargeback rates for deducting retailers. Superseding Indictment, *U.S. v. Balsiger et al.*, ¶ 16(a), attached as Exhibit A.

48. Further, the fraudulently submitted coupons included "[c]oupons that IOS already

had 'charged back' to retailers as having been denied by manufacturers." Superseding Indictment ¶ 16(d). Submitting coupons that had already been charged back to retailers further increased the chargeback rates for deducting retailers.

49. IOS's scheme to defraud retailers depended on the elimination of competitive alternatives available to small, non-deducting retailers, as vigorous competition would have lowered chargeback rates for (and fees imposed on) small retailers. Small retailers would simply have chosen processing programs with lower chargeback rates over processing program with higher chargeback rates, which – of course – would have defeated IOS's fraudulent scheme.

50. In two ways, coupon processing programs for small, non-deducting retailers in competition with IOS were eliminated. First, IOS purchased coupon programs in competition with Rapid Pay, such as the "UCCH" and "NCRS" programs referenced in the following statement from a former IOS executive named Lance Furr, which was summarized by IOS's auditor:

> [International Data ("ID")] is the major player in the [Rapid Pay] type program arena. With the purchase of UCCH (Coupon Express) and NCRS programs, they have solidified their market share. Since these purchases, ID has kept the names in tact [sic] and has not advertised that they purchased these companies. Therefore, the smaller retailers don't have a clue that all of the programs are the same company (ID). Many retailers jump from program to program. If they leave one program and go to another, ID will try . . . to transfer the chargebacks and deposits to the new program[.]

International Data Audit Work Papers, p. 3.

51. As Mr. Furr described, small retailers tried to escape high chargeback rates in IOS's processing programs by moving to what the retailers believed were competing programs. IOS would then transfer the high chargeback rates to the programs to which small retailers

"jumped."

52. Second, through the Proprietary Data Transfer Agreement, IOS secured Inmar's (and Inmar's subsidiary CMS's) agreement not to offer coupon services to IOS's customers. This agreement eliminated the "only other" competitive alternative to IOS in the "[Rapid Pay] market," as Lance Furr explained to IOS's auditor:

> ID's only major competitor is CMS which has two programs: Couponics and Millenium and per Lance [Furr], is the only other player in this [Rapid Pay] market. ID has entered into agreements in 2001 with CMS regarding other strategic marketing issues. Lance sees ID and CMS entering into an agreement to purchase CMS's programs or to sell chargebacks back and forth between the programs.

*Id.*

53. Upon information and belief, Inmar and IOS entered into secret agreements that eliminated any competition between Inmar's Couponics and Millenium programs (designed for small retailers) and IOS. For instance, David Howard – an IOS employee – stated that IOS and Inmar's subsidiary Carolina Coupon Clearing ("CCC") entered into an agreement by which IOS would serve as the coupon processor for a number of CCC's programs, including its Millenium program. *See* David Howard Interview Summary, p. 19. Inmar abruptly terminated these secret agreements when IOS was indicted because Inmar was "paranoid" that retailers would learn that IOS in fact served as the coupon processor for Inmar's processing programs:

> Howard said IOS was sub-processing coupons for CCC . . . until the recent March 2007 indictment. He said after the indictment Inmar, the parent company for CCC, terminated their contract with IOS. Howard said Inmar was paranoid, that others, meaning manufacturers and other retail clients would know IOS was sub-processing coupons for CCC clients.

*Id.* at 6.

54. In effect, by agreeing to refrain from competing for the business of small, non-deducting retailers, Inmar facilitated IOS's scheme to defraud retailers participating in IOS's funded programs. Having secured a commitment not to compete from "the only other player" to offer coupon services to small retailers, IOS could continue to maximize chargebacks for non-deducting retailers, which enabled IOS to perpetrate its fraudulent scheme. Absent Inmar's agreement not to compete for IOS's retail clients, competition between Inmar and IOS would have prevented IOS from continuing its scheme.

*Other Agreements Between IOS and Inmar*

55. Upon information and belief, IOS and Inmar entered agreements in addition to the Proprietary Data Transfer Agreement that restricted competition, led to the increase in amount and type of fees charged or otherwise imposed on retailers, and/or fraudulently reduced the amount retailers received for coupons redeemed at their stores.

*The Effects of IOS's and Inmar's Anticompetitive and Fraudulent Scheme*

56. IOS's and Inmar's anticompetitive and fraudulent scheme have adversely affected retailers, state associations, and wholesalers in at least three ways. First, by paying for the deduction methodologies of IOS's deducting retailers, Inmar has been able to maximize the chargebacks imposed on deducting retailers for which the retailers would not deduct. This has reduced the amount deducting retailers received for coupons redeemed at their stores. This, in turn, has reduced the amount state associations and wholesalers received from any deducting retailer that has secured coupon processing services through state association or wholesaler coupon programs.

57. Second, as a result of their agreement to allocate customers and fix and/or coordinate prices, IOS and Inmar have been able to impose fees and chargeback rates on retailers

that would not have prevailed had Defendants competed vigorously and not shared fee data. Upon information and belief, both the amount and type of fees IOS and Inmar charged, or otherwise imposed on, retailers has increased as a direct result of the coupon processors' Proprietary Data Transfer Agreement. This agreement has also resulted in inflated chargeback rates for IOS's and Inmar's retail clients. This, in turn, has reduced the amount state associations and wholesalers received from any retailer that has secured coupon processing services through state association or wholesaler coupon programs.

58. Third, aided by Inmar's agreement not to compete with IOS, IOS has increased chargeback rates for its retail clients, as part of the processors' scheme to defraud retailers. This, in turn, has reduced the amount state associations and wholesalers received from any retailer that has secured coupon processing services through state association or wholesaler coupon programs.

*Defendants' Fraudulent Concealment of Their Scheme and Acts in Furtherance of the Conspiracy*

59. Plaintiff had no knowledge of the secret, unlawful self-concealing conspiracy alleged in this Complaint, and could not have discovered the combination or conspiracy at an earlier date by the exercise of due diligence because of the affirmative steps taken by Defendants to avoid detection of, and fraudulently conceal, their scheme and conspiracy until after January 16, 2008.

60. For example, after the FBI executed search warrants at IOS facilities in February 2003, IOS executive Lance Furr directed IOS employees to take computer files and other information home each night to avoid seizure and possible detection of their fraudulent and anticompetitive actions. Superseding Indictment ¶ 53(a). Similarly, after February 2003, IOS

executive Chris Balsiger ordered that certain documents be destroyed and attempted to have others destroy documents. *Id.* ¶ 53(b).

61. IOS provided false and misleading information to retailers regarding the volume of coupons billed in retailer's names as well as false information regarding IOS's coupon-processing and invoicing practices. *Id.* ¶¶ 24; 53(c).

62. In approximately October 2004, IOS executives Chris Balsiger, Bruce Furr, and Lance Fur provided false and misleading information to Food Lion about the volume of coupons billed to manufacturers under Food Lion's name. *Id.* ¶ 53(c).

63. To further conceal their scheme, IOS and its officers and agents took steps to keep IOS's employees and others with knowledge of the scheme from cooperating with law enforcement officials and to retaliate against those who provided information to federal authorities, including attempting to condition severance benefits for departing employees on the employee's agreement not to speak to law enforcement officials and taking legal action or threatening legal action and/or financial harm to employees who cooperated with law enforcement efforts.

64. For example, on or about February 15, 2005, IOS reached a separation agreement with the company's controller, Christine Peak, which called for payment of an additional year of salary in exchange for agreeing not to speak with anyone – including law enforcement – about IOS without IOS's written consent. *Id.* ¶ 53(d).

65. When an IOS executive, Kari Costello, wanted to resign due to concerns about the company's fraudulent invoicing and accounting practices, IOS drafted a separation agreement that prohibited Kari Costello from speaking to any government agency about IOS without IOS's written consent. *Id.* ¶ 53(e). In June 2005, IOS executive Bruce Furr and others accused Kari

Costello of breaching a separation agreement by talking to law enforcement regarding the criminal investigation of IOS, and threatened litigation if Kari Costello continued to cooperate. *Id.* ¶ 53(f). On February 17, 2006, Defendant IOS filed a civil lawsuit in Indiana against Kari Costello to retaliate against Kari Costello for cooperating with law enforcement and to learn what information she had divulged to law enforcement. *Id.* ¶ 53(m).

