UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MONTANA FOOD DISTRIBUTORS ASSOCIATION, on behalf of themselves and all others similarly situated,

Case No.: 08-C-0457

Plaintiff,

v.

INTERNATIONAL OUTSOURCING SERVICES, LLC; INMAR, INC.; CAROLINA MANUFACTURER'S SERVICES; and CAROLINA SERVICES,

Defendants.

---

# IOS' BRIEF IN SUPPORT OF MOTIONS TO STAY PROCEEDINGS PENDING OUTCOME OF THE PARALLEL CRIMINAL PROCEEDING AND TO ENLARGE TIME TO ANSWER OR OTHERWISE PLEAD

---

## INTRODUCTION

Plaintiff Montana Food Distributors Association ("Montana Foods"), brought this putative class action alleging several claims against International Outsourcing Services, LLC ("IOS") and other defendants. The principal claims and underlying facts at issue in this case are intertwined with the claims and facts of a parallel criminal case pending against former officers and employees of IOS. Because this case closely parallels the criminal case, and IOS cannot effectively defend itself without input from the indicted former officers and employees, IOS would be unfairly burdened if this case proceeds now. Therefore, this lawsuit should be stayed pending resolution of the parallel criminal proceeding.

## FACTS

On May 22, 2008, plaintiffs filed this civil class action complaint ("Complaint") alleging breach of fiduciary duty, conspiracy to breach fiduciary duty, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), violations of the Sherman Act, as well as common law fraud, conspiracy to defraud, and unjust enrichment. (Complaint, ¶ 1.) The defendants named in the complaint consist of four corporate parties, including IOS. (Complaint, ¶¶ 3-4.)

Before Montana Foods brought this suit, on March 6, 2007, the Grand Jury in the United States District Court for the Eastern District of Wisconsin indicted IOS and eleven individual defendants who are former officers and employees of IOS with several allegations, including wire fraud, conspiracy to commit wire fraud, violations of RICO and conspiracy to obstruct justice based on an alleged coupon fraud scheme. The Grand Jury later issued a superseding indictment dismissing IOS from the indictment but maintaining the allegations against the individual defendants. A true and correct copy of the December 5, 2007 Superseding Indictment is attached hereto as Exhibit A. ("Superseding Indictment.")

The allegations in the Montana Foods Complaint assert facts that significantly overlap with the pending criminal proceeding and relate to subject matter significantly intertwined with the criminal case. All of the pertinent witnesses from IOS with knowledge of the facts concerning these allegations are premised on, and who would have to testify as to these facts in order for IOS to

appropriately answer and mount a defense, are currently indicted. These key witnesses will not be able to testify in this civil suit without waiving their constitutionally guaranteed Fifth Amendment privilege, subjecting them to the substantial risk that their testimony could be used to aid in the criminal prosecution against them. If they choose to exercise their Fifth Amendment rights, as they are likely to, then IOS will have not have an adequate opportunity to mount a meaningful defense. As a result, this matter should be stayed pending the outcome of the criminal action.

## ARGUMENT

### I. THE UNDERLYING FACTS AND SUBJECT MATTER OF THESE TWO ACTIONS ARE SUFFICIENTLY INTERTWINED SO AS TO JUSTIFY GRANTING A STAY OF THE CIVIL PROCEEDINGS.

District courts have broad discretion to stay a civil action pending the outcome of a criminal proceeding. *United States v. 6250 Ledge Road,* 943 F.2d 721, 729, n. 9 (7th Cir. 1991). The United States Supreme Court established long ago that a court has inherent power to stay its own proceedings when the interests of justice so require. *Landis v. North American Company,* 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936); *SEC v. Dresser Industries, Inc.,* 628 F.2d 1368, 1375 (D.C. Cir. 1980) (quoting *United States v. Kordel,* 397 U.S. 1, 12 n. 27, 90 S.Ct. 763, 770 n. 27, 25 L.Ed.2d 1 (1970) (citations omitted) ("Nevertheless, a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions 'when the interests of justice seem [ ] to require such action . . .'".) The Eastern District of Wisconsin, consistent with Seventh Circuit precedent, expressly held that a civil proceeding may be stayed on grounds that a concurrent

criminal prosecution is ongoing or pending, causing potential conflicts relating to the rights of witnesses to invoke the Fifth Amendment privilege. *Bruner Corp. v. Balogh,* 819 F.Supp. 811 (E.D. Wis. 1993).

Parallel civil and criminal proceedings create an untenable conflict for the individuals who are indicted and will be involved in this case. On one hand, in order for IOS to adequately defend itself in this lawsuit, it will need the testimony of its former members who were in charge of the company during the relevant time periods. However, all of these individuals are currently indicted in the criminal case, including Thomas "Chris" Balsiger, Lance Furr, David Howard, Bruce Furr, James Currey, and Ovidio Enriquez. (Superseding Indictment, 1.) If these individuals testify, they are likely to be held to have waived their Fifth Amendment privileges against self-incrimination and their testimony from the civil suit may be used to aid in the prosecution against them in the criminal proceeding. On the other hand, if they assert their Fifth Amendment privileges in the civil suit, their silence could be used against IOS, allowing the jury to draw an adverse inference against it, thus preventing IOS from adequately defending itself. *See National Acceptance Co. v. Bathalter,* 705 F.2d 924, 929-30 (7th Cir. 1983); *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 389 (7th Cir. 1995) (recognizing this situation as a Constitutional dilemma for defendants.)

Courts cut this Gordian knot by holding that the civil suit should be stayed pending the outcome of the criminal proceedings where overlapping facts and subject matter exist between cases. *Bruner,* 819 F.Supp. at 814; citing *SEC v. First*

*Financial Group of Texas, Inc.,* 659 F.2d 660, 668 (5th Cir. 1981); *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084 (5th Cir. 1979). Additionally, courts have held that where only individuals are indicted, but a corporation will be unable to mount a defense in a related civil case because the key witnesses will invoke the Fifth Amendment, the better course is to grant a stay. *U.S. v. All Meat and Poultry Products,* 2003 WL 22284318, *4 (N.D. Ill. 2003) ("In such instances as here, where the indicted individual defendants appear to be the central figures in both the civil and criminal proceedings, courts have determined that the better course is to enter a stay as to all defendants") citing *American Express Business Finance Corp. v. RW Professional Leasing Services Corp.,* 225 F.Supp.2d 263, 265 (E.D. N.Y. 2002). The significant overlap of facts and subject matter between these cases is readily apparent. The mere fact that IOS itself is no longer specifically named in the Superseding Indictment does not change this. The individuals who ran IOS at all relevant times, and who are the central figures to both proceedings, are indicted. Therefore, the Court should stay this civil suit pending the outcome of the criminal case.

In *Bruner,* this court stayed a civil suit in a similar situation. Ruling that a district court may stay a civil proceeding during the pendency of a parallel criminal proceeding when "special circumstances" exist and the stay is needed to avoid "substantial and irreparable prejudice." *Id.* at 815. Such "special circumstances" exist when the subject matter of the two cases is "sufficiently intertwined" for the Court to conclude that there is more than a mere "possibility"

that a witness' testimony could be used to help prosecute him, thus justifying the granting of a stay. *Id.* at 814. Other district courts in this Circuit inquire whether there is an "overlap" in the subject matter of the two actions. *See In re Anicom Inc. Securities Litigation,* 2002 WL 31496212 (N.D. Ill. 2002) citing *Cruz v. County of DuPage,* 1997 WL 370194 (N.D. Ill. 1997). This overlap or intertwinement may exist even where a civil action is broader in scope than a concurrent criminal complaint. *Bruner,* 819 F.Supp. at 814; *In re Anicom,* 2002 WL 31496212, at *1 (holding that where the criminal investigation pertains to the same time period and general set of facts as the allegations in the civil suit, the same subject matter is involved, which weighs in favor of granting the stay.)[1]

On its face, Montana Foods' Complaint alleges facts that significantly overlap those of the indictment. In fact, within the section of the Complaint titled "IOS's and Inmar's Anticompetitive and Fraudulent Scheme," **18 paragraphs** specifically reference the Superseding Indictment or one of the indicted individual defendants. (Complaint, ¶¶ 34-71.) Additionally, plaintiffs cite 17 paragraphs of the Superseding Indictment, and they even attached it as an exhibit to the Complaint. (Complaint, ¶¶ 34-71 and Exhibit A.) The Complaint further makes specific allegations involving indicted parties Thomas "Chris" Balsiger, Lance Furr, David Howard, Bruce Furr, James Currey and Ovidio Enriquez. (Complaint, ¶¶ 47, 50, 51, 52, 53, 60, 62, 63, 65, 66, 67, 68, 69, 70, 93, 96.) These passages from the Complaint

[1] Courts have found that the key inquiry is that the two actions involve the same subject matter, regardless of whether or not the indicted defendants are identical to the defendants named in the civil complaint. *Cruz,* 1997 WL 370194, at *2. (rejecting an argument by plaintiffs that the stay should be denied because there was only "some overlap" between the two actions and the grand jury didn't indict all of the defendants named in the civil suit.)

demonstrate conclusively that the same underlying facts and subject matter are involved in both cases:

- "Also, as part of its fraudulent scheme, IOS submitted to manufacturers fraudulently obtained coupons (e.g., coupons that had never been properly redeemed in connection with the purchase of a product) with the volume of coupons redeemed at larger stores, which ultimately increased the chargeback rates for deducting retailers. Superseding Indictment, *U.S. v. Balsiger et al.,* ¶ 16(a), attached as Exhibit A." (Complaint, ¶ 47.)

- "Further, the fraudulently submitted coupons included "[coupons that IOS already had 'charged back' to retailers as having been denied by manufacturers." Superseding Indictment ¶ 16(d). Submitting coupons that had already been charged back to retailers further increased the chargeback rates for deducting retailers." (Complaint, ¶ 48.)

- "IOS's scheme to defraud retailers depended on the elimination of competitive alternatives available to small, non-deducting retailers, as vigorous competition would have lowered chargeback rates for (and fees imposed on) small retailers. Small retailers would simply have chosen processing programs with lower chargeback rates over processing programs with higher chargeback rates, which – of course – would have defeated IOS's fraudulent scheme." (Complaint, ¶ 49.)

- "For example, after the FBI executed search warrants at IOS facilities in February 2003, IOS executive Lance Furr directed IOS employees to take computer files and other information home each night to avoid seizure and possible detection of their fraudulent and anticompetitive actions. Superseding Indictment ¶ 53(a). Similarly, after February 2003, IOS executive Chris Balsiger ordered that certain documents be destroyed and attempted to have others destroy documents. *Id.* ¶ 53(b)." (Complaint, ¶ 60.)

- "IOS provided false and misleading information to retailers regarding the volume of coupons billed in retailer's names as well as false information regarding IOS's coupon-processing and invoicing practices. *Id.* ¶¶ 24; 53(c)." (Complaint, ¶ 61.)

- "In approximately October 2004, IOS executives Chris Balsiger,

Bruce Furr, and Lance Furr provided false and misleading information to Food Lion about the volume of coupons billed to manufacturers under Food Lion's name. *Id.* ¶ 53(c)." (Complaint, ¶ 62.)

- "To further conceal their scheme, IOS and its officers and agents took steps to keep IOS's employees and others with knowledge of the scheme from cooperating with law enforcement officials and to retaliate against those who provided information to federal authorities, including attempting to condition severance benefits for departing employees on the employee's agreement not to speak to law enforcement officials and taking legal action or threatening legal action and/or financial harm to employees who cooperated with law enforcement efforts." (Complaint, ¶ 63.)

- "For example, on or about February 15, 2005, IOS reached a separation agreement with the company's controller, Christine Peak, which called for payment of an additional year of salary in exchange for agreeing not to speak with anyone – including law enforcement – about IOS without IOS's written consent. *Id.* ¶ 53(d)." (Complaint, ¶ 64.)

- "In approximately mid-August 2005, Lance Furr directed IOS to remove documents from his office and to hide them in an employee's personal residence. *Id.* ¶ 53(h)." (Complaint, ¶ 66.)

- "On or about August 18, 2005, IOS executive Chris Balsiger presented false information regarding IOS's coupon-invoicing practices to one of IOS's attorneys, knowing and intending that the same false information would be presented to law enforcement. *Id.* ¶ 53(j)." (Complaint, ¶ 67.)

- "Between January and August 2006, IOS executive Chris Balsiger and others prepared and revised a memorandum in which they described, documented, and revised a false "store tag" defense. *Id.* ¶ 53(l). The memorandum, which described IOS's historical invoicing practices, falsely indicated that although coupons from independent stores were included on invoices that listed only a large, funded retailer, all of the coupons had accurate "store tags." The document, entitled "IOS Should Not Be Indicted for Mail/Wire Fraud" was intended to be disclosed and later was disclosed to law enforcement. In March 2006, IOS executives and employees Chris Balsiger, James Currey, Ovidio Enriquez, David Howard, and others attempted to create false

invoices that could be used to support the "store tag" defense. *Id.* ¶ 53(n)." (Complaint ¶ 68.)

- "IOS executives and employees Chris Balsiger, Ovidio Enriquez, and James Currey persuaded two IOS employees – Nereo Castillo and Carlos Zapata – to provide materially false information regarding IOS's coupon-processing practices to law enforcement in April 2006. *Id.* ¶ 53(s)." (Complaint, ¶ 69.)

- "IOS Executives James Currey and Chris Balsiger developed computer programs to conceal the accounting of various aspects of the scheme, including programs to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS. *Id.* ¶ 28(d); 53(o)." (Complaint, ¶ 70.)

- "On information and belief, on April 11, 2001, CMS Executive Vice-President and CFO Cynthia Tessien and IOS CEO Chris Balsiger exchanged signed copies of the Proprietary Data Transfer Agreement sent to and/or from Inmar's offices in Winston-Salem, North Carolina via a fax machine connected to (336) 770-1923, in violation of 18 U.S.C. § 1343." (Complaint, ¶ 93.)

- "As part of the fraudulent scheme, and in violation of 18 U.S.C. § 1343, Defendant IOS used interstate wire communications to submit invoices to manufacturers for coupons that IOS falsely claimed had been redeemed at retail stores owned by Plaintiff and class members, including but not limited to the invoices detailed with specificity in the Superseding Indictment, *U.S. v. Balsiger et al.,* attached as Exhibit A, pp. 11-16 (alleging wire fraud.)" (Complaint, ¶ 96.)