66. In approximately mid-August 2005, Lance Furr directed IOS to remove documents from his office and to hide them in an employee's personal residence. *Id.* ¶ 53(h).

67. On or about August 18, 2005, IOS executive Chris Balsiger presented false information regarding IOS's coupon-invoicing practices to one of IOS's attorneys, knowing and intending that the same false information would be presented to law enforcement. *Id.* ¶ 53(j).

68. Between January and August 2006, IOS executive Chris Balsiger and others prepared and revised a memorandum in which they described, documented, and revised a false "store tag" defense. *Id.* ¶ 53(*l*). The memorandum, which described IOS's historical invoicing practices, falsely indicated that although coupons from independent stores were included on invoices that listed only a large, funded retailer, all of the coupons had accurate "store tags." The document, entitled "IOS Should Not Be Indicted for Mail/Wire Fraud" was intended to be disclosed and later was disclosed to law enforcement. In March 2006, IOS executives and employees Chris Balsiger, James Currey, Ovidio Enriquez, David Howard, and others attempted to create false invoices that could be used to support the "store tag" defense. *Id.* ¶ 53(n).

69. IOS executives and employees Chris Balsiger, Ovidio Enriquez, and James Currey persuaded two IOS employees – Nereo Castillo and Carlos Zapata – to provide materially false information regarding IOS's coupon-processing practices to law enforcement in April 2006. *Id.* ¶ 53(s).

70. IOS Executives James Currey and Chris Balsiger developed computer programs to conceal the accounting of various aspects of the scheme, including programs to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS. *Id.* ¶ 28(d); 53(o).

71. Inmar's abrupt termination of its subprocessing agreements with IOS in or around March 2007 had the purpose and effect of concealing Inmar's role in the conspiracy. Plaintiff relied on and was misled by Defendants, who held positions of trust. Accordingly, the statute of limitations has been tolled and suspended with respect to any and all claims arising from the conspiracy until not earlier than January 16, 2008.

**Class Action Allegations**

72. Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of the following class:

> All retailers, state associations, and wholesalers in the United States that have retained or engaged IOS or Inmar to provide coupon processing services from January 1, 1997 through the present (and continuing until the effects of IOS's and Inmar's fraudulent and anticompetitive scheme ceases).

73. Excluded from this class are the Court and its officers, employees, and relatives; Defendants, their parents, subsidiaries, affiliates, shareholders, and co-conspirators.

74. The class is so numerous that joinder of all members is impracticable. Moreover, with respect to the class, there are questions of law or fact common to Plaintiff and the other class members that are central to the adjudication of this action and predominate over any questions affecting only individual members. Among those common questions of law or fact are:

a. Whether Defendants participated in, or committed, or are responsible for the conduct complained of;

b. Whether Defendants' conduct constitutes violations of law alleged herein;

c. Whether Defendants conspired to allocate customers or markets, fix prices, and/or otherwise not to compete;

d. Whether Defendants conspired to share confidential information about retailers' policies and practices in breach of their fiduciary duties to those retailers;

e. Whether Defendants conspired to conceal their unlawful activities;

f. The duration, extent, and success of the agreements between Defendants to conspire to defraud the Plaintiff class;

g. Whether Defendants' conduct constituted a breach of fiduciary agreement and/or duty or conspiracy to commit a breach of fiduciary agreement and/or duty;

h. Whether Defendants' conduct violates the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962;

i. Whether Defendants' conduct violated the Sherman Act;

j. Whether Defendants' conduct constituted common law fraud or conspiracy to commit common law fraud;

k. Whether Defendants were unjustly enriched by their course of conduct with respect to their collection, processing, and submission of coupons to the Plaintiff class;

l. Whether Plaintiff and other class members have sustained or continue to sustain damages as a result of Defendants wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

m. Whether Plaintiff and the other class members are entitled to an award of compensatory, treble, and/or punitive damages, and, if so, in what amount; and

n. Whether Plaintiff and the other class members are entitled to declaratory, injunctive, or other equitable relief.

75. With respect to the class, Plaintiff's claims are typical of the other class members' claims because Plaintiff is a member of the proposed class, its claims have the same essential characteristics as the claims of other class members, its claims arise from the same general course of conduct that gives rise to claims of all class members, and its claims are based on the same legal theories as those of all other class members.

76. Plaintiff will fairly and adequately protect the interests of other class members because it has no interest that is antagonistic to or which irrevocably conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent Plaintiff and other members of the class.

77. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants; and adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members of the class.

78. Defendants have acted or refused to act on grounds generally applicable to the class, thereby rendering injunctive or declaratory relief with respect to the class as a whole appropriate.

79. This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly-situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

80. The instant case will be eminently manageable as a class action. Notice of the

pendency of this action can be given in a variety of ways, including by First Class U.S. Mail or trade journal publication.

81. The damages sustained by individual class members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

## CAUSES OF ACTION

### Count I: Breach of Fiduciary Agreement and/or Duty

82. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 81 above.

83. By agreeing to serve as coupon processors on behalf of Plaintiff and class members, Defendants were agents of Plaintiff and class members, and/or had a fiduciary duty to them.

84. Defendants breached their fiduciary agreements and/or duties to Plaintiff and class members, and that breach proximately caused injury to Plaintiff and class members in an amount to be proven at trial.

### Count II: Conspiring, Inducing, Participating in, Aiding or Abetting a Breach of Fiduciary Agreement and/or Duty

85. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 84.

86. By agreeing to serve as coupon processors on behalf of Plaintiff and class members, Defendants were agents of Plaintiff and class members, and/or had a fiduciary duty to them.

87. Defendants knowingly induced, participated in, aided, and/or abetted the breach of fiduciary agreement and/or duty to Plaintiff and class members, and/or Defendants combined and conspired to commit a breach of fiduciary agreement and/or duty, and committed overt acts

in furtherance thereof.

88. Plaintiff and class members suffered damages as a result of the breach in an amount to be determined at trial.

**Count III: Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 (c)**

89. Plaintiff repeats and realleges the allegations in Paragraphs 1- 88 above as if fully set forth herein.

90. At all times relevant to this Complaint, the Defendants each constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

91. Defendants and others not named as defendants herein, were associated in fact and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaging in and affecting interstate commerce. The RICO Enterprise is a continuing organization that consists of Defendants, their officers, agents, representatives, and other individuals who assisted in devising and implementing their schemes.

92. At all times relevant to this Complaint, Defendants agreed to and did conduct and directly or indirectly participate in, or aided and abetted, the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), committing multiple fraudulent and illegal racketeering acts, and for the unlawful purpose of intentionally defrauding Plaintiff, including: interstate mail fraud in violation of 18 U.S.C. § 1341 (all Defendants); interstate wire fraud in violation of 18 U.S.C. § 1343 (all Defendants); tampering with a witness or informant in violation of 18 U.S.C. § 1512(b)-(d) (Defendant IOS); retaliating against a witness or informant in violation of 18 U.S.C. § 1513(e) (Defendant IOS); interstate transportation of stolen, converted, or fraudulently obtained goods or money while knowing of

the theft in violation of 18 U.S.C. § 2314 (all Defendants); interstate receipt of goods or money of the value of $5,000 or more, knowing the same to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315 (all Defendants). These violations included, but are not limited to the acts discussed in the prior paragraphs of this Complaint. Defendants engaged in this pattern of racketeering activity for the unlawful purpose of and with the effect of defrauding Plaintiffs and the class members.

93. On information and belief, on April 11, 2001, CMS Executive Vice-President and CFO Cynthia Tessien and IOS CEO Chris Balsiger exchanged signed copies of the Proprietary Data Transfer Agreement sent to and/or from Inmar's offices in Winston-Salem, North Carolina via a fax machine connected to (336) 770-1923, in violation of 18 U.S.C. § 1343.