These allegations directly implicate the key IOS personnel who are also defendants in the criminal case. It is safe to assume that they are likely to invoke the Fifth Amendment, severely hindering IOS' ability to mount a defense and adequately answer or otherwise plead in response to the Complaint. Based on nothing more than a simple reading of the Complaint, there is more than a mere "possibility" that these witnesses' testimony, which is central to the civil proceeding, could be used

against them in the criminal case. *Bruner,* 819 F.Supp. at 814. Based on the intertwinement of the subject matter and facts underlying these two actions, this Court should stay this lawsuit pending resolution of the criminal case. *Id.*

## II. THE POSTURE OF THE CRIMINAL PROCEEDING AND OTHER RELEVANT FACTORS SUPPORT GRANTING A STAY OF THE CIVIL PROCEEDINGS.

Courts also consider the posture of the criminal proceeding in determining whether to grant a stay. *Cruz,* 1997 WL 370194 at *2; *See Benevolence Intern. Foundation, Inc. v. Ashcroft,* 200 F.Supp.2d 935, 938 (N.D. Ill. 2002). This factor further supports the granting of a stay here. The *Bruner* court emphasized the fact that both the Fifth and Second Circuits have gone so far as to hold a ***pre-indictment*** assertion of privilege is proper, making the case that much stronger where, such as here, a criminal complaint has already been filed. *Id.* at 815; *See Wehling,* 608 F.2d 1084 (granting a stay until all threat of criminal liability had ended); *Andover Data Services v. Statistical Tabulating Corporation,* 876 F.2d 1080 (2d Cir. 1989) (upholding the assertion of the privilege of a protective order foreclosing prosecutorial access to testimony while it was unknown whether the criminal investigation was still ongoing.)

Here, we need not speculate whether a criminal complaint will be filed. The prosecution has been started and is proceeding apace. Denial of a stay would further prejudice IOS, because without the key testimony of these indicted individuals, it will be unable to adequately defend itself against Montana Foods' allegations. Because the criminal proceeding is pending and has been ongoing for over a year now, the validity of the assertion of this privilege is not hypothetical or

speculative. This makes IOS' case for a stay much stronger, because the parties involved are already indicted for serious related offenses.

Other factors some courts have considered in determining whether or not a stay is appropriate in these circumstances include: whether the actions are brought by the government; the public interests at stake; the plaintiff's interests and possible prejudice to the plaintiff; the burden that any particular aspect of the proceedings may impose on the defendant; and interests of judicial efficiency. *Cruz,* 1997 WL 379194 at *2; *Benevolence,* 200 F.Supp.2d at 938.[2] These factors all further support granting a stay of the civil proceedings in this case.

Although the government did not bring the civil action at issue here, this Courtt has specifically held that it is appropriate to stay a case even where no governmental entity is represented in the civil proceeding. *Bruner,* 819 F.Supp. at 814. In fact, as a matter of law, there need not even be a criminal proceeding for a witness to invoke this privilege. *Id.* citing *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). Thus, the fact that the government is not a party to the civil action does not justify denial of a stay.

The interests of and possible prejudice to the plaintiffs in this case also do not warrant denial of the stay. First, there will be no real prejudice to the plaintiffs if the case is stayed. This is a class action complaint, where the actual extent of who constitutes the members of the class of plaintiffs is unknown at this

---

[2] Notably, in *Bruner,* this court specifically rejected applying any specific "multi-factor test" for this type of analysis in light of the Seventh Circuit's "dislike for multi-factor tests." *Bruner,* 819 F.Supp. at 813n.2; citing *Farmer v. Hass et al.,* 990 F.2d 319 (7th Cir. 1993). Therefore, these factors should only be considered by the Court as further support of the argument that a stay is justified, rather than as parts of any specific multi-factor test for the Court to apply.

time. Parties who are not even aware of the fact that they may be members of a class of plaintiffs cannot be substantially prejudiced by simply having to await the outcome of a pending criminal case. They will still get their day in court. In addition, the interests of the plaintiffs in this case are not better served if the stay is denied. As described throughout this brief, all of the key witnesses from IOS in this case are currently subject to the Superseding Indictment and as such, will invoke their Fifth Amendment privileges when called to testify in this matter. This will severely limit the discovery process for ***both*** parties. Once the outcome of the criminal proceeding is determined, then both plaintiffs and defendants will be able to fully investigate the facts underlying these civil allegations, and fully litigate the corresponding claims.

The burden on IOS of proceeding with the civil action right now is extreme. Without the testimony of all of the relevant witnesses who are under indictment, IOS will not only be unable to defend itself adequately on the merits, but it will not even be able to talk to its former personnel in order to prepare an answer to the Complaint. Thus, the burden on the defendants in this case weighs heavily in favor of granting the stay.

Convenience of the Court, judicial efficiency and the public interest also support granting a stay. If the stay is denied, the civil and criminal matters will proceed simultaneously presenting the high potential for duplication of judicial efforts and resources. On the other hand, if the stay is granted, then the outcome of the criminal proceeding may resolve many issues involved in the civil matter, simplifying the overall issues in the case, and possibly facilitating settlement.

Finally, the public interest does not support the denial of a stay because the combination of the ongoing criminal proceeding and a subsequent civil proceeding pending the outcome of the criminal matter will adequately protect the public's interest.

After balancing all of these factors, the court should find that they weigh heavily in favor of granting a stay in this case. This Court specifically held in *Bruner* that a stay was justified in a situation factually similar to this one. Here, the most important issue for the Court to consider is the intertwinement of the subject matter and underlying facts of the two actions. These two proceedings are based on many of the same factual allegations and cover much of the same subject matter with respect to fraud involved in the coupon industry. All of the relevant witnesses from IOS who will have to testify as to key issues in the civil matter are subject to the Superseding Indictment. This leaves the individual indicted defendants and IOS with a "Hobson's choice" – they can either choose to testify and risk that their testimony be used to aid the prosecution against them in the criminal matter, or invoke the Fifth Amendment privilege, subjecting themselves and IOS to an adverse inference, and severely hindering the ability of IOS to mount a meaningful defense to these allegations. The substantial risk of unnecessary prejudice to these indicted individuals and to IOS can be remedied through simply staying the civil proceedings pending the outcome of the criminal case. The Court is justified in granting this stay due to the risk of this substantial prejudice and because of the significant intertwinement of the facts and subject matter of these two actions.

## CONCLUSION

For the reasons stated in this brief, IOS' motion should be granted, this action should be stayed pending the outcome of the criminal proceeding, and the court should enlarge IOS' time to answer or otherwise plead until resolution of the criminal proceeding.

Respectfully submitted,

KRAVIT, HOVEL & KRAWCZYK S.C.

*s/ Mark M. Leitner*
Stephen E. Kravit
Mark M. Leitner
Michael Fischer
Sarah J. Friday
Melissa S. Blair
Aaron H. Aizenberg
Attorneys for Defendant IOS

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson - Fifth Floor
Milwaukee, WI 53202
(414) 271-7100 - Telephone
(414) 271-8135 - Facsimile

Dated: July 30, 2008

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

BEIERSDORF, INC.; BRISTOL-MYERS SQUIBB COMPANY; COMMONWEALTH BRANDS, INC.; DEL MONTE CORPORATION; ENERGIZER BATTERY, INC.; ENERGIZER HOLDINGS, INC.; GENERAL MILLS, INC.; GEORGIA-PACIFIC CONSUMER PRODUCTS LP; DIXIE CONSUMER PRODUCTS LLC; GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY, L.P.; HORMEL FOODS CORPORATION; THE J.M. SMUCKER COMPANY; JOHNSON & JOHNSON; KELLOGG COMPANY; KIMBERLY-CLARK GLOBAL SALES, LLC; KRAFT FOODS GLOBAL, INC.; LAND O'LAKES, INC.; McCORMICK & COMPANY, INCORPORATED; NESTLÉ USA, INC.; NESTLÉ PURINA PETCARE COMPANY; PEPSICO, INC.; THE PROCTER & GAMBLE DISTRIBUTING LLC; S.C. JOHNSON & SON, INC.; and CONOPCO, INC. DBA UNILEVER,

Plaintiffs,

v.

Civil Action No. 07-C-0888

INTERNATIONAL OUTSOURCING SERVICES, LLC; THOMAS C. BALSIGER; BRUCE A. FURR; STEVEN A. FURR; LANCE A. FURR; WILLIAM L. BABLER; OVIDIO H. ENRIQUEZ; DAVID J. HOWARD; JAMES C. CURREY; HOWARD R. MCKAY, PROLOGIC REDEMPTION SOLUTIONS, INC. and MARLIN EQUITY PARTNERS, LLC,

Defendants.

**SECOND AMENDED COMPLAINT**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

BEIERSDORF, INC.; BRISTOL-MYERS SQUIBB COMPANY; COMMONWEALTH BRANDS, INC.; DEL MONTE CORPORATION; ENERGIZER BATTERY, INC.; ENERGIZER HOLDINGS, INC.; GENERAL MILLS, INC.; GEORGIA-PACIFIC CONSUMER PRODUCTS LP; DIXIE CONSUMER PRODUCTS LLC; GERBER PRODUCTS COMPANY; H.J. HEINZ COMPANY, L.P.; HORMEL FOODS CORPORATION; THE J.M. SMUCKER COMPANY; JOHNSON & JOHNSON; KELLOGG COMPANY; KIMBERLY-CLARK GLOBAL SALES, LLC; KRAFT FOODS GLOBAL, INC.; LAND O'LAKES, INC.; McCORMICK & COMPANY, INCORPORATED; NESTLÉ USA, INC.; NESTLÉ PURINA PETCARE COMPANY; PEPSICO, INC.; THE PROCTER & GAMBLE DISTRIBUTING LLC; S.C. JOHNSON & SON, INC.; and CONOPCO, INC. DBA UNILEVER,

Plaintiffs,

v.

Civil Action No. 07-C-0888

INTERNATIONAL OUTSOURCING SERVICES, LLC; THOMAS C. BALSIGER; BRUCE A. FURR; STEVEN A. FURR; LANCE A. FURR; WILLIAM L. BABLER; OVIDIO H. ENRIQUEZ; DAVID J. HOWARD; JAMES C. CURREY; HOWARD R. MCKAY, PROLOGIC REDEMPTION SOLUTIONS, INC. and MARLIN EQUITY PARTNERS, LLC,

Defendants.

**SECOND AMENDED COMPLAINT**

1. This is an action for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), as well as common law fraud, failure to disclose, and unjust enrichment. Defendants International Outsourcing Services, LLC ("IOS"), Thomas C. Balsiger, Bruce A. Furr, Steven A. Furr, Lance A. Furr, William L. Babler, Ovidio H. Enriquez, David J. Howard, James C. Currey, and Howard R. McKay (collectively "Defendants") engaged in an enterprise whereby they conspired to defraud -- and did defraud -- consumer product manufacturers of hundreds of millions of dollars. Pursuant to their scheme, Defendants knowingly induced Plaintiffs to pay IOS for manufacturers' "cents off" coupons that Defendants knew had not been redeemed in connection with a consumer purchase or otherwise had not been redeemed as represented by IOS. IOS submitted fraudulent invoices to Plaintiffs or their authorized agents and received payments pursuant to those fraudulent invoices. Defendants concealed their scheme over a number of years. On March 6, 2007, a grand jury in this District indicted IOS and the other Defendants named above, charging that they stole more than $250 million pursuant to their scheme.[1] In late May or early June 2008, Defendants Marlin Equity Partners, LLC and ProLogic Redemption Solutions, Inc., with knowledge of the claims asserted by Plaintiffs, acquired IOS's coupon processing business and became liable as successors.

## THE PARTIES

2. Beiersdorf, Inc. ("Beiersdorf") is a Delaware corporation with its principal place of business in Wilton, Connecticut. Beiersdorf issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

3. Bristol-Myers Squibb Company ("Bristol-Myers Squibb") is a Delaware corporation with its principal place of business in New York, New York. Bristol-Myers Squibb,

1 Since that time, pursuant to a cooperation agreement negotiated with the prosecutors, IOS has been dismissed from the indictment, but criminal charges against all of the individual Defendants remain pending. Regardless of IOS's dismissal from the criminal proceeding, a Superseding Indictment filed on December 5, 2007 makes clear that IOS was central to the fraud scheme.

including its wholly-owned subsidiary Mead Johnson & Company, issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

4. Commonwealth Brands, Inc. ("Commonwealth Brands") is a Kentucky corporation with its principal place of business in Bowling Green, Kentucky. Commonwealth issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

5. Del Monte Corporation ("Del Monte") is a Delaware corporation with its principal place of business in San Francisco, California. Del Monte issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

6. Energizer Battery, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri and Energizer Holdings, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri. Energizer Battery and Energizer Holdings are referred to herein collectively as "Energizer." Energizer issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, in 2003 Energizer acquired the Schick shaving business. Also, on October 1, 2007, Playtex Products, Inc. was merged into a subsidiary of Energizer Holdings and became a wholly-owned subsidiary of Energizer Holdings. Finally, Eveready Battery Company, Inc. is a subsidiary of Energizer Holdings that was financially responsible for coupon redemptions prior to 2003. Accordingly, Energizer asserts the rights and claims of Schick, Playtex and Eveready as well.

7. General Mills, Inc. ("General Mills") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. General Mills issues "cents-off" coupons for

redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, in 2001, General Mills acquired The Pillsbury Company; accordingly, General Mills asserts the rights and claims of The Pillsbury Company as well.

8. Georgia-Pacific Consumer Products LP is a Delaware limited partnership and Dixie Consumer Products LLC is a Delaware limited liability company, both with their principal place of business in Atlanta, Georgia (collectively "Georgia-Pacific") and both collectively asserting rights on behalf of the following former entities: Georgia-Pacific Corporation, Fort James Operating Company, Fort James Corporation, Fort Howard Corporation and James River Corporation. Georgia-Pacific issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

9. Gerber Products Company ("Gerber") is a Michigan corporation with its principal place of business in Florham Park, New Jersey. Gerber issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

10. H.J. Heinz Company, L.P. ("Heinz") is a Delaware limited partnership with its principal place of business in Pittsburgh, Pennsylvania. Heinz issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

11. Hormel Foods Corporation ("Hormel") is a Delaware corporation with its principal place of business in Austin, Minnesota. Hormel issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

12. The J. M. Smucker Company ("J. M. Smucker") is an Ohio corporation with its principal place of business in Orrville, Ohio. J.M. Smucker issues "cents-off" coupons for

redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, J.M. Smucker acquired International Multifoods Corporation in June 2004 and acquired Eagle Family Foods Holdings, Inc. and related entities in May 2007; accordingly, J.M. Smucker asserts the rights and claims of those entities as well.

13. Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. J&J issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

14. Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business in Battle Creek, Michigan. Kellogg issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufacturers. In addition, Kellogg acquired Keebler Foods Company in 2001; accordingly, Kellogg asserts the rights and claims of Keebler as well.

15. Kimberly-Clark Global Sales, LLC ("Kimberly-Clark") is a Delaware limited liability company with a principal place of business in Dallas, Texas. Kimberly-Clark issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

16. Kraft Foods Global, Inc. ("Kraft Foods") is a Delaware corporation with its principal place of business in Northfield, Illinois. Kraft Foods issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

17. Land O'Lakes, Inc. ("Land O'Lakes") is a Minnesota cooperative corporation with its principal place of business in Arden Hills, Minnesota. Land O'Lakes issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

18. McCormick & Company, Incorporated ("McCormick") is a Maryland corporation with its principal place of business in Sparks, Maryland. McCormick issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures. In addition, Zatarain's Brands, Inc. is a wholly owned subsidiary of McCormick; accordingly, McCormick asserts the rights and claims of Zatarain's as well.

19. Nestlé USA, Inc. ("Nestlé") is a Delaware corporation with its principal place of business in Glendale, California. Nestlé issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

20. Nestlé Purina PetCare Company ("Nestlé Purina") is a Missouri corporation with its principal place of business in St. Louis, Missouri. Nestlé Purina issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

21. PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its principal place of business in Purchase, New York. PepsiCo, through its subsidiaries including but not limited to The Quaker Oats Company, Frito-Lay, Inc., Pepsi Cola North America and Tropicana Products, Inc., issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

22. The Procter & Gamble Distributing LLC (formerly The Procter & Gamble Distributing Company before a name change on October 1, 2006) ("P&G") is a Delaware limited liability company with its principal place of business in Cincinnati, Ohio. P&G issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufacturers. In addition, P&G acquired The Gillette Company in 2005; accordingly, P&G asserts the rights and claims of Gillette as well.

23. S.C. Johnson & Son, Inc. ("S.C. Johnson") is a Wisconsin corporation with its principal place of business in Racine, Wisconsin. S.C. Johnson issues "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products it manufactures.

24. Conopco, Inc. dba Unilever is a New York corporation with its principal place of business in Englewood Cliffs, New Jersey. Unilever and its divisions, including but not limited to its ice cream division operating in Green Bay, Wisconsin, issue "cents-off" coupons for redemption by the consuming public in conjunction with the purchase of products they manufacture.

25. Defendant International Outsourcing Services, LLC is an Indiana limited liability company with principal offices in El Paso, Texas and Bloomington, Indiana. IOS acts as a clearinghouse in the coupon redemption process, receiving coupons from numerous retailer clients, processing the coupons and then forwarding them to the pertinent manufacturer (or manufacturer's redemption agent) for reimbursement.

26. During the period pertinent to this Complaint, Defendant Thomas C. ("Chris") Balsiger was IOS's Chief Operating Officer, President and, later, Chief Executive Officer. Balsiger is a resident of Texas.

27. During the period pertinent to this Complaint, Defendant Bruce A. Furr was the Chairman of IOS's Board. Bruce Furr also had been IOS's Chief Executive Officer. Bruce Furr is a resident of Indiana.

28. During the period pertinent to this Complaint, Defendant Lance A. Furr was an IOS Executive Vice President and Board member. Lance Furr also was IOS's Chief Financial Officer until 2004. Lance Furr is a resident of Indiana.

29. During the period pertinent to this Complaint, Defendant Steven A. Furr was an IOS Executive Vice President, Board member and, later, President of IOS's North American Operations. Steven Furr is a resident of Texas.

30. During the period pertinent to this Complaint, Defendant William L. Babler was IOS's Chief Financial Officer. Babler is a resident of Indiana.

31. During the period pertinent to this Complaint, Defendant Howard R. McKay was an IOS consultant and sales manager and served on IOS's Advisory Board. McKay is a resident of Tennessee.

32. During the period pertinent to this Complaint, Defendant Ovidio H. Enriquez was an IOS plant manager, working in El Paso, Texas, and Juarez, Mexico. Enriquez was also a Vice President and General Manager for IOS. Enriquez is a resident of Texas.

33. During the period pertinent to this Complaint, Defendant David J. Howard was an IOS plant manager, working in Del Rio, Texas and Acuna, Mexico. Howard was also a Vice President and General Manager for IOS. Howard is a resident of Texas.

34. During the period pertinent to this Complaint, Defendant James C. Currey was the President of Currey, Adkins, a firm that handled information technology for IOS, and was on IOS's Advisory Board. Currey is a resident of Texas.

35. Defendant Marlin Equity Partners, LLC ("Marlin") is a Delaware limited liability company with its principal place of business in El Segundo, California.

36. Defendant ProLogic Redemption Solutions, Inc. ("ProLogic") is a Delaware corporation with its principal place of business in El Segundo, California.

37. Marlin purchased the coupon processing business of IOS in late May 2008, leaving IOS with only a limited data processing business, and assets insufficient to satisfy a judgment in this action. Marlin formed a new company, ProLogic, to operate the business. On

information and belief, ProLogic and Marlin were not involved in operating IOS's coupon processing business prior to 2008. Accordingly, references to "Defendants" in the factual background below refer to the entities that were in existence and operating in the coupon processing business at the time of the events described.

## JURISDICTION AND VENUE

38. Jurisdiction is proper in this Court pursuant to 18 U.S.C. § 1964(a) and (c), and 28 U.S.C. § 1331. With respect to Plaintiffs' common law claims, this Court also has jurisdiction pursuant to 28 U.S.C. § 1367.

39. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

### The Coupon Industry

40. Plaintiffs are manufacturers of a vast array of consumer products, ranging from food and beverages, to health and beauty products, to paper products, to cleansers and detergents. These companies issue "cents off" coupons that consumers can redeem in connection with the purchase of the companies' products at grocery and other retail stores.

41. The cents off coupons issued by Plaintiffs and other manufacturers are distributed on a regular basis. The principal means of distribution are via "inserts" in local newspapers (i.e., the advertising pamphlets inserted in newspapers, usually on Sunday, that include coupons) and via advertising circulars; there are other methods of distribution as well, including direct mail, on or in product packages, at the point of sale when particular products are purchased, etc. Consumers exchange the coupons for a discount when they purchase the manufacturers' products. In order to use a coupon, a consumer presents the coupon to the grocery store or retail

cashier at the time the product identified on the coupon is purchased. Pursuant to the offer stated on the coupon, there may be volume (e.g., $1.00 off three packages) or other requirements that must be satisfied. The cashier then deducts the coupon's stated face value from the product's purchase price. The retail merchant retains the coupon following the transaction.

42. Following the retail sale, the next steps in the redemption process involve the reimbursement of the retailer by the manufacturer issuing the coupon. After a coupon is received from a consumer, the retailer must submit the coupon to the appropriate manufacturer or its agent, which then pays the face value of the coupon plus a handling fee to the retailer.

43. Typically, retailers do not submit coupons directly to manufacturers or the manufacturers' agents, but instead rely on intermediary companies to act as the retailer's agent in this process. The companies that perform this service are usually referred to as coupon processors or coupon clearinghouses (both referred to hereafter as "clearinghouses").

44. Retailers normally ship their coupons to a clearinghouse, which then sorts the coupons according to the issuing manufacturer and counts them. The clearinghouse then submits invoices for the value of the coupons and the handling fee, usually along with the coupons themselves, to the various manufacturers or their designated agents for payment in accordance with the terms and conditions of the individual manufacturers' respective coupon redemption policies. The clearinghouse then receives the payments, often in the name of the retailer client, from the manufacturers. The clearinghouse forwards the payment to the retailer, less a charge for the clearinghouse's services. While the foregoing is a general description of the overall redemption process, there may be a number of variations on this process. For purposes here, the most significant variation is that in some instances a retailer so completely "outsources" the redemption function to the clearinghouse that the clearinghouse has the ability not only to submit coupons and receive payments in the retailer's name, but also to negotiate adjustments and issue

payments ostensibly on behalf of the retailer, without any oversight by or transparency to the retailer. Also, in some instances, a retailer will accept a payment from a clearinghouse upon the submission of coupons to the clearinghouse in return for divesting any further interest in the coupons, thereby giving the clearinghouse total control over those coupons and their disposition.

**The Defendants' Scheme**

45. IOS is the largest coupon clearinghouse for retailers. IOS and its predecessors have been in business since 1961. Over the years, IOS has processed hundreds of millions of coupons annually on behalf of major retailers such as Kroger, Food Lion, Pathmark, Winn-Dixie, HEB, Hannaford Brothers, Kash 'n Karry, CVS, Rite Aid, BJ's Wholesale and Fresh Brands/Piggly Wiggly. IOS receives coupons from all over the United States and Canada, arriving via the U.S. Postal Service, courier services, air freight and commercial truck lines.

46. Although the Defendants' scheme was multi-faceted, at its most fundamental level it involved simply augmenting the substantial volumes of properly-redeemed coupons that IOS received from certain of its major retailer clients with other coupons that IOS acquired, and then fraudulently submitting the entire batch as if all of the coupons had been redeemed legitimately by consumers at the designated retailer. Thus, for example, if IOS received 100 coupons from Retailer X that had been issued by Manufacturer A, IOS would add additional coupons from Manufacturer A to this batch without the knowledge of Retailer X (for illustrative purposes, say, 20) and then submit all 120 coupons to Manufacturer A; IOS would invoice Manufacturer A for all 120 coupons as if all 120 had been redeemed at Retailer X. In this way, Defendants used IOS's legitimate coupon business as a cover for their scheme. Defendants knowingly devised and participated in this scheme to defraud and to obtain money by means of false pretenses and representations and did so with the intent to defraud Plaintiffs.

47. Through this scheme, Defendants induced manufacturers, including Plaintiffs, to pay hundreds of millions of dollars pursuant to invoices that Defendants knew to be fraudulent. The coupons utilized by Defendants to effectuate their scheme included coupons that never had been redeemed by any consumer in connection with any retail purchase and coupons that IOS falsely invoiced to manufacturers as having been redeemed at a particular retail store when, in fact, those coupons had been submitted to IOS from a different store, in many instances through "coupon brokers"; in the latter case, the coupons likely had not been redeemed by a consumer and, in any event, as Defendants knew, the identification of the store at which they were nominally redeemed would prompt far greater scrutiny of the coupons (for example, due to questions involving purported coupon volume as a percentage of total sales, coupon volume compared to product volume, past redemption practices, etc.). These coupons utilized to effectuate the scheme are sometimes referred to hereinafter as "illegitimate coupons." IOS's submission of coupons to Plaintiffs or their agents for reimbursement and the accompanying invoices explicitly and implicitly represented that the coupons had been redeemed in connection with a retail purchase at the identified retailer, which was false, as Defendants knew.

48. Within IOS, Defendants referred to the scheme to defraud using terms such as "alternative invoicing," "alternative manufacturing invoicing," "8's and 9's" (referring to invoice sequences), "deuces," "error trays," "indirect revenue," "trickling," and "arbitrage."

49. In order to carry out the scheme, Defendants acted through an enterprise comprised of Defendants and various associates, including "coupon brokers" and other third parties.

50. Defendants solicited the coupon brokers (including, among others, Abdel Rahim Jebara and Daxesh V. Patel and Bharatkumar K. Patel of Riya Coupon Services, LLC, each of whom has now been indicted for coupon fraud) to acquire as many coupons as they could (either

directly or through other third parties) for IOS to include in submissions to manufacturers, knowing that many of the coupons so acquired had never been redeemed in connection with a retail purchase. Defendants, themselves and through the coupon brokers, directed third parties to procure coupon inserts for mass cutting and otherwise to procure coupons for use in the scheme.

51. In some instances, Defendants obtained mass cut and other coupons directly from those coordinating the procurement and cutting. In other cases, the coupon brokers signed up small retailers as direct or indirect IOS clients and submitted mass cut and other illegitimate coupons to IOS as coupons supposedly redeemed at these small retail establishments. Defendants, directly and through direction of IOS employees, worked with the brokers to set up and accept large coupon submissions from these retail accounts as a cover for their infusion of illegitimate coupons into the coupon redemption process. Indeed, the volume of coupons being submitted by these retail accounts was well in excess of the amount that these accounts could have submitted legitimately. Defendants then co-mingled these illegitimate coupons with legitimate coupon submissions made by certain of IOS's larger retail accounts before submitting them to Plaintiffs or their agents for reimbursement.

52. Defendant Balsiger set periodic goals for the volume of illegitimate coupons to be included by IOS with shipments from large retailers and directed others, including Defendants Enriquez and Howard, to ensure that these goals were met by the brokers and others.

53. According to a criminal indictment by the United States concerning this same scheme, "[a]s a result of their scheme, the defendants wrongfully obtained . . . over $250 million from manufacturers nationwide" for the period "[b]eginning by 1997 and continuing through December 2006." Indictment, ¶¶ 1-2, Case No. 07-CR-057 (E.D. Wisc. Mar. 6, 2007). Assuming a normal distribution of brands and products among the fraudulent submissions, the vast majority of this $250 million was wrongfully obtained from Plaintiffs.

54. Retailers whose legitimate coupon submissions were augmented and used by Defendants for fraudulent invoices and submissions to manufacturers included Food Lion, Winn-Dixie, Pathmark, Kash n' Karry, Hannaford Brothers, HEB, Rite Aid, CVS, BJ's Wholesale and Fresh Brands/Piggly Wiggly. Defendants made fraudulent submissions and presented fraudulent invoices to manufacturers pursuant to this scheme beginning by 1997 and continuing through 2006.

55. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Food Lion stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Food Lion. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Food Lion stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

56. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Winn-Dixie stores when, in fact, as Defendants knew, some or all of the coupons had not been

redeemed by any consumer and/or had not been submitted to IOS by Winn-Dixie. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Winn-Dixie stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

57. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at HEB stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by HEB. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at HEB stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire

communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

58. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Pathmark stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Pathmark. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Pathmark stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

59. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Hannaford Brothers stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Hannaford Brothers. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been

redeemed by consumers at Hannaford Brothers stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

60. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Kash 'n Karry stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Kash 'n Karry. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Kash 'n Karry stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

61. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at CVS stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by CVS. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at CVS stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

62. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) (except for Land O'Lakes) for coupons supposedly redeemed by consumers at Rite Aid stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by Rite Aid. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Rite Aid stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used

interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

63. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at BJ's Wholesale stores when, in fact, as Defendants knew, some or all of the coupons had not been redeemed by any consumer and/or had not been submitted to IOS by BJ's Wholesale. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at BJ's Wholesale stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

64. Pursuant to Defendants' scheme, IOS repeatedly submitted fraudulent invoices to each of the Plaintiffs (or their agents) for coupons supposedly redeemed by consumers at Fresh Brands/Piggly Wiggly stores when, in fact, as Defendants knew, some or all of the coupons had

not been redeemed by any consumer and/or had not been submitted to IOS by Fresh Brands/Piggly Wiggly. Without knowing the true status of the coupons or the fraudulent nature of the submissions and invoices, and relying on the invoices to be truthful representations that the coupons had been redeemed by consumers at Fresh Brands/Piggly Wiggly stores and of the amounts owed for such coupons, Plaintiffs paid these invoices. For the purpose of executing and carrying out this scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each fraudulent invoice to any Plaintiff, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

65. Especially given the huge volume of properly-redeemed coupons coming from the major retailers identified above that were utilized by Defendants for their scheme, there was no reasonable way to detect or identify the addition of even very large numbers of illegitimate coupons to the stream of legitimate coupons. Now that the nature of the scheme has been revealed, however, a number of examples even more specific than those set forth above are identifiable with the benefit of hindsight. These examples highlight the fraud. Several of these examples are set forth below.

A. IOS submitted invoices to Good Humor-Breyers Ice Cream, a division of Unilever, in 2002 that included requests for payment for coupons for Klondike®, Popsicle®, and Breyers® ice cream products under offer codes 40298, 62252, 62228, 40263, 55949, 40233, 62252, and 55896, representing that these coupons had been redeemed at HEB stores in Texas. Such coupons had been distributed only in the northeastern United States and had never been

distributed in Texas. The coupons had not been redeemed at HEB stores in Texas, as IOS represented. The charges in IOS's fraudulent invoices were passed along to Good Humor-Breyers in the contemporaneous invoices by its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 4/01/02 | 02-05285-00 | $352,873.88 |
| 5/20/02 | 02-08282-00 | $525,503.88 |
| 8/19/02 | 02-13837-00 | $605,120.07 |
| 10/21/02 | 02-17495-00 | $247,386.54 |
| 10/28/02 | 02-17892-00 | $234,631.64 |

B. IOS submitted invoices to Kimberly-Clark in 2002 that included requests for payment for coupons for Kotex® products under offer codes 42509, 42510, 42511, 42607, 42618, 42620, 42621, and 42622, representing that these coupons had been redeemed at HEB stores in Texas. Such coupons were distributed only in the northeastern United States and were never distributed in Texas. The coupons had not been redeemed at HEB stores in Texas, as IOS represented. The charges in IOS's fraudulent invoices were passed along to Kimberly-Clark in the contemporaneous invoices by its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 6/24/02 | 02-10458-00 | $3,020,744.36 |
| 7/01/02 | 02-10878-00 | $3,391,755.28 |
| 7/08/02 | 02-11382-00 | $2,964,381.51 |
| 8/19/02 | 02-13826-00 | $3,363,712.80 |
| 10/21/02 | 02-17486-00 | $2,913,282.42 |

C. IOS submitted invoices to S.C. Johnson in late 2002 and early 2003 that included requests for payment for coupons for S.C. Johnson's Scrubbing Bubbles®, Shout®,

and/or Oxy Power® products under redemption codes 26291 and 26292, representing that these coupons had been redeemed at Food Lion stores in the southeastern United States and HEB stores in Texas. Such coupons were distributed only in the northeastern United States and were never distributed in the southeastern United States or in Texas. The coupons had not been redeemed at the Food Lion or HEB stores, as IOS represented. The charges in IOS's fraudulent invoices were passed along to S.C. Johnson by its agent and were included for ultimate payment to IOS in the electronic transfers from S.C. Johnson to its agent set forth below:

| Date | Invoice No. | Amount |
|---|---|---|
| 11/29/02 | 021129001172 | $1,072,695.49 |
| 12/06/02 | 021206001172 | $2,188,752.53 |
| 1/17/03 | 030117001172 | $1,683,441.89 |
| 2/07/03 | 030207001172 | $1,016,194.07 |
| 2/14/03 | 030214001172 | $ 953,959.76 |

D. Over a three year period from 2001-2003, IOS submitted invoices to McCormick that included requests for payment for seventy thousand coupons supposedly redeemed by consumers at HEB stores in Texas, when those coupons had been distributed only in regions of the United States distant from Texas and that had never been distributed in Texas. Such coupons had not been redeemed at the HEB stores in Texas, as IOS represented.

E. In 2002, IOS submitted fraudulent invoices to Hormel for coupons supposedly redeemed at Kroger, HEB, Kash 'n Karry, Rite Aid, Publix Supermarkets, Food Lion, and Winn Dixie stores and including requests for payment for coupons for Hormel's CARAPELLI® Olive Oil product. In addition, during this same period, IOS submitted invoices to Hormel for coupons supposedly redeemed at CVS stores and including requests for payment for coupons for Hormel's CARAPELLI® Olive Oil, SPAM® and JENNIE-O TURKEY STORE®

products. For all of these coupons, either the coupons had never been distributed in the geographic markets in which they were supposedly redeemed or the products for which the coupons were supposedly redeemed were not carried by the retailer t hat IOS identified as submitting the coupons. These coupons had not been redeemed at the indicated stores, as IOS represented.

* * *

All of the invoices submitted to the indicated Plaintiffs in these examples were fraudulent and were submitted pursuant to Defendants' scheme. For the purpose of executing and carrying out their scheme to defraud, Defendants used the United States mails and/or private or commercial interstate carriers and used interstate wire communications or Defendants caused the use of the United States mails and/or private or commercial interstate carriers and interstate wire communications. Because they were part and parcel of this overall scheme to defraud, each use of the mails and/or interstate carriers and each use of interstate wire communications, including each submission of each IOS invoice identified above, constituted a separate act of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

**Defendants' Concealment of Their Scheme**

66. Defendants went to great lengths to conceal their scheme to defraud Plaintiffs, including sending letters of explanation for certain perceived redemption anomalies, distancing themselves from other participants in the enterprise who were indicted for coupon fraud earlier, and even inviting certain retailers and manufacturers to tour IOS's facilities to attempt to convince them that all was in order. Defendants also used intimidation, firing of employees, and public statements and promises to conceal their scheme.

67. For example, in 2003, an IOS employee, Robert MacDonald, who was based in Memphis, was indicted for coupon fraud along with Abdel Rahim Jebara and others.

MacDonald had been working with Jebara and another coupon broker to obtain illegitimate coupons from mass cutting operations. The mass-cut coupons were then submitted to IOS via small retail accounts that Jebara and the other coupon broker had solicited and set up as IOS clients through MacDonald. Jebara and the other coupon broker then submitted illegitimate coupons through these accounts. As the manager of the accounts, MacDonald arranged for these submissions to be accepted and, in turn, submitted to manufacturers for reimbursement (either directly or through co-mingling with legitimate submissions from large retailers). As the public and manufacturers became aware of the criminal allegations concerning MacDonald pursuant to his indictment, IOS issued a statement suggesting that MacDonald was a mid-level employee and an isolated actor, and that IOS itself and its other employees were not involved in MacDonald's activities. IOS followed this statement with public and private posturing in an attempt to defend its "good name" and reputation in the face of the revelations concerning MacDonald's activities. In fact, Defendant Balsiger threatened suits against persons who made any suggestion -- or were perceived by him to have made any suggestion -- that there might be some connection between MacDonald's activities and IOS or the other Defendants. IOS subsequently distributed several other public statements touting its supposed efforts to fight fraud, cooperation with law enforcement efforts, and commitment to preserve the integrity of the coupon redemption process.

68. Even more recently, in July 2005, Defendant Steven Furr, on behalf of IOS, drafted a letter to Pathmark, which apparently had raised concerns about IOS's possible involvement in the government's ongoing investigation following the MacDonald indictment and his subsequent entry of a guilty plea. Furr and IOS represented to Pathmark that IOS was not under investigation for fraud and had done nothing wrong, and specifically denied that non-Pathmark coupons could have been co-mingled with coupons from Pathmark and billed out under the Pathmark program.

69. To further conceal their scheme, IOS, Bruce Furr, Chris Balsiger and others took steps to keep IOS's employees and others with knowledge of the scheme from cooperating with law enforcement officials and to retaliate against those who provided information to federal authorities, including attempting to condition severance benefits for departing employees on the employee's agreement not to speak to law enforcement officials and taking legal action or threatening legal action and/or financial harm to employees who cooperated with law enforcement efforts.

70. Defendants Currey and Balsiger also developed computer programs to conceal the accounting of various aspects of the scheme, including programs to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS.

71. On March 6, 2007, a federal grand jury in this District indicted Defendants on multiple counts of wire fraud in connection with the scheme at issue here. Although some of the Plaintiffs here had been subpoenaed to provide information to the grand jury in the course of its investigation, the indictment was the first time that Defendants' scheme and the resulting injuries were revealed.

**<u>The 2008 Sale of IOS's Coupon Business</u>**

72. According to its website, www.iosnet.com, IOS has been engaged in various lines of business in addition to the coupon processing business discussed above. These other lines of business have included data services, manufacturing and assembly, and packaging and logistics. At all times relevant to this Complaint, however, the coupon processing business of IOS has been by far IOS's largest source of revenue. As such, it is likely to be the best, if not the only, source of funds through which IOS could satisfy a judgment in this action, particularly in view of the magnitude of damages suffered by Plaintiffs as a consequence of Defendants' actions.

73. Since the filing of this civil action, IOS has sold a number of its smaller divisions and businesses. According to press reports, these sales have included several sales to IOS owners and insiders, including sales to individuals who are Defendants in this action and who remain under indictment in the criminal proceeding. However, until recently, the core coupon processing business of IOS remained intact, generating significant revenue for IOS.

74. In recent weeks, IOS entered into an agreement with Marlin Equity Partners, a California-based private investment firm, to purchase IOS's coupon processing business. According to its website, www.marlinequity.com, Marlin Equity looks to acquire businesses that exhibit one or more of the following characteristics:

**Operational/Financial Characteristics**

- $10 million to $500 million in revenue (current profitability not a requirement)
- Strong management team with track record of success
- Companies or divisions experiencing some form of financial, operational or market-related transition
- Strong installed customer base with recurring revenue streams
- Defensible market position with barriers to entry
- Scalable business model
- Underutilized or non-core assets

75. In a press release dated May 23, 2008, but posted on its website on June 5 or 6, 2008, Marlin Equity announced publicly that it had "acquired one of the world's largest coupon redemption operations" from IOS and had "formed a new company, ProLogic Redemption Solutions," to operate the business. A similar announcement was released by ProLogic on June 2, 2008. ProLogic's corporate headquarters address is the same street address in El Segundo, California as Marlin Equity's headquarters address.

76. There is substantial continuity in the operation of the coupon processing business of IOS and the same business as it is now being operated by ProLogic and/or Marlin Equity. This continuity includes, among other things, continuing offices, plants, equipment, machinery, employees, customers, services, contractual relationships, and vendors. According to ProLogic's website, www.prologicredemption.com, ProLogic has "Client Service Centers" at the same addresses in Bloomington, Indiana and El Paso, Texas as previously operated by IOS's coupon processing division. William Atkinson, a Marlin Equity partner and President and CEO of ProLogic, is quoted on the Bloomington (Indiana) Herald Times website (www.heraldtimesonline.com) as saying that "[t]he approximately 40 employees who worked for IOS in Bloomington are now working for ProLogic." ProLogic also indicated on its website that it was operating plants in Acuña and Muzquiez, Mexico; these plants were previously operated by IOS. As described by ProLogic, the coupon processing service provided by ProLogic is the same as that previously provided by IOS.

77. ProLogic, Marlin Equity and IOS were all on notice of and actually aware of Plaintiffs' claims in this action at the time that the transaction discussed above was negotiated, at the time an agreement was reached, and at the time the transaction was consummated. This transaction was consciously structured in an attempt to minimize or prevent Plaintiffs' ability to enforce a judgment in this action.

78. IOS's coupon processing business is generating, or should be able to generate, very substantial revenues. In recent years, consumer products manufacturers including Plaintiffs have paid hundreds of millions of dollars annually to IOS as reimbursement for cents-off coupons submitted by IOS on behalf of its retail customers. Pursuant to its agreements with retailers, IOS retains a portion of these proceeds and/or collects fees for its coupon processing

services. As noted in ProLogic's press release, IOS's coupon processing business is "one of the world's largest" coupon processing businesses.

79. Marlin Equity's willingness to purchase the IOS coupon processing business also indicates its value. Based on Marlin Equity's published investment criteria, IOS would have revenues from $10 million to $500 million, a "strong installed customer-base with recurring revenue streams," a "defensible market position with barriers to entry," and a "scalable business model."

80. Despite the apparent value of IOS's coupon processing business, however, the indicted former CEO of IOS, Defendant Balsiger, has been quoted as saying that "[t]here were no proceeds from the sale." In papers filed with the Court prior to the transfer, IOS did not suggest otherwise.

81. Plaintiffs are not privy to all of the details of the transaction or the negotiations that proceeded it. However, instead of generating proceeds for IOS that might have been subject to collection or attachment, the transaction apparently resulted only in relief from certain debt. In addition, the sale apparently benefited IOS insiders, including indicted individuals, whose personal guarantees were released.

82. The transfer of property in the form of IOS's coupon processing business and its associated revenue streams from IOS to ProLogic and/or Marlin Equity satisfies numerous objective "badges of fraud" under the standards pertinent to transfers that seek to avoid liability.