94. On information and belief, in accordance with the Proprietary Data Transfer Agreement, members of IOS's IT staff made data pertaining to coupons which are processed by IOS available to Inmar via an FTP site beginning in April 2001 or shortly thereafter, with updates on an almost daily basis thereafter. On days when no updates were made, IOS informed Inmar via e-mail that no updates were available. Using computers connected to the internet, various Inmar, CMS, and CS employees accessed the data provided by IOS via electronic FTP and e-mail transmission in violation of 18 U.S.C. § 1343. To facilitate their customer allocation agreement, IOS or Inmar provided each other with continuous updates to their customer lists via e-mail.

95. On information and belief, Defendants Inmar, CMS, and/or CS transmitted money to IOS on the 15th day of each month via interstate electronic bank transfer, pursuant to the Proprietary Data Transfer Agreement. These communications violated 18 U.S.C. § 1343.

96. As part of the fraudulent scheme, and in violation of 18 U.S.C. § 1343, Defendant

IOS used interstate wire communications to submit invoices to manufacturers for coupons that IOS falsely claimed had been redeemed at retail stores owned by Plaintiff and class members, including but not limited to the invoices detailed with specificity in the Superseding Indictment, *U.S. v. Balsiger et al.*, attached as Exhibit A, pp. 11-16 (alleging wire fraud). In 2000, for example, IOS sent invoices to manufacturers with a total value exceeding $49 million for small-store coupons that were fraudulently submitted on behalf of larger retailers. In addition, IOS fraudulently submitted on behalf of larger retailers mass-cut coupons that had never been redeemed at any retail store. IOS hired a number of individuals, including Abdel Rahim Jebara, Dax Patel, B.K. Patel, and others to submit the mass-cut coupons to IOS, which IOS mixed in a cement mixer, and which IOS used as the basis for submitting fraudulent invoices to manufacturers. Superseding Indictment, p. 7.

97. As detailed above, Defendant IOS committed various acts of witness tampering and retaliation, the purpose and effect of which was to further their scheme to defraud Plaintiff and the class members in violation of 18 U.S.C. § 1512(b), (d), (k) and 18 U.S.C. § 1513(b), (d), (e). Specifically, Defendant IOS knowingly used or conspired to knowingly use intimidation, threats, or corruptly persuaded, attempted to persuade, or conspired to corruptly persuade or attempt to persuade employees and former employees, or engaged in misleading conduct toward another person, with the intent to: hinder, delay, or prevent the communication to a federal law enforcement officer information relating to the commission or possible commission of a Federal offense in violation of 18 U.S.C. § 1512(b)(3) or 1512(k). Defendant IOS intentionally harassed or conspired to intentionally harass another person or persons and thereby hindered, delayed, prevented, or dissuaded them from reporting to a law enforcement officer the commission or possible commission of a federal offense in violation of 18 U.S.C. § 1512(d)(2) or 1512(k).

Defendant IOS knowingly engaged or conspired to engage in conduct and thereby caused or attempted to cause damages to the tangible property of another person, or threatened to do so, with intent to retaliate against a person or persons for information relating to the commission or possible commission of a Federal offense; and/or knowingly, with intent to retaliate, took action or conspired to take action harmful to a person or persons, including interference with the lawful employment or livelihood of those persons, for providing to a law enforcement officer truthful information relating to the commission or possible commission of a federal offense, in violation of 18 U.S.C. § 1513(b)(2), (d), (e).

98. Defendant IOS transported coupons submitted by retailers in interstate commerce to IOS's processing facilities in Texas and Mexico, and then, in some cases, sent them to manufacturers' agents, knowing the same to have been converted or taken by fraud, with a value in excess of $5,000, in violation of 18 U.S.C. § 2314. Inmar, as a manufacturer's agent, received coupons with a value in excess of $5,000, at its receiving office in Texas after having been transported in interstate commerce, knowing the same to have been converted or taken by fraud in violation of 18 U.S.C. § 2315. As part of Defendants' scheme, IOS falsely told the submitting retailers that manufacturers had charged back most of these coupons, thereby fraudulently obtaining the rights to payment for these coupons from manufacturers. Defendant IOS submitted invoices for these fraudulently obtained coupons to manufacturers.

99. After submitting invoices to manufacturers, Defendant IOS received from manufacturers, possessed, concealed, stored, and/or disposed of payments of money, and disposed of coupons, of the value of $5,000 or more, which have crossed a State and/or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315. On information

and belief, manufacturers made periodic payments to IOS by means of electronic bank transfer, and IOS subsequently transferred the proceeds electronically to other accounts in violation of 18 U.S.C. §§ 2314 and 2315.

100. Defendants Inmar, CMS, and CS received, possessed, stored, and/or disposed of coupons from IOS, and induced manufacturers to pay IOS for the value of those coupons in amounts of $5,000 or more, where those coupons had crossed a State and/or United States boundary. On information and belief, Defendants Inmar, CMS, and CS knew that the coupons had been stolen, unlawfully converted, or taken. These actions violated 18 U.S.C. § 2315.

101. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property in an amount to be proven at trial. For example, Defendant IOS retained payments from manufacturers that were intended for retailers, state associations, and wholesalers; manufacturers and/or their agents were able to increase chargebacks to retailers and decrease deductions because they had access to confidential and proprietary deduction data and methodologies, and because Defendants had disincentives to limit or decrease chargebacks to their retailer clients; manufacturers increased chargebacks for valid coupons because Defendant IOS submitted invalid coupons along with the valid coupons; and Defendants imposed excess fees upon Plaintiff and class members because of Defendants' agreement to allocate customers and fix prices. Such harms are not remediable solely by the payment of damages and are continuing in nature.

**Count IV: Federal Racketeer Influenced and Corrupt**
**<u>Organizations Act Conspiracy, 18 U.S.C. § 1962(d)</u>**

102. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 101 above.

103. This count is brought against all Defendants. As set forth above, the Defendants unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c). Specifically, Defendants committed overt acts in furtherance of the conspiracy as described above.

104. Defendants have intentionally conspired and agreed to directly and indirectly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

105. As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and class members have been injured in their business and property in an amount to be proven at trial by reason of Defendants' violation of 18 U.S.C. § 1962(d), in that: Defendant IOS retained payments from manufacturers that were intended for retailers; manufacturers and/or their agents were able to increase chargebacks to retailers and decrease deductions because they had access to confidential and proprietary deduction data and methodologies, and because Defendants had disincentives to limit or decrease chargebacks to their retailer clients; manufacturers increased chargebacks for valid coupons because Defendant IOS submitted invalid coupons along with the valid coupons; and Defendants imposed excess fees upon Plaintiff and class members because of Defendants' agreement to allocate customers and fix prices.

**Count V: Conspiracy to Restrain Trade in Violation of**
**Sherman Act § 1**

106. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 105 above.

107. Defendants have engaged in a combination or conspiracy in restraint of trade and commerce, the purpose and effect of which is to allocate markets and customers for, and unreasonably fix, raise, maintain, or stabilize prices for, coupon clearing and coupon processing services provided to retailers in the United States. The combination or conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants.

108. Defendants' actions lack any legitimate business justification, and any purported business justifications are pretextual.

109. Defendants' conduct substantially and adversely affects interstate commerce in the relevant markets.

110. Defendants by and through their anticompetitive actions as outlined herein, have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

111. As a direct and proximate result of Defendants' violations of the Sherman Act, Plaintiffs and class members have been harmed in an amount to be established at trial.

**Count VI: Monopolization in Violation of Sherman Act Section 2 (Defendant IOS)**

112. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 111 above.

113. Throughout the relevant time period, Defendant IOS possessed monopoly power in the market for providing coupon processing or clearing services to retailers.

114. Through the anticompetitive conduct described herein, IOS has willfully acquired and/or maintained its monopoly power in this market. IOS has acted with an intent to illegally acquire and/or maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

115. There are no legitimate business justifications for IOS's conduct, and any purported legitimate business justifications are merely pretextual. IOS's acquisition or

maintenance of its power is not the result of superior product, business acumen, or historic accident.

116. Plaintiff and class members were injured in their business or property as a direct and foreseeable result of IOS's conduct in an amount to be proven at trial. For example, IOS's conduct caused a direct, substantial, and reasonably foreseeable increase in coupon processing fees imposed upon Plaintiff and class members, and otherwise decreased the net amounts that Plaintiff and class members received from manufacturers for their coupons.

**Count VII: Conspiracy to Monopolize in Violation of Sherman Act Section 2**

117. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 116 above.