83. The transfer of the IOS coupon processing business to ProLogic and/or Marlin Equity took place during the pendency of and while the parties had full knowledge of this civil action and the RICO and other claims against IOS asserted herein.

84. Following the transfer of the IOS coupon processing business, IOS is insolvent or virtually insolvent. Moreover, IOS received no cash consideration for the business and its

remaining assets and data processing business will be unable to satisfy a judgment in the magnitude of the claims asserted in this action.

85. Defendants who were aware of and involved in the transaction, including at least Defendants IOS, ProLogic, Marlin Equity, Bruce Furr, and Chris Balsiger, were aware of and intended to shield the coupon processing business and its assets and value from Plaintiffs' claims.

86. The transaction at issue was not conducted in the ordinary course or usual mode of business.

87. IOS retained certain benefits over the transferred property, in the form of warrants.

88. As confirmed by Balsiger, IOS did not receive any cash consideration for the transfer of assets. IOS did not receive a reasonably equivalent value in exchange for the transfer of its coupon processing business.

**COUNT I: FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962 (c) (ALL DEFENDANTS)**

89. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 88 above as if fully set forth herein.

90. At all times relevant to this Complaint, Defendants each constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

91. At all times relevant to this Complaint, Defendants, together with coupon brokers responsible for procuring illegitimate coupons and/or soliciting small retailers to become IOS clients for purposes of submitting illegitimate coupons, and other persons responsible for obtaining and mass cutting coupons to be used in the scheme, and others not named as defendants herein, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

92. Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including the aforementioned acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, and additional acts of mail and wire fraud that have yet to be identified and determined.

93. Plaintiffs have been injured in their business or property in an amount in excess of $150,000,000 by reason of Defendants' violation of 18 U.S.C. § 1962(c). Defendants Marlin Equity and ProLogic are liable as successors in the same amount and to the same extent as IOS.

**COUNT II: FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(d) (ALL DEFENDANTS)**

94. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 93 above.

95. Defendants, each being a person associated with the enterprise alleged in this Complaint, unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. § 1962 (c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

96. Part of the conspiracy was that Defendants each committed and agreed to commit two or more fraudulent and illegal racketeering acts, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as described above, and conducted and agreed to conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

97. In furtherance of the conspiracy and to effect the objects thereof, Defendants each committed and caused to be committed a series of overt acts, as described above.

98. Plaintiffs have been injured in their business or property in an amount in excess of $150,000,000 by reason of Defendants' violation of 18 U.S.C. § 1962(d). Defendants Marlin Equity and ProLogic are liable as successors in the same amount and to the same extent as IOS.

**COUNT III: COMMON LAW FRAUD**
**(DEFENDANTS IOS AND BALSIGER)**

99. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 98 above.

100. Defendants IOS and Balsiger knowingly misrepresented material facts with the intention of causing actual and justifiable reliance and did cause such reliance by Plaintiffs, to their detriment.

101. Defendants IOS and Balsiger also failed to disclose material facts associated with their submission of coupons for reimbursement and invoices for amounts owed by Plaintiffs in connection with coupon submissions as such facts were known, should have been known, or became known to IOS and Balsiger, to the detriment of Plaintiffs.

102. As a result of their reliance on Defendants' fraudulent acts and omissions, Plaintiffs have been injured in an amount in excess of $150,000,000.

**COUNT IV: COMMON LAW CONSPIRACY TO DEFRAUD**
**(IOS AND ALL INDIVIDUAL DEFENDANTS)**

103. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 102 above.

104. Defendants conspired to develop a scheme to knowingly misrepresent and/or to knowingly omit material facts with the intention of causing actual and justifiable reliance and did cause such reliance by Plaintiffs.

105. As a result of Defendants' fraudulent conspiracy, Plaintiffs have been injured in an amount in excess of $150,000,000.

**COUNT V: COMMON LAW UNJUST ENRICHMENT**
**(IOS AND ALL INDIVIDUAL DEFENDANTS)**

106. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 105 above.

107. Defendants knowingly submitted coupons to Plaintiffs that had not been redeemed by any consumer in connection with any retail purchase and/or had not been submitted to IOS by the specified retailer.

108. As a consequence, Plaintiffs made payments to which Defendants were not legitimately entitled. Defendants have been unjustly enriched in the amount of such payments.

109. Plaintiffs are entitled to restitution for this unjust enrichment in an amount in excess of $150,000,000.

**COUNT VI: FRAUDULENT TRANSFER**
**(DEFENDANTS IOS, PROLOGIC,**
**AND MARLIN EQUITY)**

110. Plaintiffs repeat and reallege the allegations in Paragraphs 1 - 109 above.

111. Under the Uniform Fraudulent Transfer Act (*see*, *e.g.*, Ind. Stat. § 32-18-2-1 *et. seq.*), Plaintiffs are creditors of and have claims against IOS, and IOS is a debtor with respect to Plaintiffs.

112. IOS transferred property, including its coupon processing business, to Marlin Equity and ProLogic. The transfer was made with an actual intent to hinder, delay or defraud creditors of IOS, including Plaintiffs, and without receiving a reasonably equivalent value. IOS was insolvent at time of the transfer or became insolvent as a consequence of the transfer.

113. Marlin Equity and ProLogic did not take the property in good faith or for a reasonably equivalent value; both Marlin Equity and ProLogic were aware of Plaintiffs' claims against IOS and the effect that the transfer would have on Plaintiffs' ability to enforce a judgment based on those claims.

114. Plaintiffs have been damaged in their business or property as a consequence of the transfer of IOS's coupon processing business. Plaintiffs are entitled to a judgment against ProLogic and Marlin Equity, in the same amount as the judgment against IOS, and no less than the value of the business transferred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

1. Awarding Plaintiffs their full monetary damages in excess of $150,000,000, to be proven at trial;

2. Awarding Plaintiffs treble their monetary damages, pursuant to 18 U.S.C. § 1964(c);

3. Awarding Plaintiffs pre- and post-judgment interest on their damages;

4. Awarding Plaintiffs the costs of this action and reasonable attorneys' fees;

5. Awarding Plaintiffs the amount by which Defendants have been unjustly enriched;

6. Awarding Plaintiffs punitive damages in an amount to be determined; and

7. Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated this 6th day of June 2008.

Beth J. Kushner, SBN 1008591
*Attorneys for Plaintiffs*
Von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
Phone: (414) 287-1373
Fax: (414) 276-6281
E-mail: bkushner@vonbriesen.com

<u>OF COUNSEL</u>:

Thomas W. Queen
Michael L. Sturm
Benjamin B. Reed
Kirstin E. Michener
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7000
Fax: (202) 719-7049

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BEIERSDORF, INC.,
BRISTOL-MYERS SQUIBB COMPANY,
COMMONWEALTH BRANDS, INC.,
ENERGIZER BATTERY, INC.,
ENERGIZER HOLDINGS, INC.,
GENERAL MILLS, INC.,
GEORGIA-PACIFIC CONSUMER PRODUCTS LP,
DIXIE CONSUMER PRODUCTS LLC,
HORMEL FOODS CORPORATION,
THE J.M. SMUCKER COMPANY,
JOHNSON & JOHNSON,
KELLOGG COMPANY,
KIMBERLY-CLARK GLOBAL SALES, INC.,
KRAFT FOODS GLOBAL, INC.,
LAND O'LAKES, INC.,
LORILLARD TOBACCO COMPANY,
McCORMICK & COMPANY, INCORPORATED,
NESTLE USA, INC.,
NESTLE PURINA PETCARE COMPANY,
PEPSICO, INC.,
THE PROCTER & GAMBLE DISTRIBUTING LLC,
S.C. JOHNSON & SON, INC. and
CONOPCO, INC. dba UNILEVER,

**Case No. 07-C-888**

Plaintiffs,

v.

INTERNATIONAL OUTSOURCING SERVICES, LLC,
THOMAS C. BALSIGER,
BRUCE A. FURR,
STEVEN A. FURR,
LANCE A. FURR,
WILLIAM L. BABLER,
OVIDIO H. ENRIQUEZ,
DAVID J. HOWARD,
JAMES C. CURREY and
HOWARD R. McKAY,

Defendants.

---

**DEFENDANTS STEVEN A. FURR, BRUCE A. FURR, LANCE A. FURR AND WILLIAM L. BABLER'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR STAY OF PROCEEDINGS PENDING RESOLUTION OF PARALLEL CRIMINAL PROCEEDING**

---

## INTRODUCTION

Defendants Steven A. Furr, Bruce A. Furr, Lance A. Furr and William L. Babler (collectively the "Furr/Babler defendants") have moved the Court to stay these proceedings pending the completion of the criminal proceedings against them pending in this District.[1] As set forth below, the interests of justice support the Court's exercise of its discretion to stay these proceedings.

## FACTS

On March 6, 2007, the Grand Jury in the United States District Court for the Eastern District of Wisconsin, in Case No. 07-CR-57, issued an indictment charging the defendants in this action (including the Furr/Babler defendants) with various crimes based on an alleged "coupon fraud" scheme. A true and correct copy of the indictment is attached hereto as Exhibit A and submitted in support of this motion ("Indictment"). The Indictment charges the defendants (including the Furr/Babler defendants) with multiple counts of wire fraud in connection with the alleged coupon fraud scheme and seeks restitution and forfeiture of any proceeds received by defendants as a result of the alleged scheme. A Superseding Indictment was issued by the Grand Jury on December 5, 2007, adding additional charges against some of the defendants. Obviously, the criminal proceeding against the Furr/Babler defendants is pending.

On October 4, 2007, plaintiffs filed this action against ten defendants including the Furr/Babler defendants ("Complaint"). According to the Complaint, the plaintiffs are twenty-three manufacturers of consumer products. (*See* Compl. at ¶¶ 2-22). In the Complaint, plaintiffs allege that defendants engaged in "coupon fraud" through an alleged scheme whereby the manufacturer

---

[1]Immediately prior to the filing of this motion, the Furr/Babler defendants have also moved to dismiss the action on various grounds, including a lack of personal jurisdiction. In making this motion, the Furr/Babler defendants in no way waive their objection to the Court's personal jurisdiction over them or the proprietary of venue in this forum.

plaintiffs allegedly paid International Outsourcing Services, LLC ("IOS") for "cents off" coupons that were not properly redeemed. Plaintiffs allege four claims against the defendants in this action: (1) violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) violation of 18 U.S.C. § 1962(d) of RICO; (3) conspiracy to defraud; and (4) unjust enrichment.

A comparison of the Complaint and the Indictment demonstrates that they both arise from the same alleged conduct:

(a) The Complaint alleges that "on March 6, 2007, a federal grand jury in this District indicted defendants on multiple counts of wire fraud ***in connection with the scheme at issue here***" (emphasis added) (Complaint at ¶ 66);

(b) The Complaint alleges that "[a]ccording to a criminal indictment by the United States concerning ***this same scheme***," defendants "wrongfully obtained . . . over $250 million from manufacturers nationwide," and that "[a]ssuming a normal distribution of brands and products among the fraudulent submissions, the vast majority of this $250 million was wrongfully obtained from plaintiffs" (emphasis added) (Complaint at ¶ 48);

(c) The Complaint alleges that the grand jury has indicted the defendants and charged that the defendants stole more than $250 million pursuant to the alleged coupon scheme (Complaint at ¶ 1);

(d) The same allegedly fraudulent invoices provided to the plaintiffs at issue in the Complaint are also at issue in the criminal proceeding (compare table of invoices set forth in Complaint ¶ 60(A) with table of invoices set forth in Indictment ¶ 35; compare table of invoices set forth in Complaint ¶ 60(B) with table of invoices set forth in Indictment ¶ 38; compare table of invoices set forth in Complaint ¶ 60(C) with table of invoices set forth in Indictment ¶ 44);

(e) Several of the plaintiffs are specifically mentioned in both the Complaint and the Indictment with respect to the alleged coupon scheme (Good Humors-Breyers in both Complaint ¶ 60(A) and Indictment ¶¶ 34-35; Kimberly-Clark in both Complaint ¶ 60(B) and Indictment ¶¶ 37-38; S.C. Johnson in both Complaint ¶ 60(C) and Indictment ¶¶ 43-44);

(f) Numerous other factual allegations in the Complaint are virtually identical to the allegations in the Indictment (compare Complaint ¶ 43 with Indictment ¶ 17).

(g) In the civil cover sheet filed with the Complaint, plaintiffs describe the pending criminal proceeding as a "related case".

The Furr/Babler defendants intend to vigorously defend themselves in the criminal proceedings and, if forced to answer or respond to discovery, will invoke their Fifth Amendment privilege against self-incrimination in this proceeding.

## ARGUMENT

### I. THE COURT SHOULD EXERCISE ITS DISCRETION TO STAY THESE PROCEEDINGS UNTIL COMPLETION OF THE CRIMINAL PROCEEDINGS.

It is well established that the Court has the inherent power to exercise its discretion and stay civil proceedings when there are parallel criminal proceedings and the "interest of justice seems to require such action". *See e.g., Landis v. North American Co.,* 299 U.S. 248, 254, 57 S. Ct. 163, 165 (1936); *Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368, 1375-76 (C.A.D.C. 1980) *cert denied*, 449 U.S. 993 (1980) (quoting *U.S. v. Kordel*, 397 U.S. 1, 12, 90 S. Ct. 763 (1970)) (citations omitted). This Court has previously exercised its discretion to stay civil proceedings during the pendency of related criminal proceedings under similar circumstances. *See Bruner Corp. v. Balogh*, 819 F. Supp. 811 (E.D. Wis. 1993).

As this Court noted in *Bruner*, the strongest case for deferring civil proceedings until after completion of criminal proceedings exists when a party under indictment for a serious offense is required to defend the civil or administrative action involving the same matter. *Bruner*, 819 F. Supp. at 813, 815 (individual defendant's argument in support of stay is even stronger since a criminal complaint has already been filed); *see also Dresser*, 628 F.2d at 1375-76. This is the situation facing the Furr/Babler defendants.

In *Bruner*, the court recognized that it was appropriate to stay parallel civil proceedings when "special circumstances" exist and issuance of the stay would avoid substantial and irreparable prejudice. *Bruner*, 819 F. Supp. at 815. In determining whether "special circumstances" exist to justify a stay, this Court considered whether the request for a stay was timely, and whether the exercise of the privilege was legitimate. *Id.* at 815-16.