118. During the relevant time period, Defendants combined or conspired to monopolize trade in the market for providing coupon processing or clearing services to Plaintiff and class members.

119. Defendants have willfully and knowingly sought to acquire and maintain monopoly power in the above-defined product market by the wrongful conduct alleged above.

120. Defendants engaged in acts and conduct in furtherance of the combination or conspiracy that have diminished, and continue to diminish, competition in the relevant product market, to the detriment of Plaintiff and class members.

121. The necessary and direct result of Defendants' wrongful conduct has been the expansion or maintenance of their combined monopoly position in the above-defined product market. Defendants' actions have affected an appreciable and substantial amount of interstate commerce.

122. Defendants' actions are not based on any lawful market dominance and have no lawful business justification, and any purported business justifications are merely pretextual.

123. As a direct and proximate result of Defendants' violations of Section 2 of the Sherman Act, Plaintiff and other members of the class have been harmed. Such harms are not remediable solely by the payment of damages and are continuing in nature.

**Count VIII: Common Law Fraud**

124. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 123123 above.

125. Defendants knowingly misrepresented and omitted material facts with the intention and effect of deceiving and causing actual and justifiable reliance by Plaintiffs and class members on these misrepresentations and omissions.

126. Although Defendants representations of fact were untrue, Plaintiff and class members reasonably and justifiably believed the representations of Defendants to be true and relied upon their representations.

127. As a result of Plaintiff's and class members' reliance on Defendants' fraudulent acts and omissions, Plaintiff and class members have been injured in an amount to be proven at trial.

**Count IX: Common Law Conspiracy to Defraud**

128. Plaintiff repeats and realleges the allegations in Paragraphs 1- 127 above.

129. Defendants combined and conspired to develop a scheme to knowingly misrepresent and/or to knowingly omit material facts with the intention of causing actual and justifiable reliance, and did cause such reliance by Plaintiff and class members to their detriment.

130. Defendants committed overt acts in furtherance of the conspiracy to defraud.

131. As a result of Defendants' acts and the acts of their co-conspirators, Plaintiff and class members have been injured in an amount to be proven at trial.

**Count X: Unjust Enrichment**

132. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 131.

133. Defendants have received measurable benefits from Plaintiff and the other class members in the form of supracompetitive prices paid for coupon processing and clearing services; and in the form of coupons provided for redemption where Defendant received payment from manufacturers for the coupons but unjustly withheld some of those payments from Plaintiff and class members. These unjustified benefits were supplied at the express or implied request of Defendants.

134. Defendants were aware that they were not legitimately entitled to these benefits, and their retention of these benefits resulted in and continues to result in inequity to Plaintiff and class members.

135. Plaintiff and class members are entitled to restitution and disgorgement of Defendants' enrichment, benefits, and unjust enrichment as a result of the unlawful and/or wrongful conduct alleged herein, in an amount to be proven at trial.

136. Plaintiff alleges in the alternative that it lacks an adequate remedy at law.

**JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on its own behalf and on behalf of the Class, demands a trial by jury of all claims asserted in this Complaint so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment:

a. Certifying this action as a class action, appointing Plaintiff as a Class Representative and its counsel as lead Class Counsel;

b. Awarding Plaintiff and the Class their full monetary damages to be proven at trial;

c. Awarding Plaintiff and the Class treble their monetary damages, pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15;

d. Awarding Plaintiff and the Class pre-and post-judgment interest on their damages;

e. Awarding Plaintiff and the Class the costs of this action and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15;

f. Awarding Plaintiff and the Class the amount by which Defendants have been unjustly enriched;

g. Awarding Plaintiff and the Class punitive damages in an amount to be determined;

h. Enjoining Defendants from continuing or resuming their unlawful and anticompetitive practices; and

i. Awarding Plaintiff and the Class such other and further relief as the Court deems just and proper.

Dated this 22nd day of May, 2008

Daniel A. Kotchen, SBN 1029853
Daniel L. Low
Kotchen & Low LLP
2300 M St., NW, Suite 800
Washington, DC 20037
(202) 416-1848 (Tel.)
(202) 293-3083 (Fax)

*Counsel for Plaintiff*

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

'07 DEC -5 P12:41

JON W. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS C. BALSIGER,
BRUCE A. FURR,
STEVEN A. FURR,
LANCE A. FURR,
WILLIAM L. BABLER,
OVIDIO H. ENRIQUEZ,
DAVID J. HOWARD,
JAMES C. CURREY,
HOWARD R. MCKAY,
DAXESH V. PATEL, and
BHARATKUMAR K. PATEL,

Defendants.

Case No. 07-CR-57 (CNC)

[18 U.S.C. §§ 371, 1343, 1349 & 2]

**SUPERSEDING INDICTMENT**

**COUNTS ONE THROUGH TWENTY-FIVE**
**(Wire Fraud)**

**THE GRAND JURY CHARGES:**

1. Beginning by 1997, and continuing through December 2006, in the State and Eastern District of Wisconsin, and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**STEVEN A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD,**
**JAMES C. CURREY,**

**HOWARD R. MCKAY,
DAXESH V. PATEL, and
BHARATKUMAR K. PATEL,**

the defendants herein, devised and participated in a scheme to defraud manufacturers that issued coupons for consumer products, large retailers, and others by knowingly submitting fraudulent coupons to manufacturers for reimbursement.

2. As a result of their scheme, the defendants wrongfully obtained more than $15 million from manufacturers located in the Eastern District of Wisconsin and over $250 million from manufacturers nationwide.

**The IOS Defendants**

3. Unless otherwise noted, at all times material to this indictment:

a. International Outsourcing Services, LLC, which formerly was known as International Data, LLC, operated as a coupon clearinghouse. In this indictment, "IOS" refers to International Outsourcing Services, its predecessors, and its subsidiaries. IOS's main offices were in Bloomington, Indiana, and El Paso, Texas. IOS also had facilities in other states and several foreign countries.

b. IOS was owned by two corporations, Indiana Data, Inc. and NAFTA, Ltd. In turn, Indiana Data was owned by Bruce A. Furr, Steven A. Furr, Lance A. Furr, and others. NAFTA was owned by a publicly-traded company and Thomas C. Balsiger (a/k/a "Chris" Balsiger).

c. Chris Balsiger served as IOS's Chief Operating Officer, President, and, later, Chief Executive Officer. Balsiger worked in El Paso, Texas.

d. Bruce A. Furr served as the Chairman of IOS's board and worked in Bloomington, Indiana. Bruce Furr also had been IOS's Chief Executive Officer.

e. Until August 18, 2006, when he purported to resign, Lance A. Furr was an IOS Executive Vice President and board member, who worked in Bloomington, Indiana. Until 2004, Lance Furr had served as IOS's Chief Financial Officer.

f. Steven A. Furr was an IOS Executive Vice President, board member, and, later, President of IOS's North American Operations. Steven Furr worked in El Paso, Texas.

g. Since 2004, William L. Babler has served as IOS's Chief Financial Officer, who worked in Bloomington, Indiana.

h. Howard R. McKay was an IOS consultant and sales manager based in Memphis, Tennessee. McKay also served on IOS's advisory board.

i. Ovidio H. Enriquez was an IOS plant manager, who worked out of El Paso, Texas, and Juarez, Mexico. Enriquez also has served as a Vice President and General Manager for IOS.

j. David J. Howard was an IOS plant manager, who worked out of the Del Rio, Texas/Acuna, Mexico region. Howard also has served as a Vice President and General Manager for IOS.

k. James C. Currey was the President of Currey, Adkins, a firm which handled information technology for IOS. Currey was based in El Paso, served as IOS's Chief Operating Officer for Data Services, and served on IOS's advisory board.

**The Riya Defendants**

4. At all times material to this indictment:

a. Daxesh V. Patel (a/k/a "Dax" Patel) was the President of Riya Coupon Services, LLC ("Riya"), a coupon broker based in New Jersey. Riya recruited independent stores in several states, including a store in Racine, Wisconsin, to send their coupons to IOS.

b. Bharatkumar K. Patel (a/k/a "B.K." Patel) was the Vice President of Riya and was based in New Jersey.