Clearly, the Furr/Babler defendants' assertion of Fifth Amendment privilege in this case is not hypothetical or unsubstantiated. The validity of their assertion of their Fifth Amendment privilege in this civil suit is apparent, as the pending criminal proceeding is based upon the same alleged coupon scheme that is described in the Complaint. *See Bruner*, 819 F. Supp. at 814 n.3. Further, the moving defendants' request to stay this civil suit is timely as it has been brought immediately in the civil case and clearly has not been waived. *See Bruner*, 819 F. Supp. at 815; *cf. U.S. v. Certain Real Property, Commonly Known as 6250 Ledge Road*, 943 F.2d 721, 729 (7th Cir. 1991) (defendant waived right to stay in civil suit by going to trial on stipulated facts without objection on Fifth Amendment grounds). Allowing this proceeding to go forward while the criminal case is pending would force the Furr/Babler defendants to choose between preserving their Fifth Amendment rights and defending this action. Forcing such a choice on the Furr/Babler defendants would not be in the interests of justice.

As plaintiffs' civil suit is based upon the same alleged "coupon scheme" and many of the same issues and allegations as the Indictment[2], to permit this civil suit to proceed against the Furr/Babler defendants would create a significant risk of endangering and prejudicing their Fifth

[2]The similarity of the issues underlying the civil and criminal actions is considered the "most important threshold issue" in determining whether to grant a stay. *Maloney v. Gordon*, 328 F. Supp. 2d 508, 511 (D. Del. 2004) (citations omitted).

Amendment privilege rights. *See Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087-88 (5th Cir. 1979); *Dresser*, 628 F.2d at 1375. Numerous courts throughout the country and in this Circuit have reached the same conclusion and stayed civil proceedings, including when the civil proceeding is in essence a "tag-along" civil RICO suit such as the one brought by plaintiffs here. *See e.g., United States v. All Meat and Poultry Products*, 2003 U.S. Dist. Lexis 17677 (N.D. Ill. 2003); *Cruz v. County of DuPage*, 1997 U.S. Dist. Lexis 9220 (N.D. Ill. 1997); *Fidelity Funding of California v. Reinhold*, 190 F.R.D. 45, 46 (E.D.N.Y. 1997) (staying parallel civil RICO case); *Trustees of Plumbers and Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134 (S.D.N.Y. 1995) (staying parallel civil RICO case); *Bruner*, 819 F. Supp. at 812 (staying parallel RICO case); *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36 (S.D.N.Y. 1993) (staying parallel civil RICO case); *Federal Ins. Co. v. Tabb*, 1991 U.S. Dist. Lexis 7935 (N.D. Ill. 1991) (staying parallel civil RICO case); *Midas Int'l Corp. v. C.V.&.G. Transportation Services*, 1987 U.S. Dist. Lexis 9764 (N.D. Ill 1987).

The Fifth Amendment privilege in civil litigation applies not only at trial, but also to the pleading and discovery stages. *National Acceptance Co. of America v. Bathalter*, 705 F.2d 924, 927 (7th Cir. 1983) (*citing United States v. Kordel*, 397 U.S. 1 (1970)); *In re Sterling-Harris Ford, Inc.*, 315 F.2d 277, 279 (7th Cir. 1963), *cert denied*, 375 U.S. 814 (1963). The Fifth Amendment privilege protects an individual against involuntarily becoming a witness against himself and from being required to answer specific allegations in a civil complaint when the answers might incriminate him in the criminal proceeding. Requiring defendants to provide a paragraph by paragraph answer to the Complaint filed in this case as otherwise required by the Federal Rules, may compel defendants to make judicial admissions or denials that could be used against them in the pending criminal

proceeding. *See National Acceptance Co.*, 705 F.2d at 927 n.5. Here, the allegations in the civil Complaint filed by plaintiffs are so similar to the criminal Indictment that an affirmative answer to almost any of the allegations could provide either direct evidence or a link in the chain of evidence needed to prosecute, which could be severely prejudicial to defendants. *See National Acceptance Co.*, 705 F.2d at 927 n.5.

Here, the criminal case is pending and is based on the same factual scenario as the Complaint. Accordingly, special circumstances exist in this case and there is a need to avoid substantial and irreparable prejudice to defendants by issuing a stay of this civil suit. *See Securities and Exchange Commission v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 668 (5th Cir. 1981); *Wehling*, 608 F.2d at 1087-88 (granting stay of proceeding prior to the issuance of indictment); *Bruner*, 819 F. Supp. at 815 (*citing First Financial* and *Wehling* with approval).

## CONCLUSION

The Furr/Babler defendants ask that the Court enter an order staying this civil suit against them, including all discovery until the parallel criminal proceedings are completed, without prejudice to their right to ultimately seek dismissal based on various grounds including, but not limited to, lack of personal jurisdiction and improper venue.

Dated: December 13, 2007

**s/K. Scott Wagner**
K. Scott Wagner, SBN 1004668
Attorney for Defendants Steven A. Furr, Bruce A. Furr, Lance A. Furr and William L. Babler
HALE & WAGNER, S.C.
205 East Wisconsin Avenue, Suite 300
Milwaukee, WI 53202
**Telephone:** (414) 278-7000
**Facsimile:** (414) 278-7590
**Email:** ksw@halewagner.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

BEIERSDORF, INC., et al.

Plaintiffs,

v. Case No. 07-C-888

INTERNATIONAL OUTSOURCING SERVICES, LLC, et al.,

Defendants.

**STIPULATION CONCERNING STAY WITH RESPECT TO INDIVIDUAL DEFENDANTS**

The undersigned parties, through their counsel, stipulate and agree as follows:

**WHEREAS**, Defendants Thomas C. Balsiger; Bruce A. Furr; Steven A. Furr; Lance A. Furr; William L. Babler; Ovidio H. Enriquez; David J. Howard; James C. Currey; and Howard R. McKay (collectively "Individual Defendants") and others were charged in a March 6, 2007 indictment and a December 5, 2007 superseding indictment issued by a Grand Jury of the United States in Case No. 07-CR-057 in the United States District Court for the Eastern District of Wisconsin (the "Criminal Action"), and the Individual Defendants have pled not guilty in the Criminal Action;

**WHEREAS**, Plaintiffs Beiersdorf, Inc.; Bristol-Myers Squibb Company; Commonwealth Brands, Inc.; Energizer Battery, Inc.; Energizer Holdings, Inc.; General Mills, Inc.; Georgia-Pacific Consumer Products LP; Dixie Consumer Products LLC; Hormel Foods Corporation; The J.M. Smucker Company; Johnson & Johnson; Kellogg Company; Kimberly-Clark Global Sales, Inc.; Kraft Foods Global, Inc.; Land O'Lakes, Inc.; Lorillard Tobacco Company; McCormick & Company, Incorporated; Nestlé USA, Inc.; Nestlé Purina Petcare Company; PepsiCo, Inc.; The Procter & Gamble Distributing LLC; S.C. Johnson & Son, Inc.;

Conopco, Inc. d/b/a Unilever (collectively "Plaintiffs") filed a complaint on October 4, 2007 against Individual Defendants and others in this case captioned Beiersdorf, Inc., et al. v. International Outsourcing Services, LLC, et al., Civil Action No. 07-C-0888 in the United States District Court for the Eastern District of Wisconsin ("the Civil Action") seeking damages and other relief related to the alleged scheme for which Individual Defendants were indicted in the Criminal Action and prospective plaintiffs Del Monte Foods Company, Gerber Products Company, and H.J. Heinz Company, L.P. ("Prospective Plaintiffs") are prepared to join that action as of the date of this Stipulation;

**WHEREAS**, Individual Defendants have moved to dismiss the Civil Action for lack of personal jurisdiction and improper venue pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3) (the "Jurisdictional Motions") and have submitted affidavits in support of the Motions;

**WHEREAS**, Individual Defendants have moved to stay the Civil Action pending resolution of the Criminal Action on the grounds that proceeding in the Civil Action could threaten the Individual Defendants' respective rights against self-incrimination (the "Stay Motions");

**WHEREAS**, Plaintiffs have requested jurisdictional discovery before responding to the Jurisdictional Motions and the affidavits of the Individual Defendants;

**WHEREAS**, Individual Defendants have objected to jurisdictional discovery prior to a ruling on their Stay Motions;

**WHEREAS**, Plaintiffs and Prospective Plaintiffs are opposed to a stay of the Civil Action while the Jurisdictional Motions are pending unless their rights to proceed after a stay are protected from the impact of the intervening time period on any applicable limitations period or other time-based defense;

**WHEREAS**, Plaintiffs and Prospective Plaintiffs are willing to stay the Civil Action, including any discovery from Individual Defendants concerning and further briefing of the Individual Defendants' Jurisdictional Motions, pending resolution of the Criminal Action and Individual Defendants are willing to preserve Plaintiffs' and Prospective Plaintiffs' ability to proceed with the Civil Action after the Criminal Action is resolved without regard to or any adverse impact from the passage of time during a stay of the Civil Action;

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and value consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties stipulate that:

1. The recitals set forth above are incorporated by reference herein as part of this Stipulation.

2. Subject to, and consistent with the provisions of this Stipulation, this Stipulation covers all claims asserted in the Civil Action and any additional claims not yet asserted that any and all of Plaintiffs and Prospective Plaintiffs may have arising out of or relating to the set of operative facts that are the subject of either the Criminal Action or the Civil Action against the Individual Defendants (the "Claims").

3. The undersigned parties stipulate to a stay of the Civil Action as between Plaintiffs and Individual Defendants, including resolution of the Individual Defendants' Jurisdictional Motions and any and all discovery to and by the Individual Defendants, until after the Criminal Action is finally resolved as to all Individual Defendants by verdict and any sentencing (including any and all appeals), plea agreement, or dismissal (the "Stay").

4. Within thirty (30) days after the final resolution of the Criminal Action as to all Individual Defendants, the parties shall confer concerning a timetable for resumption of the Civil Action and activities in the Civil Action. In the absence of some different agreement, the

undersigned parties acknowledge that the Stay may be lifted by the Court anytime after thirty (30) days after the final resolution of the Criminal Action. In the absence of any different direction by the Court, Plaintiffs will file their responses to Individual Defendants' Jurisdictional Motions (including any requests for jurisdictional discovery) within twenty-one (21) days after the date the Stay is lifted by the Court. Any further briefing on the Jurisdictional Motions shall be pursuant to the Local Rules of the Court. Individual Defendants acknowledge that at some convenient time either before or after the Court rules on the Jurisdictional Motions, an Amended Complaint may be filed that adds the Prospective Plaintiffs as additional plaintiffs; Individual Defendants agree that they will not object to the filing of such Amended Complaint based on its timing. In no event, however, shall Individual Defendants be required to respond or file an answer to the Complaint or Amended Complaint during the period of the Stay.

5. Plaintiffs and Individual Defendants agree that all rights of Plaintiffs to pursue the Claims are reserved and preserved during the Stay and pendency of the Individual Defendants' Jurisdictional Motions and all statutory or common-law time limitations applicable to any Claims by the Plaintiffs shall be tolled as of the date of the filing of the Civil Action (October 4, 2007) through the date that is sixty (60) days after the date the Court enters a final order deciding the Individual Defendants' Jurisdictional Motions or otherwise dismisses the Civil Action or any claims in the Civil Action with respect to the Individual Defendants (the "Restart Date"). Individual Defendants agree that the period from the date the Civil Action was filed through the Restart Date (the "Plaintiffs' Tolling Period") shall be excluded from, and not counted in, computing time under any statute(s) of limitation or repose or any other time-based limitations or defenses, whether at law, in equity, under statute, contract or otherwise, that might be asserted as a bar, limitation or defense to Plaintiffs' Claims in the Civil Action or any other action relating to the Claims.

6. Prospective Plaintiffs and Individual Defendants agree that all rights of Prospective Plaintiffs to pursue the Claims are reserved and preserved during the Stay and pendency of the Individual Defendants' Jurisdictional Motions and all statutory or common-law time limitations applicable to any Claims by the Prospective Plaintiffs shall be tolled as of the date of their joinder as plaintiffs in the Civil Action through the Restart Date. Individual Defendants agree that the period from the date of Prospective Plaintiffs' joinder as plaintiffs in the Civil Action through the Restart Date (the "Prospective Plaintiffs' Tolling Period") shall be excluded from, and not counted in, computing time under any statute(s) of limitation or repose or any other time-based limitations or defenses, whether at law, in equity, under statute, contract or otherwise, that might be asserted as a bar, limitation or defense to the Prospective Plaintiffs' Claims in the Civil Action or any other action relating to the Claims.

7. Individual Defendants shall not assert, plead, or raise, whether by answer, motion or otherwise, any defense of laches, estoppel, or waiver, or other defense, based on the running of any statute of limitations or the passage of time during the Plaintiffs' Tolling Period or Prospective Plaintiffs' Tolling Period in the Civil Action or any other action relating to the Claims. Individual Defendants do not waive, and expressly preserve, the right to assert, plead or raise a defense of expiration of statutes of limitation, laches, estoppel, waiver or other defense based on the running of a statute of limitations or based on passage of time not including the time during the Plaintiffs' Tolling Period and Prospective Plaintiffs' Tolling Period to the extent such defense(s) were available to Individual Defendants on or before the filing of the Civil Action (as to Plaintiffs) and the joinder of Prospective Plaintiffs as plaintiffs in the Civil Action (as to Prospective Plaintiffs).

8. The undersigned parties stipulate that each party retains the right to seek to move to have the Stay lifted prior to the resolution of the Criminal Action, and all other parties retain

the right to oppose any such motion. Plaintiffs and Prospective Plaintiffs further stipulate that if the Stay is lifted prior to resolution of the Criminal Action as the result of a motion by any Plaintiff or Prospective Plaintiff, that Plaintiff's or Prospective Plaintiff's Tolling Period will be deemed to end sixty (60) days from the date the Stay is lifted as to the moving Plaintiff or Prospective Plaintiff. Individual Defendants stipulate that if the Stay is lifted prior to resolution of the Criminal Action as the result of a motion by any Individual Defendant, the Plaintiffs' Tolling Period and Prospective Plaintiffs' Tolling Period will be deemed to end sixty days (60) days from the date the Court enters an order on the Jurisdictional Motion of that Individual Defendant or otherwise dismisses the Civil Action as to that Individual Defendant.

9. The undersigned parties acknowledge that the Plaintiffs' Tolling Period and Prospective Plaintiffs' Tolling Period may be further extended for such time as the parties agree in a writing signed by such parties.