**Background – Coupon Industry**

5. Retail coupons are legal documents that offer consumers discounts on the purchase of products. Coupons are issued by manufacturers to increase sales and obtain

marketing data. Retail stores which accept coupons in the course of a legitimate sale are entitled to be reimbursed by the manufacturer.

6. Due to the volume of coupons circulated in the United States, retailers and manufacturers rely upon clearinghouses to sort the coupons and process reimbursements from manufacturers to retailers.

**Background – IOS's Role**

7. IOS is the nation's largest coupon clearinghouse for retailers. IOS contracts with retailers, retailer associations, and others to process coupons. IOS then invoices manufacturers in the name of the retailer. As part of its role, IOS was obligated to take reasonable steps to refrain from submitting fraudulent coupons to manufacturers for reimbursement.

8. IOS offered its client stores various options for reimbursement. Under "non-funded" programs, retailers were reimbursed after IOS had processed the retailers' coupons, invoiced them to manufacturers, and received payment. Under "funded" programs, IOS made advance payments (typically using an estimated value based on the weight of the shipment) to stores and brokers before IOS fully processed and invoiced manufacturers for those coupons. One specific type of funded program offered by IOS for independent stores was known as "Rapid Pay."

9. To make advance payments to its funded-account clients, IOS borrowed money from banks. IOS used the receivables or payments due it from manufacturers for the coupons submitted at large retailers as collateral for the bank loans.

10. To receive reimbursement payments from manufacturers, IOS often opened bank accounts in the names of its retail clients. IOS controlled those bank accounts, and the retailers

in whose name the accounts were listed were not aware of how much money was deposited into or paid out of these accounts.

11. To receive reimbursement from manufacturers, IOS submitted invoices to manufacturers and their agents. Those invoices related to coupons submitted from a single retail client, and the invoices requested that payments be made to the accounts held by IOS in the name of its retail clients.

12. Based on its role, IOS was paid a contractual services fee by its retail clients. IOS also charged manufacturers shipping and other fees. As a result of the type of fees charged by IOS, the company gained financially by submitting as many coupons as possible for reimbursement – regardless of whether the coupons actually had been used to purchase the products listed on the coupons.

13. When manufacturers rejected coupons due to suspicions of fraud or other reasons, IOS "charged back" the face value of these coupons, plus additional fees, to its retail clients.

**Background – Manufacturer Fraud Controls**

14. To ensure that they only pay for coupons that actually have been redeemed in connection with purchases of their products, manufacturers and their agents have instituted fraud controls. These include assessing:

a. Whether a shipment of coupons was suspiciously large for the size of the store at which they supposedly had been redeemed;

b. Whether the store actually carried the product for which it was submitting coupons;

c. Whether the coupons had been circulated in the region where the store is located;

d. Whether the store had purchased sufficient inventory to justify the number of coupons; and

e. Whether the store's coupons appeared to have been "gang" or "mass" cut rather than torn, cut, or otherwise legitimately redeemed by individual coupon users.

15. Because many of the manufacturers' fraud detection methods focused on the volume of coupons submitted by the store, manufacturers and their agents historically have rejected a much higher percentage of coupons from smaller, independent stores than from larger retailers.

**The Scheme to Defraud**

16. The essence of the defendants' scheme was to defeat the manufacturers' fraud controls and to obtain money from the manufacturers for coupons that the defendants knew to be fraudulent. The fraudulent coupons included:

a. Coupons that never had been legitimately redeemed in connection with the purchase of a product;

b. Coupons that IOS falsely invoiced to manufacturers as having been redeemed at large retailers when, in fact, those coupons had been submitted to IOS by smaller stores that were far more likely to have their coupons rejected due to fraud concerns;

c. Coupons that IOS falsely invoiced to manufacturers as having been redeemed at large retailers when, in fact, IOS had told others that it could not identify the redeeming stores (a category known at IOS as "foreign coupons"); and

d. Coupons that IOS already had "charged back" to retailers as having been denied by manufacturers. At times, IOS also directed retailers to deduct the amount of these "chargebacks" from future payments to manufacturers.

17. Within IOS, the defendants referred to the scheme to defraud using terms such as "alternative invoicing," "alternative manufacturing invoicing," "8's and 9's," "deuces," "error trays," "indirect revenue," "trickling," "arbitrage," and "load balancing." This aspect of the scheme generally worked as follows:

a. IOS obtained as many fraudulent coupons as possible.

b. IOS and individual defendants included fraudulent coupons in shipments of coupons redeemed at IOS's larger retail clients, including HEB, Food Lion, Pathmark, Winn-Dixie, Hannaford Brothers, Kash n' Karry, CVS, Fresh Brands / Piggly Wiggly, and others.

c. IOS and individual defendants submitted, caused others to submit, and reasonably could foresee that other scheme participants would submit materially false invoices to manufacturers and their agents, making it appear as if the fraudulent coupons had been redeemed at IOS's larger clients. At times, IOS used a specific series of invoice numbers – beginning with 8's or 9's – for this purpose.

d. Chris Balsiger set periodic goals for the volume of fraudulent coupons to be included with shipments from large retailers and directed others, including Ovidio Enriquez and David Howard, to ensure that these tasks were completed.

18. As part of the scheme, at times, IOS directed employees in Mexico to use a cement mixer to mix fraudulent coupons before shipping them.

19. As part of the scheme, IOS sought to increase business from coupon brokers, who claimed to be able to recruit small stores and sub-brokers to submit coupons to IOS. These brokers included "M.D." and Abdel Rahim Jebara, both of whom worked with Chris Balsiger or other IOS employees to provide fraudulent coupons to IOS.

20. Other brokers who knowingly agreed to take part in IOS's diversion scheme were Dax Patel and B.K. Patel of Riya. As Chris Balsiger, Bruce Furr, Lance Furr, Howard McKay, and others knew and had reason to know, many of the coupons submitted by Riya and the Patels never had been used to purchase products. Because these coupons had never been used, Riya and the Patels paid stores less than face value for coupons.

21. As a further part of the scheme, IOS and individual defendants used diverted coupons to wrongfully inflate IOS's borrowing base with banks. Under IOS's loan agreements,

IOS could use as collateral the receivables due on coupons from larger stores, but could not use coupons from many smaller, independent stores. By invoicing small store coupons as if they had been negotiated at a large retail chain, IOS inflated its borrowing base, increased its line of credit, and used the proceeds to pay not only for legitimate coupons, but also to pay for fraudulent coupons provided by Riya and others, and to fund distributions to IOS executives.

22. During the period covered by the scheme, the defendants knew and had reason to know that the manufacturer victims described in Counts One through Twenty-Five of this indictment were located in the Eastern District of Wisconsin, and it was reasonably foreseeable to the defendants that as part of the scheme, wire communications would be sent to and from the manufacturers located in this district. In addition, the IOS defendants sent and caused their attorneys to send coupon-related correspondence directly to manufacturers at their Wisconsin addresses.

**Concealment of the Scheme**

23. As part of the scheme, the IOS defendants took steps to conceal the true nature of their activities from manufacturers, including:

a. When manufacturers noticed problems caused by the scheme, such as out-of-area or product-not-carried coupons, individual defendants falsely attributed the problems to retailers, plant errors, and other causes; and

b. When IOS settled with manufacturers for such problems, Lance Furr at times signed checks that disguised the fact that IOS was making the settlement payment.

24. As part of the scheme, Chris Balsiger, Bruce Furr, Steven Furr, Lance Furr, and others took steps to conceal their scheme from the innocent retailers whose accounts at IOS were used to launder the diverted coupons. These steps included providing false and misleading

information to retailers regarding the volume of coupons billed in the retailer's name as well as false information regarding IOS's coupon-processing and invoicing practices. The IOS defendants did this because they knew that the large retailers never would have authorized IOS to jeopardize their business reputations in that manner and because they knew that providing this information could lead to the discovery of their scheme.

25. As part of and to conceal the scheme, Lance Furr, Bruce Furr, Chris Balsiger, and others lied and caused others to lie to IOS's outside auditors about the nature and purpose of the diversion scheme.

26. As part of the scheme, IOS and Chris Balsiger withheld information from two IOS board members who were not employed by IOS.

27. As a further part of the scheme, after the FBI executed search warrants at IOS facilities and arrested an IOS sales manager in February 2003, individual defendants, including Dax Patel and B.K. Patel, took steps to conceal the scheme from law enforcement.