10. The undersigned parties' entry into this Stipulation shall not be deemed to be, or construed as, an admission of any matter of fact or law in connection with the Civil Action or Criminal Action. This Stipulation shall not constitute, be interpreted as or used as evidence of any admission of liability or guilt by Individual Defendants. This Stipulation shall not constitute a waiver of any defense Individual Defendants may have to the Claims (including challenges to personal jurisdiction and venue) except as expressly set forth herein. All rights of Individual Defendants to challenge jurisdiction and venue in this Court are expressly preserved and are not waived by Individual Defendants' entry into this Stipulation. This Stipulation shall not constitute an admission by Plaintiffs or Prospective Plaintiffs that any statute of limitations or similar consideration, or any other defense Individual Defendants have asserted or might assert, plead or raise, would bar the Plaintiffs' or Prospective Plaintiffs' Claims. This Stipulation shall

not be used in evidence in any action or proceeding for any purpose other than the enforcement of its terms.

11. Nothing herein shall prevent Plaintiffs from opposing the presently-pending motion to dismiss by International Outsourcing Services, LLC ("IOS") in the Civil Action (Docket No. 42), the motion by IOS for leave to amend its motion to dismiss (Docket No. 80) or any further related or similar motion by IOS or from filing an Amended Complaint to address any pleading deficiencies found by the Court pursuant to those motions and/or to add the Prospective Plaintiffs as plaintiffs in the Civil Action.

12. Plaintiffs and Individual Defendants will jointly request that the Court decide the presently-pending motions to dismiss by IOS and any further or similar motion by IOS. Following those decisions, and the filing of any Amended Complaint as contemplated in Paragraph 11, Individual Defendants and Plaintiffs will jointly move to stay the Civil Action with respect to all parties, consistent with the terms of this Stipulation. If the Civil Action proceeds with respect to any defendant following a decision on such motion, then this Stipulation shall then be null and void and shall have no further effect. In that event, Plaintiffs and Individual Defendants shall be free to take any position(s) they wish with respect to the propriety of discovery or other events in the then-ongoing Civil Action, and the Individual Defendants' right to seek a stay of the Civil Action and pursue their Stay Motions shall be fully preserved.

**[INTENTIONALLY LEFT BLANK]**

**SO STIPULATED:**

s/ Beth J. Kushner
Beth J. Kushner, SBN 1008591
*Attorney for Plaintiff and Prospective Plaintiffs*
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
Phone: (414) 287-1373
Fax: (414) 276-6281
E-mail: bkushner@vonbriesen.com

OF COUNSEL:

Thomas W. Queen
Michael L. Sturm
Benjamin B. Reed
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7000
Fax: (202) 719-7049

s/ James (Sib) Abraham, Jr.
James (Sib) Abraham, Jr.
*Attorney for Defendant Thomas C. Balsiger*

s/ K. Scott Wagner
Jacques C. Condon, SBN 1033963
K. Scott Wagner, SBN 1004668
*Attorneys for Defendants Bruce A. Furr, Steven A. Furr, Lance A. Furr and William L. Babler*

s/ James O. Darnell
James O. Darnell
*Attorney for Defendant James C. Currey*

s/ Robert L. Elliott
Robert L. Elliott, SBN 1013862
*Attorney for Defendants Ovidio H. Enriquez, David J. Howard and Howard R. McKay*

February 8, 2008

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**BEIERSDORF, Inc., et al.,**

Plaintiffs,

**Case No. 07-C-888**

**-vs-**

**INTERNATIONAL OUTSOURCING SERVICES, LLC, THOMAS BALSIGER, BRUCE A. FURR, STEVEN A. FURR, LANCE A. FURR, WILLIAM L. BABBLER, OVIDIO H. ENRIQUEZ, DAVID J. HOWARD, JAMES C. CURREY, HOWARD R. McKAY,**

Defendants.

---

## DECISION AND ORDER

---

International Outsourcing Services, LLC ("IOS") is a company that acts as a clearinghouse in the coupon redemption process. IOS receives coupons from retailer clients, processes the coupons, then forwards them to the pertinent manufacturer (or redemption agent) for reimbursement. In March 2007, a Grand Jury Indictment charged IOS and a variety of individuals (including the above-captioned "Individual Defendants") with engaging in a fraudulent scheme concerning the reimbursement of manufacturers' "cents off" coupons.

Plaintiffs in this civil action are manufacturer victims of the fraudulent scheme. Plaintiffs allege claims under the Federal Racketeer Influenced and Corrupt Organizations

Act ("RICO"), in addition to state law claims for common law fraud, conspiracy to defraud, and unjust enrichment.

After the indictment was issued, IOS was subsequently dismissed from the ongoing criminal case, Case No. 07-CR-057 (E.D. Wis.). Individual Defendants (among others) are still facing charges, and the above-captioned civil matter is currently stayed with respect to Individual Defendants in light of the criminal proceedings.

IOS moves to dismiss for failure to state a claim, for lack of jurisdiction, and for compulsory joinder of certain necessary parties. For the reasons that follow, all of these motions are denied.[1]

Finally, Plaintiffs move for discovery sanctions against IOS. This motion is granted.

## ANALYSIS

### I. Personal Jurisdiction

The RICO statute contains a provision allowing for nationwide service of process. *See* 18 U.S.C. § 1965(a-d). By authorizing nationwide service of process, RICO enables plaintiffs to bring before a single court all members of a nationwide RICO conspiracy. *See Andrade v. Chojnacki*, 934 F. Supp. 817, 831 (S.D. Tex. 1996). In this context, minimum contacts with the forum state are not required so long as the defendant has minimum contacts with the United States. *See, e.g., Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 71 (D.D.C. 1992); *Andrade*, 934 F. Supp. at 831.

---

[1] IOS moves to amend its' motion to dismiss. Plaintiffs oppose this motion, but its opposition devolves into an argument concerning the merits of IOS's motion to dismiss. As the motion to amend merely supplements IOS's arguments, and Plaintiffs were allowed fair opportunity to respond to all of these arguments, IOS's motion to amend is granted.

The Seventh Circuit has held, in rather conclusory fashion, that § 1965 "contains an explicit grant of nationwide service . . . and the Due Process Clause does not upset Congress's decision." *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 672 (7th Cir. 1987). However, the precise scope of § 1965's jurisdictional grant is unclear, and there is a divergence of opinion among the circuits on this issue. *Compare PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70-72 (2d Cir. 1998), *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 918 (5th Cir. 1987) and *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986) (§ 1965 does not authorize nationwide service of process) with *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997) and *Republic of Panama v. BCCI Holdings*, 119 F.3d 935, 942 (11th Cir. 1997) (§ 1965 authorizes nationwide service of process).

As noted by the Second Circuit, § 1965(a) grants personal jurisdiction based on "minimum contacts" for at least one defendant, and § 1965(b) provides nationwide service and jurisdiction for "other parties" not residing in the district where the "ends of justice" require. *PT United Can Co.*, 138 F.3d at 71. If this is the correct approach – and the Seventh Circuit actually suggests that it is (*see Lisak*, 834 F.2d at 672) – the Court is not in a position to make such a ruling in the context of IOS's motion to dismiss. In a multi-defendant RICO case, a proper evaluation under § 1965 requires an examination of the contacts and circumstances relating to all of the defendants. As the parties are well aware, Individual Defendants lodged their own objections to jurisdiction, and the consideration of those motions is stayed in light of the ongoing criminal proceedings.

Putting § 1965 aside for the time being, the Court can still evaluate whether the exercise of personal jurisdiction against IOS meets the relevant due process requirements. Jurisdiction is proper if one or more elements of Wisconsin's long-arm statute is satisfied and if the exercise of jurisdiction comports with due process. *See PKWare, Inc. v. Meade*, 79 F. Supp. 2d 1007, 1011-12 (E.D. Wis. 2000). Wisconsin's long-arm statute (Wis. Stat. § 801.05) is "intended to reach to the fullest extent allowed under the due process clause." *Harley-Davidson Motor Co. v. Motor Sport, Inc.*, 960 F. Supp. 1386, 1389 (E.D. Wis. 1997).

Under Wisconsin's long-arm statute, jurisdiction is proper over any defendant who is "engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise." Wis. Stat. § 801.05(1)(d). A defendant has "substantial and not isolated" contacts with the state if the defendant "'solicit[s], create[s], nurture[s], or maintain[s], whether through personal contacts or long-distance communications, a continuing relationship with anyone in this state.'" *Dreuschel v. Cloeren*, 2006 WI App 190, ¶ 7, 295 Wis. 2d 858, 865, 723 N.W.2d 430 (2006) (quoting *Stauffacher v. Bennett*, 969 F.2d 455, 457 (7th Cir. 1992)). Even if a non-resident defendant "never sets foot in Wisconsin, the existence of a continuing business relationship with someone in Wisconsin is enough to warrant an inference that the defendant benefits from services provided in Wisconsin 'and could therefore be required, as a *quid pro quo*, to submit to the jurisdiction of the state's courts.'" *Johnson Woodward Assocs., Inc. v. Brunton Co.*, 12 F. Supp. 2d 901, 907 (E.D. Wis. 1998) (quoting *Stauffacher*, 969 F. 2d at 457-58).

IOS is an Indiana LLC with principal offices in El Paso, Texas and Bloomington, Indiana. In its normal course of business, IOS receives cents-off coupons from retail stores where the coupons have been (or should have been) redeemed by consumers. IOS processes coupons for numerous retail stores located in Wisconsin, including Fresh Brands and CVS. These relationships involved the constant exchange of money and coupons over an extended period of time. IOS also directly marketed its services to Wisconsin retailers. Those marketing efforts included personal visits to Wisconsin by IOS representatives.

After receiving coupons from retailers, IOS then sorts the coupons by manufacturer, counts the coupons for each manufacturer, identifies the value, and submits the coupons to the manufacturer or its agent for reimbursement. IOS received reimbursement from numerous Wisconsin-based manufacturers, including Plaintiff S.C. Johnson & Son, Inc. ("S.C. Johnson") (Racine) , Plaintiff Kimberly-Clark Global Sales, LLC ("Kimberly-Clark") (Neenah), and Unilever Ice Cream (Green Bay). Such reimbursement involved the exchange millions of coupons and millions of dollars.[2]

By virtue of its dealings with Wisconsin retailers and manufacturers, IOS engaged in substantial, not isolated activities in the State of Wisconsin. Therefore, the requirements of Wisconsin's long-arm statute are met, as are the requirements of due process. *See, e.g., Dorf v. Ron March Co.*, 99 F. Supp. 2d 994, 998 (E.D. Wis. 2000) ("Wisconsin courts presume

---

[2] By way of example, from 2002 through 2006, IOS submitted more than 150,000,000 coupons to S.C. Johnson and was paid more than $175,000,000. (D. 96, Kraemer Aff., ¶¶ 3-4).

that compliance with the Wisconsin long-arm statute satisfies the requirement of due process as well").[3] The Court may exercise personal jurisdiction over IOS.

**II. RICO claims**

IOS moves to dismiss Plaintiffs' RICO claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Fed. R. Civ. P. 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This "short and plain statement" must be enough to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S. Ct. at 1964-65. Factual allegations must "be enough to raise a right to relief above the speculative level." *Id.* at 1965.

Plaintiffs allege two claims under RICO: an "enterprise" claim, and a conspiracy claim. Both claims survive IOS' motion to dismiss.

[3] In its' amended motion to dismiss, IOS provides coupon redemption policies that it obtained through discovery from certain Plaintiffs (including J.R. Smuckers, Kellogg's, and Land O'Lakes). These policies contain forum selection clauses directing venue in different jurisdictions. IOS argues that these policies somehow defeat this Court's jurisdiction. This cannot be so, as the policies are all directed towards retailers, i.e., sellers of the manufacturers' products. *See, e.g.,* D. 82, Ex. L (Land O'Lakes Coupon Redemption Policy) ("Redemption of Land O'Lakes coupons indicates acceptance and compliance with this Policy *on the part of the retailer*") (emphasis added). IOS is not a retailer, it is a clearinghouse that collects the coupons and processes them for redemption on behalf of retailers. Therefore, IOS was not a party to any of these coupon redemption policies, so any forum selection clause contained therein cannot defeat the exercise of personal jurisdiction over IOS.

**A. 18 U.S.C. § 1962(c) (Count I) (RICO Enterprise)**

18 U.S.C. § 1962(c) makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a civil action under § 1962(c), Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Slaney v. Int'l Amateur Athl. Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). IOS's motion focuses on Plaintiffs' "enterprise" allegations, as discussed in the two sections that follow.

**1. Association-in-fact**

Under RICO, an "association in fact" enterprise is a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). While a RICO enterprise can be formal or informal, some type of organizational structure is required. *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). A RICO enterprise must have an "ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990). A RICO enterprise is "more than a group of people who get together to commit a 'pattern of racketeering activity,'" *Richmond*, 52 F.3d at 645, so there must be "an organization with a structure and goals separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991).

Plaintiffs allege that IOS, Individual Defendants (to wit, Thomas Balsiger, Bruce Furr, Steven Furr, Lance Furr, William Babler, Ovidio Enriquez, David Howard, James Currey,

and Howard McKay), a number of coupon brokers, and various unnamed third parties were all part of the RICO enterprise. All of the Individual Defendants, except for Currey, are employees or officers of IOS in some capacity.

Plaintiffs allege that the enterprise was organized to obtain and process coupons legitimately redeemed at retail establishments, as well as to procure other coupons that had not been legitimately redeemed, then to submit the coupons together for reimbursement. "Although the Defendants' scheme was multi-faceted, at its most fundamental level it involved simply augmenting the substantial volumes of properly-redeemed coupons that IOS received with other coupons that IOS acquired, and then fraudulently submitting the entire batch as if all of the coupons had been redeemed legitimately..." (Am. Compl., ¶ 43). The alleged enterprise conducted its affairs from 1997 through 2006.

The Plaintiffs provide detailed allegations regarding the structure and goals of the enterprise. For example, defendant Balsiger "set periodic goals for the volume of illegitimate coupons to be included by IOS in shipments from large retailers and directed others . . . to ensure those goals were met." (Am. Compl., ¶ 49). Defendant Currey, through his firm Curry, Adkins and at the direction of Balsiger, developed computer programs to manage the accounting of and to conceal the enterprise's racketeering activities, including programs "to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS." (Am. Compl., ¶ 67).