**Attempts to Conceal Financial Problems**

28. After the FBI executed the February 2003 search warrants, IOS drastically reduced the volume of coupons being diverted. Because of this, IOS began to suffer financially. Because IOS was diverting far fewer coupons, manufacturers and their agents were able to more readily detect fraud and deny payment for suspect coupons. This, in turn, led to increased "chargebacks" on IOS's books. As a result of these problems, and to cover up the scheme, the IOS defendants took and caused the following actions:

a. Chris Balsiger, Bruce Furr, Lance Furr, William Babler, and others caused IOS employees to make false entries in the company's accounting records

and to "leave the books open" at the end of reporting periods to disguise financial problems;

b. Chris Balsiger, Lance Furr, William Babler, and others caused IOS's accounting staff to prepare false financial statements which IOS provided to banks;

c. IOS, Howard McKay, and other individual defendants made false statements to the company's auditors, including statements regarding "ghost shipments" of coupons that were designed to make it appear as if certain "charge back" debts had been reduced; and

d. IOS, Chris Balsiger, and James Currey developed a computer program to fraudulently shift chargebacks from non-paying stores to legitimate retailers that had no relation to "charge backs" at issue.

29. To further conceal the scheme, IOS, Chris Balsiger, and others directed a private investigator to attempt to forcibly obtain physical evidence held by a witness in Mexico.

**Materiality**

30. The above acts of the defendants involved materially false representations, concealment of material facts, and attempts to obtain money under materially false pretenses.

**COUNTS ONE THROUGH FIVE**
**(Sargento Foods)**

**THE GRAND JURY FURTHER CHARGES:**

31. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

32. The writings, sounds, and signals consisted of the following invoices, which were faxed to Sargento Foods in Plymouth, Wisconsin, from its manufacturer's agent in Illinois. The invoices included requests for payments – to an account held by IOS in the name of CVS, one of its large retail clients – for coupons issued by Sargento Foods.

33. Each of the below invoices included payment requests relating to coupons that, according to IOS, had been redeemed at CVS. In reality, CVS did not carry the products at issue and, as IOS well knew, those coupons had not been used to purchase Sargento products at CVS:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 1 | 3/18/02 | 02-04278-00 | $85,894.70 |
| 2 | 4/22/02 | 02-06375-00 | $167,731.53 |
| 3 | 5/06/02 | 02-07281-00 | $113,237.41 |
| 4 | 5/13/02 | 02-07668-00 | $117,056.50 |
| 5 | 7/08/02 | 02-11179-00 | $46,829.75 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS SIX THROUGH TEN**
**(Good Humor / Breyers)**

**THE GRAND JURY FURTHER CHARGES:**

34. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

35. The writings, sounds, and signals consisted of the following invoices, which were faxed to Good Humor / Breyers Ice Cream, in Green Bay, Wisconsin, from its manufacturer's agent in Illinois. Each invoice included requests for payment – to an account held by IOS in the name of HEB, one of its large retail clients – for coupons issued by Good Humor / Breyers for its Klondike, Popsicle, or Breyers ice cream products under one or more of the following offer codes: 40298, 62252, 62228, 40263, 55949, 40233, 62252, and 55896.

36. Each of the invoices included payment requests relating to coupons that, according to IOS, had been redeemed at HEB stores in Texas. In reality, those coupons only had been distributed in the northeastern United States and, as IOS well knew, had not been used to purchase Good Humor / Breyers products at HEB stores.

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 6 | 4/01/02 | 02-05285-00 | $352,873.88 |
| 7 | 5/20/02 | 02-08282-00 | $525,503.88 |
| 8 | 8/19/02 | 02-13837-00 | $605,120.07 |
| 9 | 10/21/02 | 02-17495-00 | $247,386.54 |
| 10 | 10/28/02 | 02-17892-00 | $234,631.64 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS ELEVEN THROUGH FIFTEEN**
**(Kimberly-Clark)**

**THE GRAND JURY FURTHER CHARGES:**

37. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

38. The writings, sounds, and signals consisted of the following invoices, which were faxed to Kimberly-Clark Corporation, in Neenah, Wisconsin, from its manufacturer's agent in Illinois. Each invoice included requests for payment – to an account held by IOS in the name of HEB – for coupons issued by Kimberly-Clark for its Kotex products under one or more of the following offer codes: 42509, 42510, 42511, 42607, 42618, 42620, 42621, and 42622.

39. Each of the below invoices included payment requests relating to coupons that, according to IOS, had been redeemed at HEB stores in Texas. In reality, the coupons only had been distributed in northeastern United States and, as IOS well knew, had not been used to purchase Kimberly-Clark products at HEB stores:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 11 | 6/24/02 | 02-10458-00 | $3,020,744.36 |
| 12 | 7/01/02 | 02-10878-00 | $3,391,755.28 |
| 13 | 7/08/02 | 02-11382-00 | $2,964,381.51 |
| 14 | 8/19/02 | 02-13826-00 | $3,363,712.80 |
| 15 | 10/21/02 | 02-17486-00 | $2,913,282.42 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNTS SIXTEEN THROUGH TWENTY**
**(LeSaffre Yeast)**

**THE GRAND JURY FURTHER CHARGES:**

40. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

41. The writings, sounds, and signals consisted of the electronic transfer of funds from an account held by LeSaffre Yeast at U.S. Bank in Milwaukee, Wisconsin, to an account held by its manufacturer's agent at Wachovia Bank, in Charlotte, North Carolina, for ultimate payment to IOS.

42. The transfers listed below included payments for coupons issued by LeSaffre for its Red Star or Perfect Rise Yeast products under offer codes 21138 or 35155. Each transfer included payment for coupons issued by LeSaffre that, according to IOS, had been redeemed at Food Lion, Hannaford Brothers, Jacksonville Winn-Dixie, or Kash n' Karry stores located in the southern United States. However, LeSaffre only had distributed the coupons in the northeastern United States, and, as IOS well knew, the coupons had not been used to purchase LeSaffre products at these stores located far away from the northeast:

| Count | Date | Invoice No. | Amount |
|---|---|---|---|
| 16 | 1/03/03 | 179290000100030102 | $16,342.24 |
| 17 | 1/13/03 | 179290000100030109 | $25,284.30 |
| 18 | 1/17/03 | 179290000100030116 | $17,206.61 |
| 19 | 2/03/03 | 179290000100030130 | $15,763.95 |
| 20 | 2/07/03 | 179290000100030206 | $26,756.66 |

Each in violation of Title 18, United States Code, Sections 1343 & 2

**COUNTS TWENTY-ONE THROUGH TWENTY-FIVE**
**(S.C. Johnson & Sons)**

**THE GRAND JURY FURTHER CHARGES:**

43. On or about the below-listed dates, for the purpose of executing the scheme to defraud described in Paragraphs 1 through 30 of this indictment, the defendants knowingly caused writings, signs, and signals to be transmitted by means of interstate wire communication.

44. The writings, sounds, and signals consisted of the electronic transfer of funds from an account held by S.C. Johnson & Sons at Johnson Bank in Racine, Wisconsin, to the account of its manufacturer's agent at Wachovia Bank in Charlotte, North Carolina, for ultimate payment to IOS.

45. The transfers listed below included payments for coupons issued by S.C. Johnson for its Shout Oxy Power and/or Scrubbing Bubbles products under offer codes 26291 or 26292. Each transfer included payment for coupons issued by S.C. Johnson that, according to IOS, had been redeemed at Food Lion or HEB stores located in the southeastern United States and Texas. In reality, S.C. Johnson only had distributed the coupons in the northeastern United States, and, as IOS well knew, the coupons had not been used to purchase S.C. Johnson products at Food Lion or HEB stores:

| Count | Date | Identifying No. | Amount |
|---|---|---|---|
| 21 | 11/29/02 | 021129001172 | $1,072,695.49 |
| 22 | 12/06/02 | 021206001172 | $2,188,752.53 |
| 23 | 1/17/03 | 030117001172 | $1,683,441.89 |
| 24 | 2/07/03 | 030207001172 | $1,016,194.07 |
| 25 | 2/14/03 | 030214001172 | $953,959.76 |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

**COUNT TWENTY-SIX**
**(Conspiracy to Commit Wire Fraud)**

**THE GRAND JURY FURTHER CHARGES:**

46. Beginning by 1997, and continuing through December 2006, in the Eastern District of Wisconsin, and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**STEVEN A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD,**
**JAMES C. CURREY,**
**HOWARD R. MCKAY,**
**DAXESH V. PATEL, and**
**BHARATKUMAR K. PATEL**

knowingly conspired with each other and with other persons and entities known and unknown to the grand jury to defraud manufacturers that issued coupons for consumer products, large retailers, and others by means of interstate wire communications, in violation of Title 18, United States Code, Section 1343.