The Amended Complaint alleges that IOS and its officers solicited coupon brokers (including Abdel Rahim Jebara and Riya Coupon Services, LLC) to acquire coupons. In

turn, the coupon brokers "submitted mass cut and other illegitimate coupons to IOS as coupons supposedly redeemed at . . . small retail establishments." (Am. Compl., ¶ 48). Finally, defendants Bruce Furr, Steve Furr, and Balsiger concealed the activities of the enterprise by reassuring IOS's retail clients that there was no wrongdoing and threatening others who might disclose the enterprise's activities. (Am. Compl., ¶¶ 63-66).

These allegations easily state an "enterprise" claim under RICO. Plaintiffs' allegations demonstrate that this association-in-fact had a structured hierarchy. The enterprise set goals and established a system to ensure that those goals were met. Stated another way, even if the predicate acts of racketeering activity (wire fraud and mail fraud) were "removed from the equation," it is apparent that the enterprise "would still exist." *Starfish Investment Corp. v. Hansen*, 370 F. Supp. 2d 759, 770 (N.D. Ill. 2005). In that respect, the alleged enterprise is clearly "something more than a group of people who allegedly got together to engage in RICO activities." *Id.*

**2. Separateness**

Liability under § 1962(c) depends upon a showing that two distinct entities exist: (1) a "person;" and (2) an "enterprise" that is not simply the same "person" referred to by a different name. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Stated another way, Plaintiffs must show that a person, here the defendant (IOS),[4] "conducted or participated in the conduct of the '*enterprise's* affairs' not just [its] *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). "The

[4] A person need not be a natural person, so IOS is a person within the meaning of RICO. *See* 18 U.S.C. § 1961(3).

requirement that a RICO defendant have engaged in the enterprise's affairs rather than just its own is simply another reference to the fact that a RICO defendant must be distinct from the alleged enterprise." *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 906 (N.D. Ill. 2004).

IOS argues that the alleged enterprise is one and the same with itself, and therefore the enterprise is not distinct from IOS as a RICO "person." According to IOS, the allegations of the complaint merely describe the day-to-day functions of IOS acting through its employees (including the Individual Defendants), its agents, and other third parties. IOS claims that the "nub of the complaint is that [the corporate defendant] operates *itself* unlawfully," and the complaint does not allege that IOS "has infiltrated, taken over, manipulated, disrupted, or suborned a distinct entity or even a distinct association in fact." *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (emphasis in original).

As discussed above, the alleged enterprise extends beyond IOS and its employees or officers to encompass third-party coupon brokers and an outside consultant (Currey). IOS still insists that this is not enough based upon *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997). In *Fitzgerald*, the alleged enterprise involved Chrysler Corporation and its car dealerships. As alleged in *Fitzgerald*, Chrysler sold extended warranties to its customers through its dealerships, but secretly determined not to provide warranty protection, so that when a consumer would bring its car to the dealership for repairs, Chrysler refused to provide reimbursement. *Fitzgerald* held that this arrangement did not constitute an enterprise under RICO:

> where a large, reputable manufacturer deals with its dealers and other agents in the *ordinary way*, so that their role in the manufacturer's illegal acts is *entirely incidental*, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute an enterprise within the meaning of the [RICO] statute.

116 F.3d at 228 (emphases added).

In the instant case, taking the allegations at face value, IOS did not deal with the third-party coupon brokers in the "ordinary way." IOS (and the Individual Defendants) specifically asked for non-redeemed coupons from the coupon brokers so it could fraudulently submit them for reimbursement. Nor did it deal with Currey, and his third-party consulting firm, in the ordinary way, by asking for a computer program to help conceal fraudulent activities. And these dealings were not incidental. The roles of Currey and the coupon brokers, respectively, were essential to the structure and operation of the alleged enterprise. This is in sharp contrast to the dealers in Chrysler, who were kept in the dark about Chrysler's fraudulent intentions.

*Fitzgerald* recognized the possibility that a "manufacturer could use its dealers or other agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in which event it might be possible to characterize the assemblage as a RICO enterprise." 116 F.3d at 228. When, as here, a RICO person "and the other alleged participants in the enterprise are legally distinct entities and each played a distinct role within the purported scheme," an enterprise consisting of a corporation and its agents can exist. *See*

*Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1103, 1109 (N.D. Ill. 2001) (citing *Fitzgerald*).

Finally, IOS also argues that the complaint fails to allege that it conducted or participated in the affairs of the enterprise, as opposed to its own affairs. *See Reves*, 507 U.S. at 185. This is merely a variation of the foregoing "separateness" argument. The complaint alleges that IOS was involved in the unlawful conduct of the enterprise, which was separate from the normal, day-to-day functioning of IOS's legitimate coupon processing business.

**B. 18 U.S.C. § 1962(d) (Count II) (Conspiracy)**

To state a RICO conspiracy claim under 18 U.S.C. § 1962(d), Plaintiffs must allege that (1) each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999). "Section 1962(d)'s target, like that of all provisions prohibiting conspiracies, is the agreement to violate RICO's substantive provisions, not the actual violations themselves." *Schiffels v. Kemper Fin. Servs.*, 978 F.2d 344, 348 (7th Cir. 1992).

IOS's agreement to form an enterprise and to the commission of predicate acts (i.e., wire and mail fraud) in furtherance of the enterprise can be inferred from the allegations in the amended complaint. This is sufficient to state a conspiracy claim under RICO. *See, e.g., Goren v. New Vision Int'l Inc.*, 156 F.3d 721, 733 (conspiracy claim under RICO must contain supportive factual allegations describing the general composition of the conspiracy,

some or all of its broad objectives, and the defendant's general role in the conspiracy); *see also Vega v. Contract Cleaning Maint., Inc.*, No. 03 C 9130, 2004 WL 2358274 at *16 (N.D. Ill.) ("at a minimum Plaintiffs must allege facts from which one can infer each Defendant's agreement to violate RICO").[5]

**C. Fraud allegations**

Fed. R. Civ. P. 9(b)'s heightened pleading standards are also applicable to allegations of fraud in a civil RICO complaint. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). Rule 9(b) provides that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A RICO plaintiff "must, at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). To meet the requirements of Rule 9(b), the complaint must plead "the 'who, what, when, and where' of the alleged fraud." *Uni*Quality Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

Plaintiffs' fraud allegations meet the heightened pleading standards under Rule 9(b). Plaintiffs allege that the fraudulent communications, in which IOS misrepresented the volume of properly redeemed coupons, took place repeatedly and continuously between 1997 and 2006. By way of example, Plaintiffs' allegations detail five different fraudulent invoices for three different Plaintiffs. (Am. Compl., ¶ 62 A-C). Plaintiffs are not required to plead

[5] For many of the same reasons, Plaintiffs' common law conspiracy claim survives IOS's motion to dismiss. IOS also argues that the intra-corporate conspiracy doctrine bars the common law conspiracy claim, *see Brew City Redevelopment Group, LLC v. Ferchill Group*, 2006 WI 128, ¶¶ 46-50, 297 Wis. 2d 606, 629-31, 724 N.W.2d 879, 891-92, but as discussed above, the alleged conspiracy reaches beyond IOS and its officers.

every single invoice, especially in a case such as this which alleges countless fraudulent transactions over an extended period of time. *See United States ex rel. Tucker v. Nayak*, No. 06-cv-662-JPG, 2008 WL 140948 at *4 (S.D. Ill.) ("[W]hen a complaint alleges numerous instances of fraud over a multi-year period . . . it would be both impractical and inefficient to require detailed allegations of the who, what, when, where and how of every single submission of a false claim"); *Fujisawa Pharmaceutical Co. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993) ("Read together, [Rules 8 and 9(b)] require that the time, place and contents of fraud be plead, but the complainant need not plead evidence. Further, where fraud allegedly occurred over a period of time, the requirements of Rule 9(b) are less stringently applied").

**III. Subject Matter Jurisdiction**

The Court recognizes that Plaintiffs amended their pleadings in a manner that destroyed diversity jurisdiction. (D. 88). Since the amended complaint states a claim under RICO (at least with respect to IOS), the Court has original jurisdiction over those claims pursuant to 28 U.S.C. § 1331. The Court may also exercise supplemental jurisdiction over the state law claims, because they are part of the same case or controversy as the RICO claims. *See* 28 U.S.C. § 1367(a).

**IV. Compulsory Joinder**

IOS seeks compulsory joinder of two other coupon clearinghouses, NCH Promotional Services ("NCH") and Carolina Manufacturer's Service, Inc. ("CMS"). NCH and CMS are coupon redemption agents for manufacturers. In other words, NCH and CMS act as

middlemen between a company like IOS and various manufacturers. Because the vast majority of IOS's coupon processing is conducted through NCH and CMS,[6] IOS argues that they are necessary and indispensable parties.

Under Rule 19(a), a party is considered "necessary" if one of the following conditions is met: (1) in that person's absence, the court cannot accord complete relief among existing parties; (2) the litigation will have a direct and immediate impact on the interests of the absent party; or (3) adjudication without the absent party leaves an existing party subject to a substantial risk of inconsistent obligations or multiple liability. *See* Fed. R. Civ. P. 19(a)(1)(A), (B)(i)-(ii); *Scottsdale Ins. Co. v. Subscriptions Plus, Inc.*, 195 F.R.D. 640, 645-46 (W.D. Wis. 2000). None of these factors are met in the instant case.

First, the presence of NCH and CMS is not necessary to afford complete relief between Plaintiffs and IOS. IOS cites its contractual arrangements with NCH and CMS, but those contractual rights and obligations have no bearing on Plaintiffs' claims against IOS. Obviously, Plaintiffs were not parties to those contracts. *See, e.g., Cleveland-Cliffs Iron Co. v. Chicago & North Western Transp. Co.*, 581 F. Supp. 1144, 1155 (W.D. Mich. 1984) (complete relief refers to relief as between persons already parties, not as between party and absent person whose joinder is sought).

Second, the underlying litigation will not impact the interests of NCH or CMS. Whether IOS is found liable or not will have no bearing on any of the legal interests of NCH or CMS as absent parties. *See, e.g., United States v. Nye County, Nev.*, 951 F. Supp. 1502,

[6] IOS claims that only 7% of its business is conducted directly with manufacturers, the rest is conducted through redemption agents like NCH and CMS.

1513 (D. Nev. 1996) (in order for joinder of absent party to action to be necessary, interest of absent party must be legally protected interest, and not merely financial interest or interest for convenience).

Finally, adjudication in the absence of NCH and/or CMS will not subject IOS to a substantial risk of inconsistent obligations or multiple liability. IOS argues that if it is found liable on Plaintiffs' claims, it logically follows that IOS would be liable under its contracts with NCH and/or CMS (the opposite would also be true). Apparently, joinder would ensure "consistency" with the outcome of the underlying litigation. However, Rule 19 requires joinder to avoid inconsistent *obligations*, not inconsistent results. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum." *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir. 1998). Despite its contractual arrangements with NCH and CMS, IOS is not at risk of inconsistent obligations, as would require joinder under Rule 19.

**V. Discovery Sanctions**

After IOS challenged personal jurisdiction, Plaintiffs noticed IOS for a Rule 30(b)(6) deposition. The notice listed a variety of topics for inquiry. IOS moved for a protective order, claiming that some of the topics represented Plaintiffs' efforts to "jump the gun" on merits discovery. The Court denied IOS's motion, stating as follows: "The Court reviewed the topics for inquiry and finds that all of the topics are arguably relevant to issues relating

to personal jurisdiction. IOS can object or instruct its client not to respond *if a particular inquiry at the deposition crosses into merits discovery*." (D. 83) (Emphasis added).

IOS produced Wenona Freeman as its Rule 30(b)(6) witness. However, as reflected in the deposition transcript, IOS's counsel specifically instructed Ms. Freeman not to prepare answers on some of the noticed topics for inquiry. Ms. Freeman was instructed "not to bother" informing herself on Topic 4. (D. 86-2, Ex. A at 76). She was told "not to look into" Topic 11. (*Id.* at 77). She was also "instructed by her counsel that Topic 7 didn't relate to jurisdictional matters, but related to merits matters, so if she followed the instruction of counsel, she didn't do anything to prepare for Paragraph 7." (*Id.* at 95).

This conduct goes far beyond the Court's instructions when it denied IOS's motion for a protective order. On the contrary, it is a blatant disregard of the Court's specific directive that *all* of the topics were arguably relevant to the issue of personal jurisdiction. Obviously, the Court did not contemplate blanket protection from all questions relating to a specific topic for inquiry. That was the relief requested in IOS's motion for a protective order, and the Court denied that request. IOS's counsel simply continued to disagree with the Court's ruling: "I don't believe Paragraph 7 is arguably relevant, so I instruct my client not to answer questions about Paragraph 7." (*Id.* at 96).

Rule 37(b)(2)(A) provides for sanctions when a party or a party's officer "fails to obey an order to provide or permit discovery." Plaintiffs ask that IOS's objection to personal jurisdiction be stricken. *See* Fed. R. Civ. P. Rule 37(b)(2)(A)(ii),(iii). The Court already concluded that IOS is subject to personal jurisdiction in this Court despite the conduct of

opposing counsel. But Plaintiffs' burden was obviously made more difficult by opposing counsel's failure to comply with the Court's order. Therefore, the Court will impose sanctions pursuant to Fed. R. Civ. P. 37(b)(2)(C). Both the client and the attorney must pay "the reasonable expenses, including attorney's fees, caused by the failure" to comply with the Court's order.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. IOS's motion to amend/correct its motion to dismiss [D. 80] is **GRANTED**;

2. IOS's motion to dismiss [D. 42] is **DENIED**;

3. IOS's motion for compulsory joinder [D. 80] is **DENIED**;

4. Plaintiffs' motion for discovery sanctions [D. 84] is **GRANTED**; and

5. Pursuant to paragraph 12 of the parties' "Stipulation Concerning Stay with Respect to Individual Defendants" (D. 93, 101), the Court presumes that the parties will now move for a stay with regard to this entire case, pending the resolution of the ongoing criminal matter (Case No. 07-CR-057 (E.D. Wis.)). Unless and until the Court hears otherwise, this matter is **STAYED**. The parties should still submit an appropriate stipulation or motion as soon as practicable.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2008.

**SO ORDERED,**

**s/ Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**