47. The primary purpose of the conspiracy was to use interstate wire communications to defeat the manufacturers' coupon fraud controls described in Paragraph 14 of this indictment and to wrongfully obtain money for the types of fraudulent coupons described in Paragraph 16 of this indictment.

48. The manner and means of the conspiracy include the actions of the defendants described in Paragraphs 16 through 30 of this indictment.

49. As part of and during the conspiracy, the defendants knew, intended, and could reasonably foresee that one or more of the conspirators would make and cause others to make

materially false representations to and conceal material facts from manufacturers in the Eastern District of Wisconsin and elsewhere, including Sargento Foods, Good Humor / Breyers Ice Cream, LeSaffre Yeast, Kimberly-Clark, and S.C. Johnson & Sons, with respect to the legitimacy and redemption history of coupons being submitted to those manufacturers for payment.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWENTY-SEVEN**
**(Conspiracy to Obstruct Justice)**

**THE GRAND JURY FURTHER CHARGES:**

50. Beginning by March 2003, and continuing through October 2007, in the Eastern District of Wisconsin and elsewhere,

**THOMAS C. BALSIGER,**
**BRUCE A. FURR,**
**LANCE A. FURR,**
**WILLIAM L. BABLER,**
**OVIDIO H. ENRIQUEZ,**
**DAVID J. HOWARD, and**
**JAMES C. CURREY**

knowingly conspired with each other and with persons and entities known and unknown to the grand jury to commit an offense against the United States, namely to corruptly influence, obstruct, and impede the due administration of justice, in violation of Title 18, United States Code, Section 1503(a).

**Purpose of the Conspiracy**

51. The purpose of the conspiracy was to influence, obstruct, and impede an ongoing grand jury investigation in the Eastern District of Wisconsin relating to the coupon-invoicing, accounting, and other business practices of IOS, its employees, and others.

52. To achieve the purpose of the conspiracy:

a. Thomas C. Balsiger (a/k/a "Chris" Balsiger), Bruce Furr, Lance Furr, Ovidio Enriquez, David Howard, James Currey, William Babler, and other conspirators knowingly caused others to provide materially false information to federal law enforcement officers and officials ("law enforcement") conducting the grand jury investigation into IOS's coupon-invoicing and accounting practices.

b. After learning that third parties had received grand jury subpoenas for information relating to IOS's coupon-invoicing and accounting practices, Chris Balsiger, Bruce Furr, Lance Furr, William Babler, and others provided materially false information to the subpoena recipients, knowing, intending, and having reason to believe that the same information would be presented to the grand jury.

c. Chris Balsiger, James Currey, Ovidio Enriquez, Lance Furr, and others attempted to coach witnesses and to persuade individuals to provide false information if interviewed by law enforcement conducting the grand jury investigation.

d. Chris Balsiger, Bruce Furr, Lance Furr, and others attempted to prevent IOS employees and others with knowledge of IOS's invoicing and accounting practices from communicating with federal authorities by conditioning severance benefits for departing employees on agreements not to speak to law enforcement and by suing and threatening to financially harm employees who cooperated with the grand jury investigation; and

e. Lance Furr, Chris Balsiger, and others attempted to conceal and destroy records to prevent their discovery by law enforcement conducting the grand jury investigation.

**<u>Acts in Furtherance</u>**

53. In furtherance of the conspiracy, the defendants and their coconspirators committed, and caused to be committed, overt acts in the Eastern District of Wisconsin and elsewhere, including the following:

a. After February 26, 2003, when search warrants were executed at IOS's offices in Memphis, Tennessee, and El Paso, Texas, Lance Furr directed IOS employees to take computer files and other information home each night to avoid being seized if additional search warrants were issued as part of the grand jury investigation.

b. After February 26, 2003, Chris Balsiger ordered that certain documents be destroyed and attempted to have others destroy documents relevant to the grand jury investigation.

c. In approximately October 2004, concerned that Food Lion had received a federal grand jury subpoena, Chris Balsiger, Bruce Furr, Lance Furr, and others provided and directed others to provide false and misleading information to Food Lion about the volume of coupons billed to manufacturers under Food Lion's name. At the time, the conspirators intended and had reason to know that the same information then would be provided to the grand jury.

d. On or about February 15, 2005, after becoming concerned that IOS's controller, C.P., might disclose the company's invoicing and accounting practices to others, Chris Balsiger, Bruce Furr, Lance Furr, and others caused IOS to reach a separation agreement with C.P. that called for C.P. to be paid an additional year of salary in exchange for agreeing not to speak with anyone – including law enforcement – about IOS without IOS's written consent.

e. On or about March 18, 2005, after K.C., an IOS executive with extensive knowledge of IOS's invoicing and accounting practices advised Bruce Furr that K.C. wanted to resign due to concerns about the company's invoicing practices, Bruce Furr, Lance Furr, and others caused a draft separation agreement to be sent to K.C. that would have prohibited K.C. from speaking to any "governmental agency" about IOS without IOS's written consent.

f. Between on or about June 3, 2005, and on or about June 17, 2005, after K.C. entered into a separation agreement with IOS, and after Bruce Furr, Lance Furr, Chris Balsiger, and others became concerned that K.C. was talking to law enforcement conducting the grand jury investigation, Bruce Furr and others accused K.C. of breaching the separation agreement, threatened to sue K.C., and threatened to overwhelm K.C. with litigation costs.

g. Between June 22, 2005, and June 28, 2005, Chris Balsiger, James Currey, and others knowingly caused materially false information regarding IOS's relationship with Riya to be submitted to federal law enforcement conducting the grand jury investigation.

h. In approximately mid-August 2005, after IOS received formal notification that it was a target of the grand jury's investigation, Lance Furr directed IOS employees to remove documents from his office and to hide them in an employee's personal residence.

i. In approximately August 2005, Lance Furr attempted to convince K.P., an employee in IOS's accounting department, to provide false information if

contacted by federal law enforcement conducting the grand jury investigation.

j. On or about August 18, 2005, Chris Balsiger, in the presence of other IOS defendants, presented false information regarding IOS's coupon-invoicing practices to one of IOS's attorneys, knowing and intending that the same false information would be presented, unwittingly, to law enforcement conducting the grand jury investigation.

k. On or about September 21, 2005, James Currey and others presented false information regarding IOS's coupon-invoicing practices and IOS's relationship to Riya Coupon Services to IOS's attorneys and others. This false information included a "store tag" defense, which falsely indicated that all coupons involved in IOS's claimed "load balancing" and "alternate invoicing" practices contained accurate "store tags" that identified the redeeming store. The false information presented by James Currey was intended to be disclosed and later was disclosed to law enforcement in an attempt to avoid indictment by the grand jury.

l. Between on or about January 5, 2006, and August 2006, Chris Balsiger and others prepared and revised a memorandum in which they described, documented, and revised the "store tag" defense. The memorandum, which described IOS's historical invoicing practices, falsely indicated that although coupons from independent stores were included on invoices that listed only a large, funded retailer, all of the coupons had accurate "store tags." The content of this document, which ultimately was entitled "IOS Should Not be Indicted for Mail/Wire Fraud," was intended to be disclosed and later was disclosed to law enforcement in an attempt to avoid indictment by the grand jury.

m. On or about February 17, 2006, Chris Balsiger, Bruce Furr, Lance Furr, and others caused IOS to file a civil lawsuit in Indiana against K.C. to retaliate against K.C. and to force K.C. to divulge what information, if any, she had provided to law enforcement conducting the grand jury investigation.

n. In March 2006, Chris Balsiger, James Currey, Ovidio Enriquez, David Howard, and others attempted to create false invoices that could be used to support the "store tag" defense.

o. On or about March 27, 2006, James Currey directed others to create a computer program that would allow IOS to generate "real time" invoices that would appear consistent with the false "store tag" defense.

p. On or about March 29, 2006, Ovidio Enriquez, David Howard, and others provided a tour of the IOS plant at Acuna, Mexico, to IOS's counsel and others. During the tour, Enriquez, Howard, and other IOS employees generated a fraudulent invoice to substantiate the store tag defense. This invoice was later presented to law enforcement conducting the grand jury investigation as "proof" of the "store tag" defense.

q. Between on or about March 24, 2006, and April 3, 2006, after IOS learned that the grand jury was investigating IOS's accounting practices, Chris Balsiger, Bruce Furr, William Babler, and others prepared an explanation of IOS's accounting practices that falsely blamed C.P. and K.C., two former employees IOS suspected of cooperating with law enforcement, for all of IOS's suspect practices.

r. On or about March 30, 2006, William Babler advised K.P., an employee of IOS, that IOS had developed a plan to falsely blame C.P. and K.C. for IOS's accounting activities in order to make the "Milwaukee investigation" go away.

s. On or about April 25, 2006, during interviews with federal investigators, IOS employees N.C. and C.Z. provided materially false information regarding IOS's coupon-processing practices and other matters. Before their interviews, N.C. and C.Z. had been brought to IOS's offices in El Paso, Texas, where they were persuaded to provide false information by Chris Balsiger, Ovidio Enriquez, and James Currey.

t. On or about August 23, 2006, after having been advised that his statements would be provided to law enforcement pursuant to a grand jury subpoena, Chris Balsiger provided materially false information to IOS's auditors regarding matters he knew to be under investigation by the grand jury.

u. On or about January 10, 2007, Chris Balsiger and others caused IOS's attorneys, who had been misled as to IOS's historical practices, to present the false "store tag" defense to law enforcement conducting the grand jury investigation. As part of this presentation, federal law enforcement was provided a copy of the fraudulent invoice generated by Ovidio Enriquez, David Howard, and others on March 29, 2006.

v. In March and April 2007, in an effort to quash a grand jury subpoena issued to a law firm for records related to IOS's coupon-invoicing practices, IOS, Chris Balsiger, and others caused the false "store tag" defense to be presented to a federal judge.

All in violation of Title 18, United States Code, Sections 371 & 2.

**FORFEITURE NOTICE**

1. Upon conviction of one or more of the offenses alleged in Counts One through Twenty-Six of the Indictment, the defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including but not limited to the following:

a. A sum of money equal to $ 250,000,000 in United States currency, representing the amount of proceeds obtained as a result of the defendants' wire fraud scheme, for which the defendants are jointly and severally liable.

2. If the above-described forfeitable property, as a result of any act or omission of the defendant(s): (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above, including but not limited to the following:

Real Property – Indiana
a. 1804 S. Weimer Road, Bloomington, IN 47403-2870;
b. 4496 W. Tanglewood Drive, Bloomington, IN 47404-9563;
c. 1600 E. 2nd Street, Bloomington, IN 47401;
d. 1700 W. Bloomfield Road, Bloomington, IN 47403-2004; and
e. 7199 S. Lodge Rd., Bloomington, IN 47403.

Real Property – Texas
a. 4905 Olmos Lane, El Paso, TX 79922;
b. 6016 Escondido Drive, El Paso, TX 79912;
c. 780 Villa Mirada Lane, El Paso, TX 79922;

d. 28 Kingery Drive, El Paso, TX 79902;
e. 123 Alta Vista Drive, Del Rio, TX 78840;
f. 212 Silver Sage, Del Rio, TX 78840;
g. 84 & 86 Apple Island Drive (lots 84 & 86 replatted into Lot 84-A), Horseshoe Bay, TX 78657;
h. 500-02 Sam Houston Parkway East, Houston, TX 77060;
i. 100-200 South Alto Mesa Drive, El Paso, TX 79912; and
j. 300 Farm Road 259, Canutillo, TX 79835.

Real Property – New Jersey

a. 10 Arrowhead Lane, Somerset, NJ 08873
b. 15 Forest Dr., Boonton, NJ 07005;
c. 166 W. Kelly Street, Metuchen, NJ 08840;
d. 43 Hampton Road, Clifton, NJ 07012;
e. 26 Comfort Place, Clifton, NJ 07011;
f. 1348 McCarter Hwy., Newark, NJ 07102;
g. 3793 Rte. 1 South, Monmouth Junction, NJ 08852;
h. 901 Spring St., Elizabeth, NJ 07201;
i. 1272 S. River Road, Cranbury, NJ 08512; and
j. 2870 Route 35 South, Hazlet, NJ 07730.

Real Property – Other States

a. 107 Roy Lane, Wentzville, MO 63385;
b. 8600 Merriam Road, Romulus, MI 48174;
c. 20 Hatfield Lane, Goshen, NY 10924;
d. 1 Industry Lane, Pittsburgh, PA 15275;
e. 24 Wexford on the Green, Hilton Head Island, SC 29928-6125;
f. 22 Marquette Lane, Kankakee, IL 60901;
g. 120 Course View Drive, Ruidoso, NM 88345; and
h. 8 Ernie Blake Road, Taos Ski Valley, NM 87525.

Vehicles

a. 1999 Bentley Arnage (VIN# SCBLB51E5XCX02650);
b. 2003 Mercedes Benz S500 (VIN# WDBNG84J83A367535);
c. 2003 Mercedes Benz Roadster (VIN# WDBSK75F23F034658);
d. 2003 Mercedes Benz Roadster (VIN# WDBSK75F63F025008);
e. 2003 Mercedes Benz C Series (VIN# WDBRN64J83A513203);
f. 2003 Mercedes Benz 600 Series (VIN# WDBNG76J73A370918);
g. 2002 Mercedes Benz S43 (VIN# WDBNG70J32A243719);
h. 2002 BMW 745 Li (VIN# WBAGN63492DR02916);
i. 2003 BMW X5 (VIN# 5UXFB33513LH48919);
j. 2004 Infiniti QX56 (VIN# 5N3AA08C64N804587);
k. 2005 Lexus RX330 (VIN# 2T2HA31U15C079559);
l. 2004 Lexus SC430 (VIN# JTHFN48Y040049488);

m. 2005 Toyota Landcruiser (VIN# JTEHT05J952074939);
n. 2006 Landrover (VIN# ALMF13406A215524);
o. 2004 Cadillac SLR Roadster (VIN# 1G6YV34A345601892); and
p. 1999 Harris-Kayot 22.2 Ft. Boat (Hull# HAMD3108B999).

Cash & Financial Assets

a. Approximately $3,364,326.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 8601);
b. Approximately $613,681.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 2120);
c. Approximately $685,728.00 held in Fidelity Investment Account of Bruce A. Furr (Account ending with 2138);
d. Approximately $976,775.36 held in Wachovia Bank Checking Account of Bruce A. Furr (Account ending with 6802);
e. Approximately $977,902.40 held in The Shemano Group Brokerage Account of Thomas C. Balsiger (Account ending with 7310);
f. Approximately $337,877.90 held in Goldman Sachs & Co. Brokerage Account of Thomas C. Balsiger (Account ending with 797-3);
g. Approximately $1,463,107.58 held in Merrill Lynch Brokerage Accounts of Thomas C. Balsiger (Accounts ending with 1427, 1428, 1429);
h. Approximately $1,395,528.68 held in UBS Brokerage Accounts of Thomas C. Balsiger (Accounts ending with 6588, 0007, 0008, 0014, 0655, 0968, &9726);
i. Approximately $350,533.37 held in Bank of the West Checking Account of Thomas C. Balsiger (Account ending with 0620);
j. Approximately $531,425.39 held in Hilliard Lyons Brokerage Account of Lance A. Furr (Account ending with 1872); and
k. A cashier's check in the amount of $32,000, representing the proceeds of the sale of 3554 Windgarden, Memphis, TN 38125.

A TRUE BILL:

[redacted] 12/5/07

FOREPERSON

Dated: December 5, 2007

Steven M. Biskupic

STEVEN M. BISKUPIC
United States Attorney